**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KEVIN CORNWELL, et al., ) | **Case No. 08 Civ. 3758 (VM)** |
| ) | **ECF Case** |
| Plaintiffs, ) | **CLASS ACTION** |
| ) | |
| -against- ) | AMENDED COMPLAINT FOR |
| ) | VIOLATION OF THE FEDERAL |
| CREDIT SUISSE GROUP, BRADY W. DOUGAN, ) | SECURITIES LAWS |
| RENATO FASSBIND, D. WILSON ERVIN and ) | |
| PAUL CALELLO, ) | |
| ) | |
| Defendants. ) | **JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

**Page**

I.   NATURE OF THE ACTION AND OVERVIEW ....................................................1
II.  JURISDICTION AND VENUE ......................................................................9
III. PARTIES ............................................................................................15
IV.  ALLEGATIONS.....................................................................................18
     A.  Background:  The United States Sub-prime and Residential Housing
         Crisis .........................................................................................18
     B.  Defendants Disregarded Clear Indications of Losses in ABS Fair Value
         and Asset Impairments During the Class Period ...................................31
     C.  While Credit Suisse Denies It's Exposed, Other Sub-prime Market
         Participants Start Recognizing Losses As Sub-Prime Obligations Lose
         Value .........................................................................................40
     D.  Defendants Vouch For The Integrity Of Credit Suisse's Flawed Controls
         And Risk Management ..................................................................48
     E.  Credit Suisse's Former Employees Confirm The Knowing And Long-
         Standing Violations Of Pricing Controls ............................................55
     F.  Credit Suisse's Compensation Structure Created Severe Conflicts of
         Interest and Incentivized Inflated Asset Valuations ..............................79
     G.  Defendants Wrongfully Foisted Sub-Prime And Illiquid Investments On
         Unwitting Clients .........................................................................86
     H.  Credit Suisse's Flawed Fair Value and Risk Reporting..........................97
V.   FALSE AND MISLEADING STATEMENTS AND OMISSIONS ABOUT THE
     COMPANY'S FINANCIAL PERFORMANCE, EXPOSURES AND RISK
     FROM THE SUB-PRIME CRISIS..............................................................102
VI.  THE TRUTH SLOWLY LEAKS INTO THE MARKET...............................145
VII. THE DEFENDANTS' VIOLATIONS OF GAAP........................................167
VIII. PLAINTIFFS' CLASS ACTION ALLEGATIONS.....................................191
IX.  LOSS CAUSATION/ECONOMIC DAMAGES ...........................................192
X.   APPLICABILITY OF PRESUMPTION OF RELIANCE FRAUD-ON-THE-
     MARKET DOCTRINE ...........................................................................193
XI.  NO SAFE HARBOR ..............................................................................194
XII  SCIENTER ..........................................................................................194
CLAIMS .....................................................................................................194
PRAYER FOR RELIEF .................................................................................200
JURY TRIAL DEMANDED.............................................................................200

Plaintiffs, Kevin Cornwell, John M. Grady, ERSTE-SPARINVEST Kapitalanlagegesellschaft m.b.H., and Irish Life and Permanent plc ("ILIM") (collectively "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' press releases, transcripts of earnings conference calls, federal charges, regulatory findings and sanctions, customer complaints, e-mails, Securities and Exchange Commission ("SEC") filings by Credit Suisse Group ("Credit Suisse" or the "Company"), media reports about the Company, and statements by former employees. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a securities class action on behalf of Plaintiffs and all other persons or entities, except for Defendants, who purchased or otherwise acquired Credit Suisse securities, including but not limited to American Depositary Receipts ("ADRs") (the "Class") during the period February 15, 2007 through April 14, 2008 inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Credit Suisse is a foreign money center bank headquartered in Zurich, Switzerland.  Shares of Credit Suisse Group trade on the Swiss Stock Exchange ("SWX") and ADRs trade on the New York Stock Exchange ("NYSE").  Credit Suisse is subject to Swiss capital requirements imposed by Swiss Federal Banking Commission ("SFBC") and is regulated by the United Kingdom's Financial Services Authority ("FSA") and, in the United States by the Securities and Exchange Commission ("SEC").  Credit Suisse, with its subsidiaries, including Credit Suisse Securities (USA) LLC ("Credit Suisse Securities"), operates as an "integrated

1

bank" with three operating segments:  investment banking, private banking and asset management.  As a non U.S. public parent company trading in the United States, Credit Suisse is required to file a Form 20-F annually with the SEC.  The Form 20-F for a foreign registrant is in all material respects the equivalent of a Form 10-K for a U.S. public company. Despite the turmoil in the United States sub-prime markets and its growing impact on the credit markets, on February 15, 2007, for its 2006 performance, Credit Suisse publicly reported "record" revenues of CHF 38,603 million[1] and "record" net income of CHF 11,327 million, and in the quarters that followed Credit Suisse continued to incongruously announce "record" financial performance, particularly in investment banking, the area in which the sub-prime debacle had devastated its peers.   Defendants publicly gloated that the Company's integrated bank strategy and its sophisticated and independent systems of internal controls and risk management operations, that had purportedly reported directly up to the CFO, Renato Fassbind ("Fassbind") and CEO, Brady Dougan ("Dougan"), respectively, permitted the Company to prosper under the severe market dislocations that had caused others, such as UBS and Merrill Lynch, to suffer billions of dollars of write-downs on the securities held in their proprietary accounts.

3.     The 2006 annual report, while containing volumes of representations about the Company's vision, mission, general principles and oversight, particularly with respect to the Company's purportedly sophisticated risk management processes and risk assessment models for pricing the fair values of its complex securities, was noticeably silent when it came to quantifying and disclosing the actual amounts of the Company's sensitive sub-prime structured assets, its exposures and loss contingencies and the financial assumptions that had been used in their calculation for incorporation into the Company's financial statements.  Instead of breaking

---

[1] During the Class Period, the exchange rate between Swiss francs ("CHF") and United States

out this information, and making transparent disclosures as required under United States Generally Accepted Accounting Principles ("GAAP"), Credit Suisse's December 31, 2006 balance sheet, and the financial statement footnotes and management discussion and analysis ("MD&A") merely reported aggregate numbers (net of hedging) for residential mortgage backed securities ("RMBS") and collateralized debt obligations ("CDO's"), and grossly under-reported the amounts at risk for these assets.

4.     As a result, on August 28, 2007, the SEC's corporate finance division wrote to the Company identifying the inadequacies in its 2006 Form 20-F disclosures about its sub-prime exposures and loss contingencies, and the lack of transparency in its reporting.  The SEC requested that the supplemental information be furnished within ten days.  On September 26, 2007, Fassbind, the Company's CFO, wrote back flatly refusing to make the requested public disclosures on the stated grounds that the Company's risk of a material loss from sub-prime lending was "remote," and that providing the requested information would be burdensome.

5.     In explaining his position, Fassbind wrote that under normal conditions the Company managed its risk through a series of controls, including, *inter alia*, "***a robust mark down policy.***"  He further stated:

> When the residential sub-prime mortgage-backed securitization markets became dislocated, our primary risk management is to reduce the number of loans acquired, adjust the characteristics of the loans acquired to ensure that such loans are as liquid as possible given market conditions and, at the same time, distribute the remaining loans owned by us.  We have engaged in this strategy over the last several months of market dislocation and in doing so, have significantly reduced our risk.

Fassbind also asserted that sub-prime loss exposure had been reduced through economic hedging, which, however, proved to be ineffective as a result of the gross deficiencies in the

---

dollars was approximately 1.08 to one.

Company's internal controls.

6.      The correspondence between the SEC and Fassbind was publicly filed with the SEC and posted on Credit Suisse's website, and Fassbind's statements about the Company's "remote" risk, "robust mark down policy," and the effectiveness of its hedging and other "risk management" practices were later disclosed to be false to a remarkable degree.  In fact, as would later be revealed, as of the end of 2006 Credit Suisse's exposure to loss for its "sub-prime" investments (including for securities collateralized by "Alt-A" mortgages and CDO's and SIV's that were foisted upon unsuspecting money-market clients) exceeded $30 billion, and the deficiencies in the Company's internal controls over marking down its asset-backed securities ("ABS") is what caused the February 19, 2008 surprise announcement that the Company had incurred an additional $2.8 billion of losses in 2007 on its sub-prime securities.  For first quarter 2008, Defendants announced a stunning $5.281 billion in fair value markdowns, much of it, again, on the Company's sub-prime securities.

7.      Fassbind's comments to the SEC also suggested that Credit Suisse had long known of the risks inherent in the sub-prime securities, but failed to account for the full amount of Credit Suisse's exposure on its books because the toxic securities had been improperly transferred to others.  Credit Suisse retained these risks, and more, because its officers had repackaged sub-prime and other illiquid debt as collateral for auction rated securities ("ARS") which it sold to its "cash management" clients in the guise of being safe and liquid investments. Contrary to Defendants' assertions, rather than installing effective internal controls and risk management systems, Credit Suisse undercut and tolerated the circumvention of its critical processes in order to obtain huge commissions, and to make incentive payments to those employees for successfully violating their responsibilities to their clients.  Indeed, by the summer

4

of 2007 the Defendants learned of its likely civil and potential criminal exposures, because one of its largest victimized asset management clients contacted the Company's chief operating officer ("COO") and general counsel, and showed him e-mails from Credit Suisse officers that falsely described the ARS purchased for its account.

8.      On October 16, 2007, the SEC wrote back to Fassbind cautioning the Company to evaluate "on both a quantitative and qualitative basis" its sub-prime lending adverse impacts and to make transparent disclosures.  On November 13, 2007, Fassbind responded "acknowledging" the SEC's comments -- but pointedly continuing, through the Company's inadequate quarterly reports, and in its conference calls with analysts, to hide and misstate the billions of dollars of sub-prime exposures and losses that the Company suffered.  And, even armed with the then secret knowledge that its brokers had made fraudulent placements of billions of dollars of unsuitable and/or falsely described the assets for the cash management client accounts, Defendants continued to falsely and publicly attribute the Company's success relative to its peers to its extraordinary systems of internal control and risk management.

9.      Credit Suisse continued to report "record" earnings, particularly in investment banking, until its announcement of its third quarter 2007 ("3Q07") financial results.  Even then, however, Credit Suisse claimed to have actually posted a *profit* on its sub-prime securities and continued to misstate and conceal the true risks it faced from the sub-prime crisis.  In announcing the Company's 3Q07 results, the Defendants first started to leak out information related to the Company's exposures and losses attributable to its wrongful placement of ARS in customer accounts.

10.     The fundamental and structural weaknesses in the Company's internal controls and risk management led inexorably to its false financial reporting.  As changes in the values of

5

these hard-to-price securities directly translated into changes in their compensation -- an enormous internal control failing -- Credit Suisse's traders, supervisors and senior executives were highly incentivized to mismark and over-value these products, and under-report losses, and the supposedly "independent function" verifying the pricing merely rubber-stamped the traders' positions, or immediately bowed to the traders' positions when disagreements arose. Pricing variances developed by the "independent" product controllers using the Company's testing models were routinely and simply dismissed by traders and supervisors as "false negatives." The product controllers were also unable to confirm recorded credit default swaps ("CDS") with counter-parties, so that the Company's hedges were ineffective. Thus, the Company's true exposures to the sub-prime crisis were reflected in the "gross" amount of these toxic securities, amounts that the Company steadfastly refused to disclose. On February 12, 2008, in again announcing only modest asset markdowns for the fourth quarter of 2007 ("4Q07"), Dougan, Credit Suisse's CEO, again attributed Credit Suisse's success relative to its peers to the Company's strong risk management:

> What we present to you today will essentially boil down to three major points -- we have outperformed much of the industry, we have managed our risks well, we have a resilient business with attractive growth prospects.
>
> First, Credit Suisse has outperformed much of the industry over the last year by virtue of its high-quality business franchises, diversified business model, strong capital and solid funding base and *strong risk management culture* . . .
>
> Second, *our net write-downs in the fourth quarter and for the year were relatively small* . . .
>
> Third, our prospects for profitable growth in 2008 and beyond are attractive compared to the rest of the industry.

11.    During that same analyst conference call, Wilson Ervin, the Company's Chief Risk Officer, emphasized that it was the Board's and senior management's hands-on control over

6

the Company's risks that had permitted Credit Suisse to weather the difficult market conditions:

> Back at the Risk Investor Day in May, we talked about a risk philosophy and maintaining strong disciplines across the Bank.  Those strong foundations were important to us then and remain doubly so today.  We maintain a broad perspective and the tools that are sophisticated enough so that we can capture our positions effectively and systematically, but we don't lose sight of common sense, which is perhaps the most important tool in the tool box.
>
> ***We have a strong risk culture that takes a proactive approach to managing positions and an independent risk function that reports straight to the CEO. While we work in close partnership with the business, we're empowered to say no.  We have strong management oversight, including executives with strong trading floor experience in complex markets, and we have an active Board.***

These statements were particularly misleading and disingenuous in that, for this same conference call, Credit Suisse was reporting CHF 920 million in losses, and CHF 9.3 billion in asset buy-backs, attributable to the fraudulent misconduct of its brokers in placing sub-prime and other illiquid securities into the accounts of the Company's money market clients.

12.    For the investors in Credit Suisse's stock, the reliability of its pricing controls and risk management tools was becoming increasingly important as the dislocation in the sub-prime market continued to spread to other leveraged products.  It is thus hardly surprising that, one week later, on February 19, 2008, when Credit Suisse announced another ***$2.8 billion*** in sub-prime asset write downs -- which it attributed, in part, to asset mis-markings by its traders, a major breakdown in its vaulted internal controls over the pricing of the Company's products and financial reporting -- that the news shocked the market, and Credit Suisse's stock declined to $48.22 down $2.66, or 5.2% from its previous trading day close of $50.88.  This reflected a price decline of 5.62% net of other events affecting the market and the Company's peers.

13.    In the analyst conference call conducted the same day, Defendants discussed that the losses occurred as a result of trader "mis-marking," and that the Company only recently incurred these sub-prime losses, which purportedly explained why they had not been uncovered

7

by the time of the call a week ago.  Dougan and Fassbind also explained that the $2.8 billion would translate into only a $1 billion after-tax reduction of net income -- because the asset write-down would result in Credit Suisse's employees (including Dougan himself) receiving approximately $1.4 billion less in compensation.  This extraordinary incentive for trader mis-marking and management's failure to require asset mark-downs was both part of the motive for the accounting fraud alleged in this case, and also was at the heart of the Company's internal control deficiencies.

14.     On March 20, 2008, in its "revised" 4Q07 financial report and for its 2007 annual report, Defendants admitted that Credit Suisse had, in fact, misstated its 4Q07 sub-prime losses by over a billion dollars.  The 2007 annual report also admitted that there had been a "material weakness" in internal controls over the Company's financial reporting.  As reported by the Company's outside auditor, KPMG Klynveld Peat Marwick Goerdeler SA ("KPMG"), the identified "material weakness" involved "the controls over the valuation of asset-backed securities positions in the collateralized debt obligations trading business in Investment Banking relating to the supervision and monitoring of the initial valuations of these positions by trading personnel and the related price testing and supervision by product control."   With these disclosures, Credit Suisse's stock price relative to other market events declined 2.83%.

15.     In a conference call with analysts, Dougan attempted to minimize and explain away the false pricing and internal control transgressions by contending that Defendants had been caught unawares because the mis-marking had been performed by "a small number of traders" who had engaged in "intentional misconduct," which "made the issue harder to detect"; that the Company's "overall" control framework remained "sound"; and that Credit Suisse had managed their sub-prime positions "more conservatively that most" in the industry.

16.    Nothing could be farther from the truth, as the recent stunning revelations of government investigations and findings, customer complaints, federal indictments and SEC charges graphically demonstrate.

17.    As the Company would later admit to its regulator in the United Kingdom, the Financial Services Authority ("FSA"), Credit Suisse's traders had been fraudulently mis-marking the Company's sub-prime securities for at least five months.  These findings were based upon facts that Credit Suisse reported to the FSA upon completing its internal investigation.  Credit Suisse admitted to the FSA that it found that significant price testing variances had been identified by product controllers as early as August 2007.  Credit Suisse also admitted to the FSA that questions had been raised and dismissed about this pricing throughout the five-month period -- reflecting a massive and fundamental breakdown of the Company's internal controls that led the FSA to impose a £5.6 million fine against the Company.  The Company's former employees have elaborated on the particularities of the pricing violations and confirmed that the internal control deficiencies and sub-prime exposures in fact existed throughout the class period.  The repeated instances of fraudulent misconduct in valuing billions of dollars of structured assets and in the placement of unsuitable and unauthorized investments to customer accounts was a direct consequence of the obviously flawed risk management and internal control processes, that the Defendants had personally and aggressively vouched for throughout the class period.

## II.    JURISDICTION AND VENUE

18.    Jurisdiction is conferred by §27 of the Securities Exchange Act (the "Exchange Act" or the "Act").  The claims asserted herein arise under §§10(b) and 20(a) of the Act and Rule 10b-5.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337, and §27 of the Act.

19. Pursuant to the "conduct test" adopted by the Second Circuit, this Court may properly exercise jurisdiction over Plaintiff's claims on behalf of the class. The conduct test provides that a federal court has subject matter jurisdiction if (1) the defendant's activities in the United States were more than "merely preparatory" to a securities fraud conducted elsewhere, and "directly caused" the claimed losses, or (2) the defendant engaged in substantial conduct in the U.S. that was material to the completion of the fraud.

20. Defendants prepared, issued and ultimately disseminated many of the false and misleading statements that damaged Plaintiff and the Class in the United States. The domestic conduct was substantial, not merely "preparatory" or perfunctory, and was material to the completion of the fraud. Defendants regularly filed false and misleading financial statements with the SEC, including Annual Reports on Form 20-F and Current Reports on Form 6-K throughout the Class Period. In conjunction with their U.S. filing obligations, Defendants retained U.S. law firms to advise them. For example, in August 2007 the SEC requested that Credit Suisse clarify its disclosures regarding subprime exposure. (The letter and Credit Suisse's response is discussed in more detail *infra*.) Notably, the law firm of Cleary Gottlieb Stein & Hamilton LLP was copied on the Company's response as was a partner in the firm's New York office, and thus presumably assisted the Company in preparing its response, from New York.

21. Prior to and during the Class Period, Defendants disseminated these false and misleading statements into international markets using the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets. Thus, there was a single worldwide market for Credit Suisse shares, and shares purchased on foreign exchanges traded

in tandem with ADrs, and Defendants' conduct in the U.S. directly caused damage both domestically and throughout the world.

22.     Credit Suisse's Investment Banking segment and Derivative Structured Product Trading business, a sub-part of Investment Banking, handled ABS and both were based primarily in New York.  For example, Paul Calello, the CEO of the Investment Banking segment, is a U.S. citizen and resides in New York.  Prior to February 2008, Eric Varvel served as Co-Head of the Global Investment Banking department in the Investment Banking segment and was based in New York.  Clayton Perry, Credit Suisse's Global Head of CDO Distribution, and David Yan, Credit Suisse's Head of CDO Research, were also both based in New York.  As a result, many of the MBSs and CDOs that Credit Suisse ultimately wrote down were likely packaged, managed, bought, sold and/or valued from Credit Suisse's U.S. operations.

23.     The Company's financial disclosures illustrate the importance of the United States market to Credit Suisse's overall operations and, in particular, to the fraud alleged here. For example, in a February 12, 2008 Form 6-K filed with the SEC, the Company detailed its ABS exposure, showing that the majority of the Company's exposure was in the United States markets.

24.     Moreover, one of the primary allegations in this Complaint is that Credit Suisse misrepresented its true risk profile and failed to implement sufficient internal controls to prevent investor losses.  Credit Suisse's Chief Risk Officer, D. Wilson Ervin, is based out of New York.  During the Class Period, Mr. Ervin had responsibility over strategic risk management, credit risk management, risk measurement, and management and operational risk oversight.  He was also expected to maintain a strict risk control environment and to ensure

11

that Credit Suisse's risk capital was deployed wisely.  Prior to assuming this position, Mr. Ervin was the Head of Strategic Risk Management at Credit Suisse First Boston where he oversaw the company's global risk profile and recommended corrective actions when appropriate.  Because Mr. Ervin was based in New York, undoubtedly many of the key decisions affecting the Company's risk analysis, internal controls, and disclosures were made or approved in the U.S.  It was, in part, the failure of this control process that lead to the losses of Plaintiff and the Class.

25.     Dougan, CEO of Investment Banking until his ascension to CEO of Credit Suisse in May 2007, is a United States investment banker who worked at the New York Office in his capacity as CEO of Investment Banking at all relevant times until May 2007.  Dougan maintains a residence in the United States in a New York City suburb (Greenwich, Connecticut).  As described above, Paul Calello ("Calello") is head of trading at Credit Suisse Investment Banking, a function he performs from the New York Office.  Defendant D. Wilson Ervin ("Ervin"), Chief Risk Officer for Credit Suisse, manages Credit Suisse's risk management functions and internal controls processes from the New York Office.  Confidential Witnesses confirmed that crucial risk management and internal controls processes relevant to the "material weaknesses" over the valuation and financial reporting for the Company's sub-prime assets were operated from the New York Office.  While in their New York offices, these Defendants also participated in the earnings and other telephone conferences with analysts in which they made the most glaring false and misleading statements alleged in this case.

26.     As noted above, Credit Suisse ADRs are traded on the NYSE, and Credit Suisse is therefore subject to regulation by the NYSE as well as Financial Industry Regulatory Authority ("FINRA"), which was formed by merger of certain regulatory operations of the NYSE and the

12

National Association of Securities Dealers, Inc.  As a foreign issuer, Credit Suisse is also regulated by the SEC and, accordingly, makes regular SEC filings, including annual reports on Form 20-F and reports on 6-K.  The Investment Banking and Asset Management businesses also include legal entities registered and regulated as investment advisors by the SEC.  According to the Company, it is further regulated by the Board of Governors of the Federal Reserve System (the "US umbrella supervisor"), the Commodity Futures Trading Commission and the New York State Banking Department.

27.    The criminal ARS scheme described in this complaint originated from and was substantially perpetrated in New York.  The two traders who have been indicted, Julian Tzolov and Eric Butler, worked in the Credit Suisse New York Office.  The SEC civil complaint filed against them originated from the SEC's New York Regional Office, and the SEC filed the complaint in the United States District Court for the Southern District of New York.  The DOJ also filed its indictment in a United States District Court in New York (the Eastern District).  The STM action seeking redress for the criminal ARS scheme was also brought in a United States District Court in New York (the Eastern District).

28.    Credit Suisse has previously submitted to the jurisdiction of U.S. courts, including the Southern District of New York.  Defendants have also previously entered class action settlements under Federal Rule 23.  In the so-called "Swiss Banks Litigation," Credit Suisse submitted to a worldwide settlement agreement providing for the final settlement of all claims as to plaintiffs from around the world.  The settlement agreement specifically purported to provide preclusive res judicata effect worldwide under Federal Rule 23, and Credit Suisse acknowledged that the settlement agreement would have such worldwide effect.  Further, when a Swiss citizen, in contravention of the settlement agreement, later attempted to pursue a claim

in Swiss court Credit Suisse successfully argued that the U.S. class action settlement was final, thus precluding claims in Swiss court. Hence, a Swiss court will enforce a U.S. judgment against a Swiss citizen such as Credit Suisse and the Individual Defendants. In short, Credit Suisse has intentionally availed itself of the preclusive effects of U.S. laws and Federal Rule 23, and this Court exercising such jurisdiction in this case is entirely appropriate.

29. Credit Suisse's ubiquitous presence in the U.S. further justifies this Court's exercise of jurisdiction. Credit Suisse's main U.S. office is in New York, and the Company employs approximately 10,000 employees nationwide. According to the Company's Form 20-F for the fiscal year ended December 31, 2007, and filed with the SEC on March 20, 2008, over 40% of the Company's net revenues and income from continuing operations before taxes came from the Americas. Forty-five percent (45%) or $607,944 million of total Company assets, are in the Americas. Further, the Company stands to benefit from the proposed Congressional bailout of the financial industry, having lobbied in conjunction with other foreign-banks with significant United States based operations to be included in any bailout plan passed by Congress. The Congressional plan requires a participating financial institution to have "significant operations in the U.S."

30. Venue is proper in this District pursuant to §27 of the Act and 28 U.S.C. §1391(b). Credit Suisse is a Swiss corporation. As such, pursuant to 28 U.S.C. §1391(d), Credit Suisse may be sued in any District of the United States. Credit Suisse has sufficient minimum contacts with the Southern District of New York because Credit Suisse ADRs are traded on the New York Stock Exchange ("NYSE"), many of the false and misleading statements were made in or issued from this District, Credit Suisse has offices in this District and many of the acts and transactions giving rise to the violations of law complained of occurred here.

14

31.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities exchanges.

## III.   **PARTIES**

32.     Plaintiff Grady purchased Credit Suisse ADRs on the NYSE at prices that were artificially inflated as a result of Defendants' fraud during the Class Period.  Grady was damaged as the truth became revealed, and the artificial inflation was removed from the ADR price.

33.     Plaintiff Cornwell purchased Credit Suisse ADRs on the NYSE at prices that were artificially inflated as a result of Defendants' fraud during the Class Period.  Cornwell was damaged as the truth became revealed, and the artificial inflation was removed from the ADR price.

34.     Based in Vienna/Austria, Plaintiff ERSTE-SPARINVEST Kapitalanlagegesellschaft m.b.H. ("ERSTE-SPARINVEST") is an investment company backed by the financial strength of the Erste Bank Group and the Austrian Sparkassen Group.  It currently manages assets in excess of $25 billion.  This makes it the second-largest capital investment company in Austria.  ERSTE-SPARINVEST has been the market leader in mutual funds for many years with a market share of over 21%, and is the third-largest investment company for large-scale investor funds.  Plaintiff ERSTE-SPARINVEST purchased and sold shares in Credit Suisse as set forth in the attached certification, and was damaged as the truth became revealed, and the artificial inflation was removed from the stock price.

35.     Irish Life & Permanent plc, now one of Ireland's largest financial services companies, was created in 1999 through the merger of Irish Life Plc and Irish Permanent Plc. Irish Life Investment Managers (ILIM) is the asset management arm of Irish Life & Permanent

15

plc. ILIM manages money on behalf of a wide range of institutional and retail, occupational DB & DC pensions, large multinational corporations, charities and domestic companies and is the largest manager of Irish pension assets. Currently managing assets of in excess of €34bn., ILIM has seen significant growth in funds under management since 1992 reflecting its recognized market innovation and leadership position. Plaintiff ILIM purchased and sold shares in Credit Suisse as set forth in the attached certification, and was damaged as the truth became revealed, and the artificial inflation was removed from the stock price.

36. Credit Suisse Group is a global financial services company offering services to corporate, institutional and government clients and high-net-worth individuals. On January 1, 2006, it reorganized to form a fully integrated global bank, with three segments: Investment Banking, Private Banking and Asset Management. Credit Suisse is based in Zurich, Switzerland. Credit Suisse is the corporate parent of Credit Suisse Securities, which is headquartered in New York. The Company's ADRs are listed on the New York Stock Exchange.

37. Defendant Brady W. Dougan ("Dougan") is, and at all relevant times was, a director of Credit Suisse, and since May 2007 has served as CEO of the Company and also CEO of Credit Suisse Securities. Dougan signed the Company's financial reports published during the Class period, and made false and misleading statements to stock analysts in earnings conference calls. Dougan works out of the Credit Suisse 11 Madison Avenue, New York, New York offices and resides in Greenwich, Connecticut.

38. Defendant Renato Fassbind ("Fassbind") is, and at all relevant times was, Chief Financial Officer ("CFO") of Credit Suisse and Credit Suisse Securities. Fassbind signed the Company's financial reports published during the Class period, signed false "Sarbanes-Oxley" ("SOX") certifications, and made false and misleading statements to stock analysts in earnings

conference calls. Fassbind also made false and misleading statements about the Company's exposure to the sub-prime crisis in letters to the SEC. Upon information and belief, Fassbind resides in Zurich, Switzerland.

39. Defendant D. Wilson Ervin ("Ervin") is, and throughout the Class Period was, the Chief Risk Officer of Credit Suisse Securities, and a member of the Executive Board of the Board of Directors. Ervin made false and misleading statements to stock analysts in earnings conference calls. Ervin works out of the Credit Suisse 11 Madison Avenue, New York, New York offices and resides at 27 North Moore Street, New York New York.

40. Defendant Paul Calello ("Calello") served, during the Class Period, as a member of the Credit Suisse Executive Board of the Board of Directors and the Executive Board for Banking Business. Additionally, since May 2007, Paul Calello has been Chief of the Company's Investment Banking division. Calello made false and misleading statements to stock analysts in earnings conference calls. Calello works out of the Credit Suisse 11 Madison Avenue, New York, New York offices and resides at 43 Remsen Street, Brooklyn, New York.

41. Defendants Dougan, Fassbind, Ervin and Calello are referred to herein collectively as the "Individual Defendants." The Individual Defendants possessed the power and authority to control the contents of Credit Suisse's financial reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Each of the Individual Defendants made false and misleading statements to analysts about the performance of Credit Suisse and/or its risk management or internal controls.

42. The Executive Board is responsible for the day-to-day operational management of

17

Credit Suisse.  It develops and implements the strategic business plans for the Group overall as well as for the principal businesses subject to approval by the Board of Directors.  Because of their positions and access to material non-public information available to them but not to the public, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the affirmative representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as each was either made by the particular Individual Defendants or were "group-published" information, the result of the collective actions of the Individual Defendants.

## IV.    ALLEGATIONS

### A.    Background:  The United States Sub-prime and Residential Housing Crisis

35.    The crisis in the United States sub-prime and residential housing market has its roots in the massive number of increasingly exotic mortgage loans, frequently written on unverified asset or income information to higher credit risk home buyers, and the subsequent bundling (and re-bundling) of those loans by investment banks, such as Credit Suisse, into various ABS and debt obligations, often referred to in the industry as "fixed income" products, which were then marketed and sold by the banks to investors, and here to Credit Suisse's own money-market asset management clients as part of Credit Suisse's "integrated bank" strategy.

36.    Typically, after a homebuyer obtains a mortgage (a "mortgagor") and closes on the sale, the lending institution sells the mortgage to third-parties in the secondary market. Participants in the secondary market include quasi-governmental institutions such as Fannie Mae and Freddie Mac who purchase only certain mortgages that conform to specific underwriting standards, and private institutions, including many Wall Street firms and multi-national banks.

18

In the industry, quasi-governmental institutions are referred to as "agency" institutions while private institutions are referred to as "non-agency" institutions.

37.     During the late 1990s, interest rates for mortgages declined and an increasing number of individuals in the United States obtained access to residential mortgages.  The increase in loan origination and lending to new homeowners spurred a rapid increase in the residential mortgage industry.  The increase in the number of buyers led to an increase in demand that, coupled with low interest rates, fueled a rise in home prices.  Rising prices, in turn, fueled a residential building boom.  As lenders attempted to reach ever increasing numbers of potential homebuyers, aggressive, often predatory, lending practices by United States lenders led to an increasingly large pool of borrowers whose ability to stay current on their mortgage obligations was particularly sensitive to interest rate fluctuations.  Lenders, for their part, were willing to make ever-riskier loans because mortgage purchasers in the secondary market were so plentiful that lenders who originated risky loans could quickly offload the loan, thereby offloading the risk.

38.     The house of cards began to collapse when, in mid-2005, housing prices stalled and interest rates began to rise.  Homeowners who had over-extended themselves by taking out mortgages featuring exotic terms such as artificially-low payments for introductory periods, began to default.  So, too, did homeowners with unstable and/or unverified incomes, those whom Credit Suisse referred to as the "Alt-A" borrowers.  Dramatic increases in defaults beginning in 2005 had a cascading effect on credit markets due to the correlation between the rising rates of default on sub-prime mortgages, and the falling values of the encumbered houses, on the one hand, and the decline in the value of securities backed by those mortgages, on the other.  The decline was accentuated by the lack of transparency in the reporting of these complex securities.

39.     Credit Suisse actively participated in a broad array of areas that generated large fees but exposed it to huge risks from sub-prime loans and the implosion in the United States housing market.  The Company securitized sub-prime loans that it purchased (or committed to purchase for the purpose of securitization) from third parties and retained interests in the securities created; originated and serviced sub-prime loans; provided "warehouse financing" in the form of repurchase agreements to sub-prime lenders; traded in the secondary market for sub-prime loans (including market-making activities); and provided liquidity or other credit enhancement facilities to special purpose entities that issued commercial paper and held sub-prime assets (Credit Suisse Letter to SEC dated September 26, 2007 at 4-5).  It is important to understand the products, markets and financial instruments at issue as well as the timing of events in the United States residential housing crisis to understand defendants' reckless and wanton disregard for Credit Suisse's exposure to, and its false reporting of minimal risk for the unfolding sub-prime fiasco during the Class Period.

Sub-prime and Alt-A Loans

40.     In the United States residential mortgage market, borrowers are generally classified as being either "prime," "nonprime" or "sub-prime."  During the late 1990s and 2000s, lenders became increasingly willing to lend to sub-prime borrowers with progressively worse credit scores, and to borrowers with less than conventional documentation of their income and/or net assets.  At the same time, lenders began to offer mortgage products with increasingly exotic – and risky – features.  The trend started with loans at increasingly lower loan-to-value ratios ("LTV ratios") that required down payments significantly below the traditional 20% required for a prime loan.  As the trend continued, lenders began to issue large numbers of "no income/no asset verification" loans known in the industry as "NINA" loans.  NINA loans were also

20

frequently described as "no-doc" loans because the lender had required little, if any, documentation of the borrower's income or assets before originating the loan.  The NINA/no-doc mechanism allowed borrowers with purportedly satisfactory credit ratings to borrow money without providing any verification whatsoever of their ability to make scheduled payments.

41.    The combination of sub-prime borrowers and exotic mortgage products melted into one another as the housing boom proceeded with the effect of creating an ever-increasing pool of loans that, because of the quality of the borrowers' credit and/or product features, were properly categorized as non-prime – i.e., sub-prime.  According to the SEC, a sub-prime residential mortgage is one that is made at a rate above the prime rate to borrowers who do not qualify for prime rate loans or to a borrower with a low credit rating/FICO score.  But a loan made to a borrower who may not be technically sub-prime in terms of credit history is properly considered a sub-prime loan when the loan has atypical, risk-increasing features, such as negative-amortization provisions or teaser interest rates (often combined with balloon payments).  Such exotic mortgages issued to borrowers with better than sub-prime credit scores are frequently lumped into the ill-defined "Alt-A categorization," reflecting that the borrower is purportedly better off than sub-prime credit worthiness, but the loan product features risk factors making the loan less than a prime loan.  The SEC told Credit Suisse that it believed the characteristics of a sub-prime loan included:

  a. an unconventionally high LTV ratio;

  b. reduced or non-existent income or asset-verification requirements;

  c. interest-only payment plans where the borrower initially pays only the interest on the principal (instead of paying the interest and a portion of the principal);

21

d. negative-amortization terms that permit the principal to increase as the borrower makes payments over an initial period;

e. conversion after an introductory period from a low, fixed interest rate to a variable rate plus margin for the remainder of the term;

f. very high or no limits on interest rate increase at reset periods;

g. substantial prepayment penalties that extend beyond the initial interest rate adjustment period.

(SEC Letter to Credit Suisse dated August 28, 2007 at 2).

42. Instead of categorizing highly risky loans made to borrowers of better than sub-prime quality as a "sub-prime loan," Credit Suisse categorized such loans as "Alternative-A" (referred to by Credit Suisse and herein as "Alt-A" loans). As noted above, there is no industry-accepted definition of Alt-A, but such loans are generally understood to be made to borrowers of slightly better than sub-prime status, but with risk-enhancing product features, such as limited or no documentation requirements. Alt-A loans also frequently combine risk-enhancing product features, such as an "option-ARM" structure – an adjustable-rate mortgage where the borrower chooses how much to pay on a monthly basis – with limited or no borrower income documentation. Narrowly defining "sub-prime" loans permitted Credit Suisse to avoid counting its substantial book of at risk "Alt-A" loans, when, in representations to regulators and the market, it stated that its exposure to "sub-prime" loans was "de minimis." Although Credit Suisse has yet to fully break out its class period exposures to Alt-A loans, on March 20, 2008, Credit Suisse revealed that even as late as third quarter 2007, its exposure to Alt-A loans, "net" of unspecified hedges was still $7 billion.

Securities Collateralized by Residential Mortgages

43.     As lenders reached out to increasingly risky borrowers with increasingly risky mortgage products through the late 1990s and into the 2000s, the pool of sub-prime and highly risky, Alt-A loans continued to expand.  Investment bankers, including those at Credit Suisse, sought to find ways to capitalize on the phenomenon, and earn the lucrative fees it offered.  To do so, they created complex asset-backed securities, particularly "RMBS" and "CDO's."  Credit Suisse underwrote and invested in both RMBS and CDO's prior to and during the Class Period.

*RMBS*

44.     To create an "RMBS," or residential mortgage-backed security, an underwriter (also referred to as an originator) purchases a large number of individual residential mortgages from mortgage lenders.  In theory, the mortgages underlying a RMBS are of similar quality, including with respect to the quality of the borrower, such that they could be pooled together and rated (i.e., AAA, BBB-, etc.).  Once the underwriter purchased a sufficient number of mortgages, it pooled the mortgages together and sold them to a specially created entity, what Credit Suisse referred to broadly as a variable interest entity ("VIE").  These VIE's are separate, bankruptcy-remote legal entities created by the underwriter in order to transfer the risk of the underlying mortgages off the underwriter's balance sheet.  (Depending upon the nature of Credit Suisse's interests in the VIE, the financial performance of certain VIE's was included in Credit Suisse's consolidated financial statements.)  The VIE takes title of the component mortgages and issues either bonds or RMBS collateralized by the transferred mortgage pool - i.e., asset-backed securities or ABS.  The RMBSs are issued in so-called "tranches," ranging from "High Grade" (AAA- and AA-rated bonds), "Mezzanine" (BBB- to B-rated bonds), or an unrated equity tranche often referred to as the "residual tranche."

23

45.     VIE's can issue AAA-rated paper out of a pool of sub-prime or Alt-A mortgages, even though the pool of mortgages would not itself be AAA-rated, by prioritizing payments and apportioning losses among different classes of bonds.  In the normal course, the AAA-rated, "senior" or "super senior" tranche of RMBS receives first priority on cash flows from the borrowers on the underlying mortgages (referred to in the industry as "remittance payments"), but receives a lower yield on the investment, reflecting less reward for less presumed risk.  At the other end of the spectrum, the equity tranche holders (if any) receive the highest return on their investment because the equity tranche is the first to experience losses in the event of defaults by the mortgagors.  Typically, the AAA-rated RMBS-holder would only experience losses if both the equity and mezzanine tranches were exhausted as a result of credit events, such as defaults, in the underlying mortgage collateral.  However, once the equity and mezzanine tranches are both exhausted, the "senior" or "super senior" tranche is on the hook for all further losses.

46.     An RMBS originator or underwriter, such as Credit Suisse, usually works closely with one of the three rating agencies – Moody's Corp. ("Moody's"), Standard & Poor's ("S&P") or Fitch – to determine the right combination of mortgages to include as collateral for a particular RMBS.  The goal for underwriters is to fill each mortgage pool with collateral that pays the highest interest but still allows for an AAA-rated class of RMBS.  Doing so allows the VIE to issue RMBS bonds or securities that pay higher rates, which gives the VIE a competitive advantage in attracting investors.  Of course, the higher the interest rate paid, the greater the risk.

47.     Once the underwriter and rating agencies reached agreement on a pool of mortgages and the payment schedule and the ratings agency assigned ratings to the various RMBS tranches, the VIE sold the RMBS to investors.  The VIE then transferred the proceeds

24

from the sale to the originator (*i.e.*, Credit Suisse) in consideration for the underlying collateral. The VIE also passed on remittance payments from the individual mortgagors to the RMBS-holders by the priority dictated in the RMBS agreement.

48.     Investment bankers did not stop their financial engineering with creation of RMBS.  With RMBS as the foundation, financiers, including those at Credit Suisse, designed even more complex finance products designed to profit from sub-prime RMBS, including cash, hybrid and synthetic asset-backed securities known as collateralized debt obligations ("CDO's").  Credit Suisse was a market leader in originating CDO's from 2000-2003, continued to underwrite CDO's thereafter, including during the Class Period, and was actively involved in the cash and synthetic CDO secondary market.

*Cash CDO's*

49.     Cash CDO's are structurally similar to RMBS in that both involve transferring assets to an VIE and the VIE's subsequent issuance of bonds collateralized by the transferred assets.  The principal difference between an RMBS and a CDO is that while an RMBS is collateralized by a pool of tangible, residential mortgages, the bonds a CDO issues are collateralized by a pool of RMBS tranches, thereby increasing their complexity.  Thus, CDO's issue bonds that are backed by a tranche of bonds, which are in turn backed by residential mortgages.

50.     In the conceptualization phase, the originator of a CDO must make a series of decisions about the quality of RMBS tranches that will collateralize the CDO.  Specifically, originators, such as Credit Suisse, had to determine whether they would create a "Mezzanine CDO" or "High Grade CDO."  Mezzanine CDO's are collateralized by lower, BBB/BB-rated RMBS tranches while High Grade CDO's are typically collateralized by AAA/AA-rated RMBS

25

tranches. Originators earned higher fees for structuring mezzanine CDO's, which also paid higher interest rates to CDO investors to compensate for the additional risk associated with holding bonds backed by BBB/BB-rated paper.

51. Upon undertaking to originate the CDO, much like they do in underwriting an RMBS, CDO originators amass a collection of assets for inclusion in the CDO. The collection process is referred to as "warehousing" or "ramping up" the CDO. Instead of warehousing residential mortgages, however, a CDO originator amasses and warehouses tranches of RMBS. During the ramping up period – typically one to four months – originators assume 100% of the credit risk (the risk of default of the security) and the market risk (the risk of devaluation of the security for changes in the interest rate) associated with holding RMBS tranches in their warehouse and, accordingly, on their balance sheet.

52. Just as the RMBS that collateralized CDO's are divided into tranches, the CDO bonds issued by the VIE are also divided into tranches. Typically, CDO bonds are divided into at least three tranches: senior, mezzanine, and equity. CDO's also frequently contained a AAA-rated "super senior" tranche. Similar to an RMBS, CDO's are able to issue AAA-rated paper even though the collateral underlying the instrument is a pool of lower rated securities. CDO's thus frequently had the effect of turning high-risk residential mortgage loans (be they sub-prime or Alt-A) into "AAA-rated" bonds based on the prioritization of payments and the apportionment of potential losses suffered by the underlying RMBS. Similar to the structure of an RMBS, the super senior tranche of the CDO (if any) received the first dollars paid into the CDO but received the lowest yield on its investment, while the equity tranche received the highest return on investment, but absorbed the first mortgage default losses. Once the equity tranche absorbed its maximum amount of losses, the losses eat up the CDO food chain, biting

26

first from the mezzanine tranche and so on until reaching the highest-rated tranche, which, like its RMBS counterpart, absorbs all losses once the lower tranches are exhausted. Throughout the class period, Credit Suisse had billions of dollars of "super senior" tranches of CDO's which were ultimately collateralized by sub-prime and/or Alt-A mortgages.

53. CDO originators also work closely with a rating agency to determine the right mix of RMBS to include in a CDO such that the VIE can issue AAA-rated bonds for the CDO in question. In the same way that an RMBS underwriter seeks to include the lowest-quality mortgages (which pay the highest interest rates) that will support a AAA-rating, a CDO originator seeks to include the lowest-quality RMBS (which also pay the highest interest rates) that will support a AAA-rating because doing so increases the yield to investors. Thus, the risk compounded exponentially as CDO originators sought to engineer the most competitive CDO product: each individual RMBS included in the CDO is backed by the lowest quality mortgages that would support a AAA/AA-rating for High Grade CDO's or a BBB/BB-rating for Mezzanine CDO's, and each CDO sought to include the lowest quality RMBS that would support issuance of a AAA/AA-rated bond.

54. Cash CDO's are referred to as such because when the VIE sells the tranched bonds to investors, the VIE transfers the proceeds received from the sale of the bond to the originator (Credit Suisse), while cash flows received by the underlying RMBS are passed through to the CDO investors in accordance with the CDO's payment structure. In many cases, CDO originators, such as Credit Suisse, retained a tranche of the CDO to facilitate the sale and liquidity of the CDO tranches. In addition to originating CDO's, Credit Suisse also traded its CDO's in the secondary market for CDO's during the Class Period. As Paul Calello, the head of

Credit Suisse's Investment Banking division, put it, "We're in the moving business, not the storage business." (2Q07 Earnings Conference Call)

*Synthetic CDO's and Credit Default Swaps*

55.    Synthetic CDO's, which Credit Suisse both originated and traded in the secondary market, are composed of bundled credit default swaps ("CDS") linked to residential mortgages. A CDS is an insurance-type instrument used to transfer credit risk from the owner of an asset to another party. A CDS is a contractual agreement between two parties whereby the owner of the asset (such as a residential mortgage), an RMBS tranche or a Cash CDO tranche agrees to make periodic payments to a counterparty in exchange for that counterparty's willingness to assume the risk of default associated with the underlying asset (frequently referred to as the "referenced asset").

56.    The insurance function of CDS is evident from an illustrative example. The owner of an RMBS may wish to buy protection against defaults by a substantial number of borrowers in the underlying pool of mortgages. Such a "protection buyer" could hedge against the potential loss by entering into a CDS with a counterparty who would agree, in exchange for premium payments, to accept the risk of loss associated with the RMBS. The protection seller thereby provides the protection buyer with insurance against the risk of loss in the referenced asset, while the protection buyer agrees to provide the protection seller with regular payments. If the referenced asset defaults, the protection seller typically agrees to either take possession of the insured asset at face value or to pay the protection buyer the difference between the bond's par value and the amount recoverable on the bond.

57.    In the case of a CDS linked to residential mortgages, the protection seller is betting that the losses suffered by the holder of the mortgage, RMBS or Cash CDO will be

28

minimal.  In doing so, the protection seller is taking a "long" position on residential mortgages, while the protection buyer is "shorting" residential mortgages as a hedge against the risk of loss. CDS's thereby offer protection sellers – those betting on few losses – to take a long position on residential mortgages, RMBS and/or CDO tranches without having to take possession of any underlying assets.  Thus, while the number of RMBS's and CDO's that could be originated are necessarily constrained by the number of residential mortgages, CDS's offered protection sellers an additional avenue to increase their bet on the residential housing market.  There is, conceivably, no limit to the number of CDS-type insurance policies that can be written in connection with existing RMBS's and CDO's.

58.    Credit Suisse's origination of Synthetic CDO's mirrored its origination of Cash CDO's.  As with Cash CDO's, Synthetic CDO's issued senior, mezzanine and equity tranches. The senior or super senior tranche of Synthetic CDO's, however, carried an additional risk because they frequently remained unfunded, meaning that senior investors received a portion of the CDS premium payments without initially contributing any funds into the collateral account. If the referenced assets suffered losses which exceed the senior attachment point, the bondholders would be forced to pay the excess amount to the CDO issuer, much like an insurance company.  Credit Suisse significantly increased its synthetic CDO's in 2007.

59.    As a risk management tool, Credit Suisse engaged in substantial hedging seeking to reduce its RMBS and CDO exposure to the sub-prime crisis.  Hedges may or may not, however, closely correlate to the risks they purport to protect.  At Credit Suisse, as reported by its former employees, Credit Suisse often failed to obtain the reported hedging benefits from its purchases of CDS, because, due to internal control deficiencies, the trades could not be timely confirmed with its counter-parties. Where the Company considered the hedge to closely correlate

29

to the related risk, Credit Suisse would net out the two items in reporting its financial exposure. In repeatedly announcing that its exposure to sub-prime risk was "de minimis" or "remote," Credit Suisse "netted" out the "long" positions with hedges that were not correlated to the risk. Credit Suisse first disclosed its "gross" exposures on its CDO securities on March 20, 2008, in slides presented to analysts for its earnings call on its 2007 annual results.

Sensitivity of Credit Suisse Structured Products to the Residential Housing Market

60.     The value of RMBS and other structured products contrived by Wall Street financiers is dependent upon the ability of the underlying mortgage borrower to repay the mortgage loan. Irrespective of the number of times that a pool of mortgages is re-sold and re-packaged into new and different financial instruments, those instruments are ultimately completely dependent upon the performance of the borrowers in the underlying pool of mortgages. If borrowers are unable to make their mortgage payments of remittances, *i.e.*, the "credit risk," the asset-backed security (be it RMBS or CDO) will fall in value. Under the "fair value" accounting method used by Credit Suisse, a mark down of fair value would immediately translate into the recognition of losses on its financial statements. The increasing risks of non-payment should also have appeared in Credit Suisse's reported exposures or "position risk" for these securities.

61.     The value of RMBS or CDO's are also extremely interest-rate sensitive in that they compete with other securities in the market with rates of return determined by current rates. Increases in the interest rate also affect the trading values of RMBS and CDO's, because they affect the risk from borrower defaults, particularly to the extent that the underlying mortgages were ARMs (where the interest rate paid by the borrower changes along with the prevailing market interest rates). Thus, if an RMBS or CDO is backed by a pool of sub-prime ARMs, as

many were, a rise in interest rates could cause the underlying mortgage borrower's monthly payment to balloon, increasing the likelihood that the borrower will default on the mortgage, thereby negatively impacting the value of the security. Moreover, where home values had fallen, borrowers were unable to refinance their mortgages and lenders were unable to recover the full loan balances when properties were foreclosed and sold.

62.    RMBS's and CDO's were further subject to a cascading devaluation because of rating agency downgrades of the quality of the RMBS and CDO bonds when borrowing in the underlying mortgage pools did not perform.. As the major investment banks holding the RMBS and CDO's wrote down their value based on the sub-prime crisis, the write-downs adversely affected the ratings and market indices for these complex and toxic securities that dictated their value.

**B.    Defendants Disregarded Clear Indications of Losses in ABS Fair Value and Asset Impairments During the Class Period**

63.    During the Class Period, defendants knowingly or recklessly ignored clear signals from market indicators, the effects of the sub-prime implosion on market participants, including their peer investment banks, and direct communications from regulators that the value of the Company's multi-billion dollar portfolio of RMBS's and CDO's was impaired and that Credit Suisse was required to provide more transparent and better disclosure to investors and ensure the accuracy of its valuations and risk assessments. Instead of quantifying and accurately disclosing its full investment exposures to the sub-prime crisis and timely recognizing losses, Defendants reported only aggregated amounts for investments that had been netted to conceal the company's actual sub-prime exposures, and personally assured regulators and its investors that its exposures were *de minimis* and remote.

Leading Indicators Showed Reduced Values Prior to and During the Class Period

31

64.    Prior to and during the Class Period, the leading indicators of the health of the mortgage market and value of RMBS's and CDO's demonstrated that Credit Suisse structured assets (and, by extension, "long" trading positions) were impaired and losing value.

*The Mortgage Market*

65.    As explained above, the value of Credit Suisse's "long" asset-backed securities' positions (as opposed to "short" positions that theoretically act as hedges) is dependent upon mortgagors staying current on their loans, and indirectly on the health of the underlying housing market itself.  Thus, there is a direct correlation between the state of the mortgage and housing market and the value of Credit Suisse's structured assets.  Industry experts use three main indicators to assess the current state of, and future prospects for, the mortgage market: (i) the Housing Price Index, which measures home prices; (ii) interest rates; and (iii) delinquency rates, which monitor the percentage of mortgagors who default on their mortgage obligations.

66.    The following chart demonstrates that U.S. housing prices collapsed in early 2006:

32



67.    As residential housing prices fell in the United States, interest rates increased dramatically causing a commensurate increase in rates charged on both fixed interest rate mortgages and ARM's:

**Rate Trends**



68.     The combination of decreasing home values and increasing interest rates was a perfect storm for the millions of U.S. mortgagors who had over-extended themselves by purchasing homes that they could not afford without low, teaser interest rates or other exotic mortgage terms.  In the early 2000s, as the residential housing bubble was growing, many buyers purchased homes that were out of their price range on the basis of 3, 5 or 7-year ARMs that featured low interest rates which re-set when the teaser period expired.  Such buyers wrongly assumed that they would be able to refinance the home upon expiration of the teaser interest rate and put the home's equity to use to obtain a long-term payment that they could afford.  But when home values began to decline in late 2005 and interest rates rose, millions of homeowners were faced with new, higher mortgage payments and no refinancing options.  The result, beginning in the first quarter of 2005 and continually increasing thereafter, including throughout 2006, was that mortgage default rates rose dramatically, particularly for non-prime loans such as sub-prime and Alt-A mortgages.



**Figure 11: Comparison of Prime Versus Subprime Delinquency Rates, Total US 1998-2007**

Sources: Mortgage Bankers Association.

69.    By 2006, Credit Suisse had amassed billions of dollars of exposure to sub-prime and Alt-A mortgage-backed assets.    Increasingly, the growing mortgage defaults were compromising the value of United States asset-backed securities by eroding the supposedly secure revenue streams that supported even the highly-rated RMBS and CDO tranches.    The erosion materially reduced the value of the assets and diminished their marketability, which, in turn, caused the bankruptcies and multi-billion dollar write-downs that swept through the banking sector during the Class Period (detailed below).

*The ABX Index*

70.    That RMBS and CDO values were being eviscerated in 2006 and 2007 by the increasing defaults of U.S. mortgagors was made clear by the trading platforms that monitored the pricing of this class of securities, including particularly the ABX Index.    The ABX Index measures the cost of purchasing "protection" for non-prime RMBS and CDO's.    Buying "protection" in this context is akin to purchasing insurance for an asset-backed security.    As in all markets, if the cost of purchasing insurance for an instrument goes up, the market is indicating a decline in value in anticipation of a future loss.

71.    Credit Suisse, like most large, international banks looked to the ABX Index to provide value transparency within the RMBS and CDO market and, accordingly, to help the banks accurately value their ABS portfolios and hedge against risks associated with holding and trading in sub-prime assets.    Credit Suisse and other banks looked to the ABX Index in measuring and updating the values of these complex assets, in part, because the American Institute of Certified Public Accountants' ("AICPA's") Center for Audit Quality affirmed the relationship between the ABX Index and the value of securities supported by sub-prime mortgage loans.

35

72.     The ABX Index tracked the cost of buying and selling CDS protection for selected RMBS tranches.  Each of the Index's 15-20 RMBS tranches had a different rating, from AAA to BBB- and was considered to be representative of other RMBS product tranches backed by sub-prime collateral with the same rating.  The components of the ABX Index were classified by vintage (*i.e.*, the year when the underlying sub-prime mortgage loans were issued).  For example, ABX Index 07-1 references sub-prime mortgage-backed RMBS tranches for mortgage loans originated in the second half of 2006.  Likewise, ABX Index 07-2 references sub-prime mortgage-backed RMBS tranches for mortgage loans that were originated in the first half of 2007.

73.     In the table above, "Series" refers to the type of loan ("HE" or Home Equity), the bond's credit rating (e.g., BBB), and the vintage of the referenced mortgage-backed securities (e.g., 06-2). "Coupon Rate" sets the annual premium payment (measured in basis points) that a protection seller agrees to pay a protection buyer over the life of the CDS.  For example, assuming a notional value of $100 million, a Coupon Rate of 224 on the ABX-HE-BBB 07-1 means that protection on a BBB-rated RMBS tranche issued during the second half of 2006 would cost roughly $2.24 million over the life of the CDS product.

74.     "Price" is the cost of buying the specific bond protection.  The "Price" is an expression of the par value of the referenced tranche.  The price is set to 100 on the day the particular Index is launched and equal to 100 cents on the dollar.  At 100, the only payment made by the protection buyer to the protection seller is the Coupon Rate.  If the Index drops below 100, however, it means that protection is becoming more expensive and that protection sellers are demanding an additional premium payment.  The amount of the additional premium is expressed by the amount by which the Index drops below 100.  For example, as of February 23,

2007, the ABX-HE-BBB 07-1 was trading at $76.80, a 23.20% discount from its 100 par value. The discount means that, in addition to the coupon payment detailed above, protection sellers were also demanding an up-front fee from protection sellers equal to 23.20% of the bond's face value.  In the $100 million example above, the discount translates into an up-front fee of $23.2 million to buy protection, in addition to the $2.24 million coupon payment that will be made over the life of the CDS.

75.     The ABX Index showed that no later than October 2006 the sub-prime mortgage-derived fixed income instruments were being adversely affected by the sub-prime mortgage crisis, and during February 2007, at the beginning of the Class Period, the ABX Indices declined 15-40% in response to rising default rates on sub-prime mortgages and the announced bankruptcy of several sub-prime mortgage originators.  An asset-backed strategist at RBS Greenwich Capital stated in a February 23, 2007 *Market Watch* article that "ABX needs protection sellers badly" but that "[r]eal (not perceived) problems in select mortgage pools and in the sub-prime mortgage lending industry do not make for an ideal fundamental opportunity at this time."

76.     As the chart below demonstrates, the value of the ABX indices plummeted during 4Q06 and 1Q-2Q07, demonstrating that the cost of insuring sub-prime RMBS and CDO bonds had increased dramatically.  Investors thus anticipated that the risks associated with sub-prime and RMBS and CDO tranches would almost certainly cause large losses.  Therefore, the collapse of the ABX Index during this period revealed that the value of RMBSs and CDO's backed by sub-prime mortgages was deteriorating at a hear-historic pace during late 2006 and 2007 – i.e., immediately prior to and at the beginning of the Class Period:

**Figure 5: ABX.BBB 06-2**



Source: Markit

77.     The two main ratings agencies – Standard & Poor's and Moody's Investor Services – also observed the rise in mortgagor defaults (and the attendant impact on ABS) in late 2006 and early 2007.  In a Standard & Poor's report for 3Q06, the agency observed that issuers claimed to be tightening their underwriting standards in response to rising delinquencies and early payment defaults.  Moody's likewise observed a trend in weakening loan quality, stating in 1Q07 that "loans securitized in the first, second and third quarters of 2006 have experienced increasingly higher rates of early default than loans securitized in previous quarters."  By June 2007, Moody's noted "following the pattern of serious delinquencies . . . cumulative losses for late 2006 pools have trended higher than those for early 2006 pools at the same points of seasoning."

78.     By the beginning of the Class Period, the damage caused from sub-prime delinquencies and defaults was already rolling through the mortgage and sub-prime lending markets causing massive losses and bankrupting sub-prime mortgage companies.  As a result, in

38

January 2007, the Financial Services Authority ("FSA"), the regulator for all financial service providers in the United Kingdom and a regulator of Credit Suisse, issued a Financial Risk Outlook that, according to the FSA, "warned about the risks associated with challenging market conditions" and the need to closely monitor valuations of financial instruments such as ABS that were becoming increasingly illiquid.

*Auction Rate Securities*

79.    Auction Rate Securities ("ARS") are bonds or preferred stock that investment banks, including Credit Suisse, offered to corporate, institutional and (less frequently) high net worth individuals. ARS are securities with interest rates or dividend yields that are regularly re-set through a "Dutch auction" process. In Dutch auctions, potential investors submit bids indicating the lowest yield at which the investor would be willing to buy the ARS. Typically, a Dutch auction would be held every 7, 28 or 35 days, depending upon the features of the particular ARS at issue. If investors do not make a sufficient number of bids in the Dutch auctions for an ARS, then the auction is said to have "failed," and the ARS are not sold. Although the issuer continues to pay pre-determined interest rate or yield to investors holding the ARS after a periodic auction fails, all of the current holders continue to hold the securities until a successful auction is held.

80.    By combining long-term debt with short-term features, ARS offered certain advantages to both issuers and investors. For issuers, ARS were a lower-cost financing option than a formal bond offering or traditional variable rate debt obligations in that ARS did not require third-party bank support and the financing process for ARS typically involved a fewer number of parties. For buyers, ARS provided a slightly higher after-tax yield than other cash-equivalent investments (such as money market instruments) and were typically AAA-rated.

39

Many investment banks, including Credit Suisse, marketed ARS as a little or no risk cash-equivalent investment that provided a mechanism by which to diversify cash-equivalent holdings while maintaining liquidity.  By the beginning of the Class Period, the market for ARS had grown to more than $250 billion.

81.    Some ARS are asset-backed instruments.  Such asset-backed ARS can be collateralized by many different kinds of collateral, including corporate bonds and other instruments, such as federally guaranteed student loans.  But collateral for asset-backed ARS can, and did, include sub-prime mortgages and CDO's.  Credit Suisse repackaged its own CDO's in its trading accounts and other high risk securities as collateral for ARS, and inappropriately and fraudulently marketed and sold these ARS to its money market clients as liquid and secure investments.

82.    Beginning in or about August, 2007, Dutch auctions for ARS began to fail, leaving investors who had been sold purportedly cash-equivalent, liquid ARS holding illiquid and devalued investments.  Credit Suisse customers who had been misled about the ARS products then discovered the truth and made complaints to senior officers at Credit Suisse and to Government regulators.  In the second half of 2007, Credit Suisse repurchased some, but not all, of the improperly placed ARS from its money market clients for almost $10 billion, and wrote off approximately $1 billion in losses for the loss in value of these assets.

**C.      While Credit Suisse Denies It's Exposed, Other Sub-prime Market Participants Start Recognizing Losses As Sub-Prime Obligations Lose Value.**

83.    Just prior to the beginning of the Class Period, on February 8, 2007, HSBC Holdings Plc ("HSBC"), the largest bank in Europe and third-largest in the world by market value, sent shockwaves through the market when it announced its first-ever profit-warning and increased its loan-loss reserves fully 20% more than analysts had predicted.  HSBC said that its

40

actions were a direct result of escalating default rates amongst sub-prime borrowers: "[t]he impact of slowing house price growth is being reflected in accelerated delinquency trends across the U.S. sub-prime mortgage market . . . It is clear that the level of loan-impairment provisions to be accounted for as at the end of 2006 . . . will be higher than is reflected in current market estimates."

84.     Also on February 8, 2007, one of the country's largest sub-prime lenders, New Century Financial Corp. ("New Century"), announced that the company would take a 4Q06 loss due to delinquencies and defaults associated with its sub-prime loan portfolio.  New Century also announced that it would need to restate certain 2006 results, and that the company would substantially reduce its volume of loan originations in 2007.

85.     Less than one week later, on February 13, 2007, Credit Suisse agreed in principle to purchase the assets of ResMae Mortgage Corp. ("ResMae"), the third-largest sub-prime lender in the country.  According to ResMae, it had been "devastated" by the surge in sub-prime defaults.  Goldman Sachs analyst Lori Applebaum observed in connection with the proposed ResMae sale that "the outlook for sub-prime mortgage credit quality remains extremely challenging . . . *The sub-prime mortgage market [is] now hitting peak levels of early payment defaults and delinquencies in 2007, with peak losses to follow*."  Credit Suisse did not complete its acquisition of ResMae because Citadel Investment Group bid 15% more for the lender than Credit Suisse had agreed to pay.

86.     On March 4, 2007, HSBC announced a huge, $11-billion write-down to cover losses at the bank's American entity, HSBC Finance Corporation, due to impairment of sub-prime assets, including a large volume of assets that HSBC had obtained when it acquired

41

Household International, Inc., a lender that specialized in sub-prime loans. HSBC's write-down led to the removal of two of HSBC's highest-paid executives.

87.    On March 12, 2007, the New York Stock Exchange suspended trading in New Century stock on fears that the sub-prime lender would declare bankruptcy imminently, largely as a result of a tidal wave of defaults by sub-prime borrowers that had triggered repurchase obligations on loans that New Century had sold to leading financial institutions such as Bank of America, Citigroup, Morgan Stanley and Barclays Bank. Three weeks later, on April 2, 2007, New Century declared bankruptcy when it could not reach an agreement with its creditors on its sub-prime loan repurchase obligations – the lender held $35.1 billion in debt at the time of its bankruptcy. In connection with the bankruptcy announcement, University of California senior economist David Shulman said that "the sub-prime problem in the sub-prime are is just the tip of the iceberg for the mortgage market as a whole . . . *For all practical purposes, the sub-prime market is in the process of shutting down*." Steven Persky, CEO of Dalton Investments LLC, a Los Angeles-based hedge fund, observed that "*[t]he sub-prime guys are dead*."

88.    On June 22, 2007, investment bank the Bear Stearns Companies ("Bear Stearns") took the emergency measure of pledging up to $3.2 billion in loans to bail out a proprietary hedge fund that the bank admitted was collapsing under the weight of continued sub-prime delinquencies and defaults. The Bear Stearns action was the largest hedge fund bail-out since a consortium of twelve banks combined to provide $3.6 billion to save Long-Term Capital Management in 1998. The *New York Times* reported the next day that while "Bear Stearns averted a meltdown this time," *the state of the sub-prime market could leave "Wall Street firms . . . holding billions of dollars in bonds and securities backed by loans that are quickly losing their value*."

42

89.    On July 30, 2007, HSBC reported an additional *$6.35 billion in write-downs* due to sub-prime loans.  The same day, stock of sub-prime lender American Home Mortgage Investment Corp. ("American Home") declined 90% and trading was thereafter halted when the bank announced that it did not have cash sufficient to continue lending.  Unlike New Century, American Home specialized in Alt-A sub-prime loans, particularly an exotic loan referred to as a "pay option" loan, which is an adjustable rate loan that permits borrowers to defer some interest payments.

90.    David Olson, former director of market research at Freddie Mac, stated in connection with the American Home unraveling that "[w]e obviously have a major correction going on in the mortgage market; it started in sub-prime and now it's shifting to Alt-A."  Vincent Arscott, an analyst at Fitch Ratings, reported that "*[i]t's another one on the heap* . . . American Home played in a little more of the Alt-A space, and that's why they were able to hang on a little longer."

91.    On August 2, 2007, sub-prime lender Accredited Home Lenders Holding Co. ("Accredited") announced that it might have to file for bankruptcy because its sale to a rescue buyer was in doubt.  Four days later, on August 6, 2007, American Home filed bankruptcy.  A little over one week later, on August 15, 2007, Merrill Lynch warned that Countrywide Financial ("Countrywide") – the largest mortgage lender in the United States – might face bankruptcy.  Countrywide temporarily averted bankruptcy by securing an $11 billion loan from a consortium of banks, but the company would be forced to sell itself to Bank of America several months later.

92.    By August 22, 2007, Lehman Brothers Holdings, Inc. ("Lehman") – the biggest underwriter of U.S. bonds backed by mortgages – had shut its sub-prime-lending unit and

43

Accredited stopped making home loans altogether.  Ameriquest Mortgage, one of the nation's largest sub-prime lenders, went out of business and, by August 31, 2008, had agreed to a fire sale of its assets to Citigroup.  By the time Quality Home Loans ("Quality") filed for bankruptcy protection, *fifteen mortgage lenders had declared bankruptcy in the first eight months of 2007, and more than 90 lenders had ceased operations or been forced to seek a buyer.*

93.     Meanwhile, Credit Suisse, in its 2006 annual report declared that 2006 was a "record year," the "best ever result in the history of the bank."  Purportedly, the income of its investment banking division grew by 272% over its 2005 results.  In its first quarter 2007 ("1Q07") report, investment banking at Credit Suisse reported "record quarterly revenues in debt underwriting and fixed income trading," and that "the adverse impact from the dislocation of the US sub-prime mortgage was contained."  For second quarter 2007 ("2Q07"), Credit Suisse's Investment Banking division again purportedly delivered "record revenues," even while it noted "the dislocation of the US sub-prime mortgage market as of the end of 1Q07, the effects of which carried over into 2Q07."  Credit Suisse, in none of these filings identified any asset mark downs or loss reserves for sub-prime securities.  Nor were its sub-prime exposures separately identified in its financial statements or management discussions and analysis ("MD&A") in its annual or quarterly reports.  The amounts at risk reported for even the aggregated categories of assets were *de minimis* and made without meaningful disclosures of the underlying assumptions used for their determination.

94.     On August 28, 2007, Fassbind received an SEC Letter commenting on the Company's disclosures in its 2006 annual Form 20-F, and particularly requesting that Credit Suisse provide "more clarity about [the Company's] exposure to sub-prime loans."   (SEC Comment Letter dated August 28, 2007 at 2).  Credit Suisse responded to the SEC's request by

44

brushing aside any suggestion that the Company had worrisome sub-prime exposures, refusing to quantify the extent of its exposure (despite seven separate requests by the SEC for the Company to quantify certain exposures and involvement in sub-prime and mortgage-backed securities) and stating unequivocally that "*a material adverse impact on our financial condition, results of operations or liquidity resulting from our involvement in sub-prime lending is remote* due to the reduction of our sub-prime residential loan exposures, our active management of our sub-prime risks and our economic hedging of such risks." Credit Suisse also directed the SEC to its 2006 Annual Report, footnote 29, which reported the Company's purported exposures and risk sensitivities on the basis of aggregated classes of its securitized assets. (Credit Suisse Letter to SEC dated September 26, 2007 at 10, 13) (emphasis added).

95.    The SEC responded on October 16, 2007 by stating that *"[w]e caution you to evaluate, on both a quantitative and qualitative basis, the appropriate amount of transparent disclosures you provide regarding your sub-prime lending so that readers are informed about your level of involvement in these activities."* (SEC Letter dated October 16, 2007 at 2) (emphasis added). Credit Suisse, by letter dated November 13, 2007, responded that it "acknowledges the Staff's Comments and will evaluate its disclosures regarding sub-prime lending activities in future filings with the Commission." Nonetheless, in filing its third quarter 2007 ("3Q07") results (which it filed November 1, 2007), the Company again failed to quantify its sub-prime exposures, and despite reporting billions of dollars of write-downs for its leveraged finance and structured products generally, actually claimed to have earned an undisclosed amount of *profit* on its sub-prime securities. At the November 1, 2007 Credit Suisse conference call, Fassbind elaborated upon these anomalous results:

> In structured products, the mortgage sector continued to experience liquidity challenges and increased delinquencies. The recorded markdowns of CHF1.1

45

billion related to our structured products business including RMBS, CMBS, and CDO's, net of fees and hedges.  On a gross basis, we recorded markdowns of CHF2.5 billion.  Let me give you some further detail on this CHF1.1 billion markdown.  In broad terms, the markdown is equally split across the three product areas mentioned; RMBS, CMBS, and CDO's.

In addition, it's important to note that *the impact from sub-prime exposures was slightly positive in the quarter.*  As we indicated with our second quarter results, we continue to feel comfortably positioned in terms of our balance sheet exposure to residential sub-prime, as evidenced by the positive contribution during the third quarter.  And *our CDO exposure is a fraction of what has been recently disclosed by some of our peers and is de minimis*.

(Emphasis Added)

As analysts repeatedly asked Fassbind and others on the call to identify the dollar amount of the Company's sub-prime exposure, they flatly refused asserting only (and falsely) that the amounts were "de minimis" and the Company's exposure to loss "remote."

96.    The news across the rest of the industry of damage to sub-prime lenders and investment banks, however, continued to worsen:

- Northern Rock, a United Kingdom mortgage lender with nearly 20% of the UK mortgage market, *sought emergency financial support* from the Bank of England;

- The European Central Bank and the Federal Reserve Bank of the United States took unprecedented steps to provide liquidity to credit markets frozen by the impact of the sub-prime collapse;

- Swiss bank UBS AG ("UBS") *wrote down $3.4 billion* of assets because of losses due to the sub-prime crisis, which the *International Herald Tribune* reported "*illustrat[ed] the impact of the cascading global turmoil*" over sub-prime lending (emphasis added);

- Merrill Lynch reported that it would need to *write down $5.5 billion* in assets for bad investments linked to defaulted sub-prime mortgages;

- Citibank reported a 57% decline in net income, including *more than $2 billion in write-downs* and losses due to the sub-prime market turmoil and associated ABS valuation declines.

46

- Citibank, JP Morgan Chase and Bank of America announced plans for a "super fund" to be created by reeling investment banks to purchase as much as $100 billion in assets that had become illiquid in the wake of the sub-prime mortgage crisis;

- Standard & Poor's predicted that United States sub-prime losses would reach $150 billion.

97.     On October 24, 2007, Merrill Lynch announced that the $5.5 billion write-down on sub-prime assets that it had disclosed just weeks earlier would be an *$8.4 billion write-down*. One week later, on November 4, 2008, Citigroup announced that its sub-prime exposure would cause the bank to incur an additional *write-down of up to $11 billion*.  The same day, Citigroup Chairman and CEO Charles Prince was forced out of the bank.

98.     On November 8, 2007, Morgan Stanley issued a press release entitled "Morgan Stanley Provides Information Regarding Sub-prime Exposure" and reported that revenues for the two-month period ended October 31, 2007 had been *reduced by $3.7 billion* due to the decline in value of sub-prime assets as indicated by relevant benchmarks and "as reflected by the sharp decline of the ABX Indices."  Morgan Stanley reported that the sub-prime ABS exposure it was writing down was in the most senior tranches of sub-prime ABS CDO's.

99.     On November 22, 2007, the Organization for Economic Cooperation and Development ("OECD") released a study indicating that *total United States sub-prime losses would reach $300 billion*.  The OECD study was not alarmist – ten days earlier, Deutsche Bank analysts had predicted as much as *$400 billion in total losses* on sub-prime mortgage assets.

100.    On December 10, 2007, UBS announced that it would *write down an additional $10 billion* assets as a result of the sub-prime market implosion.  The UBS write-down was equivalent to the bank's entire net profit in 2006.  *By the UBS announcement, banks had announced losses on write downs related to sub-prime exposures of over $70 billion.*

47

101.    Thus, the environment for sub-prime, including Alt-A, loans and securities was toxic by the beginning of the Class Period and sharply worsened throughout the Class Period. The (i) increase in mortgage defaults; (ii) decline in home values; (iii) decrease in remittance payments; (iv) the decline in the ABX Index; (v) severe financial difficulties faced by mortgage originators and other investment banks, including tens of billions of dollars of write-downs on sub-prime assets and dozens of bankruptcies; and (vi) distressed asset sales and write-downs clearly indicated that value of sub-prime and Alt-A mortgages and mortgage-backed securities were impaired and would continue to deteriorate.

102.    And yet, right through the February 12, 2008 analyst conference call for the Company's fourth quarter 2007 ("4Q07") results, the Defendants continued to maintain that the Company had dodged the bullet and outperformed the industry through its superior "risk management culture."  Then, to the market's great surprise, one week later, on February 19, 2008, Credit Suisse announced $2.85 billion in losses on the fair values of its asset-backed securities, the CDO's that had been "mismarked" for sub-prime debt.

**D.    Defendants Vouch For The Integrity Of Credit Suisse's Flawed Controls And Risk Management.**

103.    In its 2006 annual report Credit Suisse reported that it faced and actively managed seven major categories of risks, most of which were implicated by the sub-prime crisis.

-- Market risk -- the risk of loss arising from adverse changes in interest rates, foreign currency exchange rates, equity prices and other relevant market rates and prices, such as commodity prices and volatilities;

-- Credit risk -- the risk of loss arising from adverse changes in the creditworthiness of counterparties;

-- Expense risk -- the risk that the businesses are not able to cover their ongoing expenses with ongoing income subsequent to a severe crisis, excluding expense and income items already captured by the other risk categories;

48

-- Liquidity and funding risk -- the risk that the Group or one of its businesses is unable to fund assets or meet obligations at a reasonable or, in the case of extreme market disruptions, any price;

-- Operational risk -- the risk of loss resulting from inadequate or failed internal processes, people and systems or from external events;

-- Strategy risk -- the risk that the business activities are not responsive to changes in industry trends; and

-- Reputational risk -- the risk that the Group's market or service image declines.

104. In its 2006 annual report and for each quarterly financial report published during the Class Period, Credit Suisse reported modest amounts for its "position risk" on aggregated groups of securities, including for "real estate and structured assets" and for "international lending and counter-party" assets. In its financial reports, Credit Suisse defined "position risk" as, "the level of unexpected loss in economic value on the Group's portfolio of positions over a one-year horizon that is exceeded with a given, small probability (1% for risk management purposes; .03% for capital management purposes.)"

105. This annual report includes 23 single-spaced pages describing the Company's "Risk management," including sections on "risk management oversight" -- which contained a description of the risk oversight performed at the levels of the Board of Directors, Group management (including by the Group Chief Risk Officer ("GCRO"), the Bank management lead, risk management committees (including the Capital Allocation and Risk Managemetn Committee ("CARMC"); Risk Processes and Standards Committee ("RPSC"); Credit Portfolio and Provisions Committee ("CPRC"); Reputational Risk Review Committee ("RRRC"); and Divisional Risk Management Committee ("RMC"). Each of these committees must have been keenly aware of the sensitivity of the pricing of complex products based on sub-prime mortgages -- an obvious and critical aspect of managing potential losses on the products -- because, as

49

Dougan put it in a January 1, 2008 interview with Brian Caplen, editor of The Banker's magazine,

> One of the odd things about the whole sub-prime crisis is that it is probably the longest anticipated crisis we have ever seen.  The truth is we took some hits a year ago back, in November and December 2006, and we dramatically adjusted the size of our positions and the size of our business, and also did more hedging. We were a little surprised that the market became fine again in January and February [2007].  In March, we had a bad spell, then it was good again in April and May and by summer there were serious problems.
>
> ***But all along we had a clear view that this was a market that was going to have difficulty.***

During this same interview Dougan explained that while he was head of the Investment Banking division before succeeding retiring Oswald J. Grüber to the position of Chief Executive Officer, he had weekly calls about managing the risks of the sub-prime mortgage crisis.

106.    Credit Suisse also utilized complex mathematical models referred to as "ERC," economic risk capital, and "VAR," value at risk, to track changes in its exposures resulting from changes in its asset portfolio and changing market conditions.

107.    Under the valuation process implemented at Credit Suisse, the traders in Investment Banking, in the first instance, determined the "fair values" ascribed to its complex securities, and the traders were required to "mark them to market" on a daily basis -- *i.e.,* to adjust their values, and to take the valuation changes into income, based upon on-going changes in market conditions.  As Fassbind explained in the 2Q07 earnings call, "[d]epending on which accounting rules you are with, if you are at fair value which is our concept base, basically, the Investment Bank is managed basically on a daily basis, you [assess] the value and you correct it accordingly."  The accounting rules to which Fassbind was referring were SFAS 115, 157 and 159 which required Credit Suisse to immediately recognize in its reported income changes in the "fair value" of assets held within its trading portfolio.

50

108.    The primary "internal control" at Credit Suisse over the pricing and valuation of these sensitive and complex products was the use of a purportedly "independent" group of product analysts, in the "product control" division, that reported to the CFO, Renato Fassbind. As Fassbind explained in the 3Q07 earnings call:

> In our trading operations, our specialists are responsible for marking their positions on a daily basis with price testing and verification performed by a separate and independent function, our product control department, which, by the way, reports to me. We have processes in place to ensure that the reported fair values, including those derived from models, are appropriate and determined on a reasonable basis. Independent functions review and refine the mathematical models used to calculate the value of our complex products.

109.    At the fourth quarter 2007 ("4Q07") earnings call, Wilson Ervin, the Company's Chief Risk Officer, further attributed Credit Suisse's success in dodging the sub-prime bullet to the direct participation of the CFO and CEO in oversight of the price verification and risk management processes:

> We have a strong risk framework in governance. We have an independent risk function that reports to the CEO, with strong senior oversight. We have independent pricing controls and consistent fair value descriptions across these key sectors, reporting to Renato, our CFO.

> *        *        *

> Back at the Risk Investor Day in May, we talked about a risk philosophy and maintaining strong disciplines across the Bank. Those strong foundations were important to us then and remain doubly so today. We maintain a broad perspective and the tools that are sophisticated enough so that we can capture our positions effectively and systematically, but we don't lose sight of common sense, which is perhaps the most important tool in the toolbox.

> We have a strong risk culture that takes a proactive approach to managing positions and an independent risk function that reports straight to the CEO. While we work in close partnership with the business, we're empowered to say no. We have strong management oversight, including executives with strong trading floor experience in complex markets, and we have an active Board. Our management and governance has helped us to make good decisions both before and during this event.

51

So, in summary, Credit Suisse has been able to navigate the events of late 2007 effectively.   It wasn't painless or perfect, but it has been effective and demonstrated the benefits of our disciplined approach to risk.  Our positions are actively managed and have been cut significantly in Q4.  We have extensive hedges in place to reduce P&L swings and our credit performance continues to be solid.

110.    One week later, on February 19, 2008, these same executives announced that traders had been tardy in updating their marks on CDO's and RMBS and that additional losses of $2.85 billion in their fair value had been incurred.  In explaining this shocking shift from the announcement a week previous, Dougan insisted that the problems were "isolated," caught "very rapidly" and by "our internal processes."  He further stated that the disclosure was "voluntary" and "not normally something that we would disclose," but that they had done so, "in connection with our bond issue which we had launched and which we're selling today."   The Press, however, reported that, in fact, KPMG had forced the write-down by refusing to sign off on the offering.

111.    On March 20, 2008, in an earnings call held the same day that "revised" 4Q07 financial statements were filed, along with the Company's 2007 annual report, Dougan explained that, based upon an internal review conducted with outside counsel, approximately $1 billion of the earlier announced valuation reductions had, in fact, occurred in 4Q07 rather than in 2008. Dougan, however, continued to insist that the Company's "overall control framework" was "sound."  In response to an analyst question as to how this mispricing could have been missed, noting that, "I would have thought there would have been an extra focus on these particular portfolios given the volatility in the market," Dougan conceded that to be a "very reasonable question."   He attributed the lapse to the fact that the market was "volatile," the securities themselves were "extremely illiquid" noting that "some of these securities can see 40 point bid offer spreads," and that because "intentional misconduct" by some of the traders was involved,

52

the problem had been harder to identify.  Dougan's first two reasons, however, concede that he and other senior executives had long understood the enormous risks of incorrectly pricing these critical investments in huge amounts, and that he had done nothing to protect against either mistaken or "intentional" mispricing that flowed naturally from the glaring internal control deficiencies at Credit Suisse.

112.   Far from considering the mispricing to be an unfortunate isolated incident, the Company's auditor, KPMG, found that the mispricing had occurred as a result of a "material weakness" in the Company's internal controls over the pricing of its complex securities:

> The following material weakness has been identified and included in management's assessment controls over the valuation of asset-backed securities positions in the collateralized debt obligations trading business in Investment Banking relating to the supervision and monitoring of the initial valuations of these positions by trading personnel and the related price testing and supervision by product control, which is segregated from trading, were not effective.

113.   Later, Credit Suisse's UK regulator, the FSA, in imposing what it considered to be a "significant" five million dollar fine, publicly revealed the results of the Company's internal investigation which further demonstrated that systemic internal control problems had existed for at least five months before the February 19, 2008 announcement.

114.   The FSA's "Key Review Findings" included:

- There were failures to respond adequately to a number of warning signals or "red flags" and to translate identified concerns about price testing variances in CDO positions within the SCG into tangible or timely actions;

- Certain personnel within control functions with responsibility for recording or checking prices were overly deferential in challenging certain SCG traders and do not appear to have had sufficient seniority or management support to challenge effectively;

- Undue reliance was placed on the technical ability and revenue contribution of certain Front Office staff, who were highly influential in down-playing price testing variances and in influencing the price

53

testing methodology used, and did not take appropriate action to control and manage such staff effectively; and

- Certain control functions failed to escalate in a timely manner price testing variances that were identified, owing to issues such as the complex booking structure used for the CDO trading business, a lack of effective supervision over price verification processes and an over-reliance on assertions made by certain Front Office staff.

115. These findings were, in turn, premised on the following chronology of events supplied by the Company to the FSA from its internal investigation:

- By September 2007, Credit Suisse had identified CMBS, RMBS, Leveraged Finance and CDO's as priority risk areas which warranted concern and organised detailed review meetings by product type, including for CDO and ABS products.

- In August/September 2007, some significant price testing variances in the SCG's books were identified but, although questions were asked, the explanations given by certain traders were not adequately challenged.

- In October 2007, inconsistencies in the valuation of ABS bonds were identified between different books held by the SCG. The differences were attributed to timing differences (i.e. London versus New York closing prices), but were not investigated further.

- Price testing variances continued to be identified in November and December 2007 but concerns were not effectively escalated or resolved. Certain traders were able to continue pricing certain positions higher than market indices despite requests to the contrary.

- In December 2007 and January 2008, Credit Suisse discussed with certain traders variances identified in a benchmarking exercise between Front Office marks and the ABX index (an index referencing asset-backed securities). Explanations provided by the relevant traders to not appear to have been challenged sufficiently. Credit Suisse agreed to perform a further detailed analysis of specific marks relative to the ABX index.

- At the end of January 2008, a Front Office supervisor of the SCG undertook a "CDO drill down" of the SCG's books. Concerns were raised in February 2008 that some positions were over-valued.

54

- On 12 February 2008, Credit Suisse announced its financial results for 2007.

- On 15 February 2008, Credit Suisse notified the FSA that, based on some preliminary work, there was a potentially material mismarking issue and that additional analysis was ongoing.

- On 17 February 2008, Credit Suisse suspended a number of traders.

- On 19 February 2008, Credit Suisse announced the repricing of asset-backed positions, estimated at USD 2.85 billion.  The write down was revised on 20 March 2008 to USD 2.65 billion (CHF 2.86 billion).

116.    Even these findings, however, only begin to scratch the surface of the wholesale breakdown in Credit Suisse's internal controls over the pricing of the complex securities that everyone understood were critical given the dislocations in the sub-prime market and the scrutiny of the SEC and other regulators.

**E.      Credit Suisse's Former Employees Confirm The Knowing And Long-Standing Violations Of Pricing Controls.**

117.    Credit Suisse, in its financial reports, claimed to use sophisticated models to manage its significant risks over the pricing and valuation of complex structured assets in Credit Suisse's proprietary trading accounts, including its RMBS, CDO's and other leveraged securities which did not actively trade in established public markets.  It also claimed to manage its sub-prime risk, through active hedging of, *inter alia*, the credit risk through the purchase of credit default swaps ("CDS's"), which effectively served to insure against borrower defaults on the ABS.  Credit Suisse claimed to update and "mark to market" the complex securities on a daily basis.  The tools which Credit Suisse purportedly used to verify its exposure included an "Economic Capital Risk" ("ERC") model which was designed to measure all quantifiable risks and "Value at Risk" or "VaR," a tool used to measure the potential loss in fair value of trading

positions due to adverse market movements over a defined time horizon and for a specified confidence level. The VaR tool used historical market data accumulated over a two-year period.

118. In quantifying and presenting the amounts of these complex products on its balance sheets, and recognizing losses on its income statement for adverse changes in the market for these securities, Credit Suisse purported to calculate and test the "fair value" of the securities at a 99% confidence level, which means that there is a "1-in-100" chance of incurring a daily mark-to-market trading loss that is at least as large as the reported VaR."

119. The reliability of the VaR model, and its results, were purportedly checked daily through "backtesting" which compared the actual daily backtested profit and loss attributable to movements in financial market variables to the amounts derived by the VaR model using a one-day holding period. As Credit Suisse explained in its financial reports, "an accurate one-day, 99% VaR model should have no more than four backtesting exceptions per year." In 2006, the Company reported four backtesting exceptions. In its 2007 annual report, filed March 20, 2008, the Company reported nine overall backtesting exceptions, and 15 backtesting exceptions using backtesting profit and loss, a subset of actual daily trading revenues which includes only the impact of daily movements in financial market variables, such as interest rates, equity prices and foreign exchange rates on the previous night's positions.

120. Confidential Witness #1, a former Credit Suisse project manager and product controller from approximately 2001 through early 2007, reported to the Director of Product Control in the New York Office. In her role as a product controller, the witness was aware of several internal control deficiencies relating to the processes for accounting for and valuing assets, as well as a number of projects to remediate deficiencies. She explained that for some of Credit Suisse's complex "conduit" products there was no market equivalent and therefore, the

56

valuations of such products was largely dependent on "what the trader had to say." She explained that there were as many as 10 to 15 different data sources that the traders could use in the valuation process, and that there were "substantial" differences in the resulting valuations dependent on which source was used, so that a potential existed that the source providing the most attractive valuation would be utilized while disregarding those sources that did not provide as high a valuation.

121. Witness #1 explained that in the summer of 2006 a team from Zurich was tasked with reducing the number of information providers or "data sources" that traders could use. This project had not been completed by the time she left in early 2007.

122. The witness explained that, beginning in September 2006, she had worked on a project evaluating the Company's "value at risk" models. By January 2007, the project group had identified 800 variances between where the traders had priced certain assets, the "exotics," and what the product controllers believed the true value to be. The product controllers were then tasked with determining the reasons for the exceptions which involved interviewing the traders and closely examining the data. Following this process, the variances were considered to be "false negatives" and taken off the "exception list." According to this witness, the variances were considered "false negatives" and removed from the exception list if the traders offered a plausible explanation for their valuations. Witness #1 explained that the decisions about which testing exceptions to report to the Company's regulators and how many to report were made by the global heads of the various business units, such as Fixed Income.

123. The negative test results represented instances in which the proclaimed profit did *not* stand up against changes to the data in the models. The witness emphasized that, when the valuation at risk models were tested at Credit Suisse beginning in at least 2005, it was obvious

57

that there were far too many negative test results that demonstrated that the profit proclaimed and recorded in Credit Suisse's general ledger did not hold up against changes to the data in the models. These findings set off "huge alarm bells" throughout Credit Suisse.

124.    The witness said that she and her colleagues and superiors had not expected to see the number of negative test results that materialized. As she put it, the negative test results that emerged should "not have been that high" and the findings "did not make sense to anyone." The negative test results were primarily centered around two product lines. There were some negative test results related to collateralized debt obligation ("CDO") assets. However, the majority of the negative test results related to exotic derivatives and convertible bonds. The exotic derivatives included options in illiquid products and swaps.

125.    In the July or August 2006 timeframe, Witness #1 prepared four PowerPoint presentations regarding the 800 false negative results. She presented the total number of false negative results and details about why the negative test results were occurring to a team of senior executives, which included a senior executive in the Risk organization and also to the Global Head of Operations and Product Control, Dan McHugh, who reported to the CFO, Renato Fassbind. In her presentations, she recommended that an evaluation of front office systems be performed. However, her request for access to these systems as a next phase of the project was denied on the grounds that the negative test results were a "Product Control issue" and, therefore, remediation of the issues should only concern the middle office systems and processes.

126.    The witness explained that Defendants CEO Brady Dougan and Fassbind were aware of the significant number of negative test results. She became aware of this based on comments made by Head of Special Projects for the Controllers Division Judy Heicklin. Heicklin noted that the project on which the witness was involved to quantify the negative test

58

results and identify solutions to the issues creating the negative test results was "on the radar" of Dougan and Fassbind. Moreover, the project had been "run up through the executive committee," including Dougan and Fassbind. The witness said that Dougan and Fassbind, and others throughout the Company, "knew that there were issues with valuations" as of at least late 2005. To support her point, the witness noted that the Valuation Risk Group was established at the end of 2005 to deal with the valuation issues and to act as an internal third party to validate the complex models used in valuations. The Valuation Risk Group was in addition to the Special Projects Team and Operations Risk Group, which also dealt with matters pertaining to valuation issues.

127. The witness further pointed out that there were monthly Structured Trade Reviews at the New York office. These reviews consisted of presentations by the Trading team to a Risk Committee, during which the trades of credit default swaps ("CDS") and associated liabilities were "mapped out," so that the extent of liabilities could be identified and corresponding hedging strategies could be evaluated. Although the witness did not attend these reviews, she understood from systems and processes that she evaluated that the documentation presented at the reviews included details about the counterparties to the trades and where the liabilities associated with the trades purportedly existed. However, the Trading team that mapped out the documentation for the Structured Trade Reviews did not have a "true and clear picture or understanding of where all the liabilities were." The witness explained that the consequences of this lack of understanding regarding the true extent of Credit Suisse's liabilities, was that the Company's hedging strategy was flawed. She noted that the Company was hedging its CDO exposure with CDS, which she was aware of based on reviewing various "projects in the pipeline." For example, the witness said that there were projects to improve and standardize

59

the Structured Trade Reviews in a bid to improve the identification of liabilities and hedging activities. One such project in Europe began in 2006 and a second, similar project in New York began in early 2007. The witness learned from reviewing the objectives of these projects that Credit Suisse was hedging its CDO exposure with CDS, but that this strategy was flawed. The fact that Credit Suisse did not have an understanding of the liabilities associated with the trades of CDS meant that the hedging of CDO's with CDS was ineffective because the CDO's and CDS did not correlate.

128. Confidential Witness #2, was a former director of market risk management in Credit Suisse's New York offices between 2004 and early 2007. In this role he was very heavily involved with the CDO group. He was responsible for several projects related to identifying and monitoring trends in the sub-prime ABS CDO market and identifying the related risk exposure.

129. Witness #2 knew Kareem Serageldin, the trader supervisor who has been identified in the press as the person responsible for the intentional mismarking of the CDO's. According to Witness #2, Serageldin was promoted in early 2007 from overseeing a small CDO group to Global Head of Credit Suisse's synthetic CDO group, covering the New York and London offices. The witness explained that before his promotion Credit Suisse held mostly cash CDO's but Seragaldin shifted the book of business to "mostly" synthetic CDO's. Credit Suisse held billions of dollars of "super senior" tranches of CDO's; these were the CDO's that were written down pursuant to the February 19, 2008 announcement.

130. Witness #2 explained that Credit Suisse's super senior tranches were held on Credit Suisse's books at the original values which were supposedly based on "comparables," but that often true comparables did not exist. Also, super senior tranches generally did not trade often. According to the witness, one issue that led to the markdown was that Credit Suisse

60

rarely, if ever, marked down the value of the super senior tranches after they were recorded at their original value.

131.     Witness #2 explained that the product controllers lacked the knowledge to effectively perform their duties.   They rarely challenged traders' marks, explaining that "challenging the traders' marks at Credit Suisse was a good way to screw up your career."

132.     The witness also said that the models used by the Valuation Risk group personnel were "a little bit phony."  He noted that the role of the Valuation Risk group was to assess how much money Credit Suisse could potentially lose and to determine the Company's risk-related capital requirements, as imposed by the European Banking Committee ("EBC").   The Company's Commercial Mortgage Backed Securities ("CMBS") and Leveraged Loan organizations were subject to capital requirements by the EBC in the range of six to eight percent of its value at risk, depending on Credit Suisse's credit rating.  However, the models used by the Valuation Risk group were designed to make it "appear" as if Credit Suisse carried minimal risk, so that the risk-related capital requirements were low.  If the risk-related capital requirements were low, Credit Suisse could use money for other purposes that might otherwise have to be used to satisfy the capital holding requirements.  The witness understood that the risk-related capital requirements, as calculated using the models, were reviewed by CFO Renato Fassbind.  The witness emphasized that risk-related capital requirements were "important" for Credit Suisse and, therefore, "everyone" saw and paid attention to the risk-related capital requirements.  The problem with the valuation at risk models, as the witness explained, was that they were based on a two-year history.  He clarified that the data going into the models, for instance for the years 2004 through 2006, was based on mortgage default rates during that period.  As such, the results of analysis based on that data suggested that the default rates would remain low, as they had been

61

in prior periods, over the periods to come. The flaw was that the model ignored present economic conditions, which included the escalating default rates of the credit crisis.

133. Beginning in 2005, the witness was concerned about the risk that the super senior tranches might not be able to be sold at the value at which they were being held on Credit Suisse's books, as well as other risks resulting from sub-prime mortgage-related assets. As he explained, he believed that there was potential for sub-prime related issues beginning in 2005 and he prepared a memorandum regarding his concerns in this same time frame. If there were widespread defaults on sub-prime loans, the value of Credit Suisse's super senior tranches could also be at risk, as lower grade tranches failed to perform and investors' interest in the higher grade tranches waned as a result. The witness submitted the memorandum he prepared to Wilson Ervin in 2005. In the memorandum, he explained that 2005 was likely the "peak" of the mortgage market and that given the U.S. mortgage market trends, especially the lackadaisical underwriting standards at the time, there would likely be a "big problem."

134. Confidential Witness #3, from late 2005 to mid-2007 was a product controller. From mid-2006 to mid-2007 he worked as a coordinator for interest rate swaps and then as the Coordinator for credit default swap ("CDS") drafts.

135. As a Product Controller, the witness was responsible for analyzing profits and losses pertaining to trades each day and liaising with the Traders to confirm the profit and loss details. As a CDS Draft Coordinator, Witness #3 was responsible for manually confirming details of over-the-counter ("OTC") credit derivative trades that Credit Suisse executed with various counterparties. For example, the witness obtained trade details from the "trader's desk," including information such as the trade date and the notional amount. He entered such

information into a standard confirmation form and was responsible for ensuring that Credit Suisse's trade details matched those of the counterparty.

136. Witness #3 explained that throughout his tenure there were regular and recurring issues with unconfirmed trades. He noted that, often times, the values of the trades, as detailed by the Credit Suisse trading desk, did not match the value of the trade from the counterparty. In such instances, the deals could not be confirmed unless or until the trade details matched. Witness #3 explained that, in many instances, Credit Suisse recorded the trade value at one amount, but the counterparty recorded the trade value at another amount.

137. The witness explained that in late 2006, only 35-40% of Credit Suisse's deals were electronically confirmed through its Depository Trust and Clearing Corporation ("DTCC") system. By mid-2007 approximately 70-80% of the Company's over-the-counter ("OTC") derivative deals were confirmed electronically. Trades that were confirmed manually typically took longer to execute and settle, and therefore, presented a greater risk to the parties involved. The witness emphasized that if the OTC derivative deals were not completed within 30 days, there was a substantial risk that the reference entities to the CDS could default and either party to the transaction could lose "hundreds of millions" or even billions of dollars, as a result. For instance, if the CDS provided protection on bonds from American Airlines -- the reference entity -- and American Airlines defaulted or filed bankruptcy before Credit Suisse's trade of the CDS was confirmed and settled, then Credit Suisse would still carry the liability related to the CDS protection.

138. Witness #3 recalled that Credit Suisse had deals that were "done" (*i.e.*, agreed upon by Credit Suisse and the counterparties) in 2004 and 2005 that were still not confirmed as of 2006 and 2007. In late 2006, in his role as CDS draft coordinator, he observed "hundreds" of

63

deals that had remained unconfirmed for significant periods of time -- some as long as two years -- with many of the unconfirmed deals being a year or more old.  Again, each of these deals could be valued anywhere from "hundreds of millions" to billions of dollars.

139.    In questioning about the estimated $2.85 billion write-down to collateralized debt obligation ("CDO")-related assets, the witness commented that he did not see how Credit Suisse could have avoided unrealized losses because of the number of unconfirmed deals that remained on Credit Suisse's books during his tenure and the size of these deals.  The witness further noted that, given the turbulence in the industry in 2007, there were a number of issues with the reference entities defaulting or otherwise experiencing financial difficulties and/or credit events that required payout of the CDS protection.

140.    The witness went on to explain that in late 2006 to mid-2007 there was an ongoing emphasis to "get deals confirmed."   Although this emphasis was communicated to Witness #3 by the CDS Back Office Associate Vice-President, Yolanda Wilson, he said that "everyone knew" there were issues and significant material risks associated with unconfirmed deals.  More specifically, the witness noted that the Defendants, including Dougan and Fassbind, were aware of these issues because "the whole industry knew" about these issues and the government was "cracking down" on firms that had large numbers of unconfirmed trades in their portfolios.[2]

---

[2] As reflected in testimony on July 9, 2008 before the Subcommittee on Securities, Insurance, and Investment, Committee on Banking, Housing and Urban Affairs, United States Senate, on "Over-the-counter   derivatives,"   available   at:   http://www.federalreserve.gov/newsevents/ testimony/parkinson20080709a.htm, for too many years, post-trade processing of OTC derivatives transactions remained decentralized and paper-based despite enormous growth in transaction volumes.  Among other problems, dealers reported large backlogs of unconfirmed trades, a significant portion of which had been outstanding for 30 days or more.  The failure to confirm trades promptly can exacerbate counterparty credit risks by allowing errors in counterparties' records of their transactions to go undetected, which could lead them to

141.   The witness added that "at the highest levels of the Company," as he learned through discussions with Wilson, the executives were aware of outstanding deals and the priority to complete the confirmation process for such deals.  These unconfirmed trades had already been recorded in the PeopleSoft general ledger.  The witness believed that Fassbind reviewed the

---

underestimate exposures or to fail to collect margin when due.  Such backlogs also could significantly complicate and delay the close-out and replacement of trades with a defaulting counterparty.

By 2005, backlogs of unconfirmed trades were especially large in the credit derivatives market, in part because market participants, including hedge funds, frequently closed out their positions in CDS through a transaction known as a novation.  In a novation, one party steps out of the contract and is replaced by another party.  The master agreements that govern OTC derivatives trading require the party seeking to step out to obtain the prior written consent of its counterparty, but dealers were frequently accepting novations from market participants without any evidence that they had obtained such prior consent.  These sloppy practices not only contributed to backlogs of unconfirmed CDS, but also created confusion about the identities of trade counterparties and thereby undermined the effectiveness of counterparty credit risk management.

By September 2006, the dealers reported that, in the aggregate, they had reduced confirmations outstanding more than 30 days by 85 percent.  In 2006, the dealers agreed to expand their efforts to tackle backlogs in the equity derivatives market, again by making greater use of electronic confirmation services.  Dealers also quickly announced their support for a novation protocol for credit and interest rate derivatives that had been developed by the International Swaps and Derivatives Association.  The protocol provides that if the party initiating the novation has not received written confirmation from the original counterparty by the close of business on the date the novation is struck, it is deemed to have two contracts, one with the original counterparty and another with the counterparty that agreed to accept the novation.  The protocol thereby provides the party initiating the novation a strong incentive to obtain the original counterparty's consent promptly.

Although these achievements were impressive, the financial turmoil during the summer of 2007 convinced prudential supervisors and other policymakers that further improvements in the market infrastructure were needed.  Specifically, CDS backlogs grew almost fivefold from June to August 2007, reversing much of the previous improvement.  Although the backlogs subsequently receded, this episode demonstrated that backlog reductions were not sustainable during volume spikes.  Moreover, it underscored that, in many respects, the post-trade processing performance of the OTC derivatives markets still lags significantly the performance of more mature markets and still has the potential to compromise market participants' management of counterparty credit risks and other risks.

65

general ledger and would have ultimately been responsible for reporting to "the Street" regarding the percentage of trades that remained unconfirmed at any given time during the Class Period.

142.    The witness further explained that the SEC required Credit Suisse to report on the number of OTC derivative trades that were outstanding each reporting period.  These reports provided details about the trade date, the counterparty to the trade, the reference entity and reference assets, and how old the trade was.  Unconfirmed trades were "bracketed out" in categories of 20 to 60 days old, 60 to 180 days old, and 181 or more days old.  According to the witness, the SEC was focused on "aging" trades that were 180 or more days old.  He understood that Fassbind was ultimately responsible for these reports to the SEC.

143.    Based on his experience as a Product Controller, the witness noted that there were a number of internal control deficiencies related to profit and loss analyses.  For instance, he said that the Product Controllers performed such analyses based on data provided by the Traders.  However, after the profit and loss analyses were performed and the profit or loss was recorded in the general ledger, the Product Controllers often learned that the data provided by the Traders was wrong and therefore the profit or loss that had been previously calculated was incorrect.

144.    Witness #4 elaborated upon and confirmed many of the facts described by Witness #3.  From late 2007 to mid-2008, Witness #4 was a Senior Derivatives Analyst responsible for working with the DTCC system, the system used to document and clear OTC trades.  This witness' job was to "confirm" the trades of credit default swaps ("CDS") in the DTCC system and resolve the discrepancies that impeded their confirmation, by working with traders in the New York office.

145.    With respect to the $2.85 billion write-down of Credit Suisse's CDO-related assets, the witness commented that the write-down was not surprising because there were "no

controls" in place for the OTC derivative trades.  This witness emphasized that there was a lack of "audit trails" regarding OTC trades throughout the witness' tenure and that Credit Suisse was "very sloppy" in terms of documenting OTC trades.

146.    Witness #4 explained that there were three functions pertaining to the execution of OTC trades.  The front office function included the Traders and Trader Assistants, who "made the deals" and initially documented the trades in the Paystation and Doman information systems.  Middle office personnel consisted of Product Controllers and Product Line Business Managers, who were responsible for evaluating profit and loss ("P&L") based on the Traders' data.  The back office personnel (including the witness) confirmed and settled the OTC trades in the DTCC system.  The settlement of trades was executed in the Telematch system.  Trades could only be settled, though, after they had been confirmed in DTCC.

147.    The DTCC data was based on the Traders' "blotters," which were often forms or even less formalized "pieces of paper" that contained details about the trades.  For instance, the "blotters" and the data that was ultimately uploaded or manually entered into DTCC included the name of the asset, the amount of the trade, the counterparty, the date of the trade, and the "notional amount," such as whether the asset had a fixed or variable interest rate.

148.    To confirm the OTC trades, Witness #4 had to ensure that the data entered into DTCC at Credit Suisse matched the data entered into DTCC by the counterparty to the trade, such as Goldman Sachs or Lehman Brothers.  For various reasons, though, the OTC trades could often not be confirmed in a timely manner.  In some instances, the Traders may have not been clear with the counterparties regarding all the terms of the trade.  In other instances, the front office personnel may have made mistakes in entering the data into Doman.  Or the back office personnel, who were responsible for manually entering the data into DTCC, could have made

67

mistakes, causing a "mismatch" between Credit Suisse's data and the counterparty's data relevant to the trade.

149.   There were both economic and non-economic differences between the data entered into DTCC by Credit Suisse and the data entered into the system by the trade counterparties.  The economic differences included variances in the notional amounts or the trade value.  As examples of economic differences, the witness explained that there were a number of instances in which Credit Suisse's trade value was significantly greater than that entered by the counterparty.  The witness added that there were also instances in which the trade value entered by Credit Suisse was significantly less than that entered by the counterparty.  The non-economical differences included variances in details about the counterparty or reference assets.

150.   The witness emphasized that the economical differences impacted Credit Suisse's P&L.  By the time the trades were entered into DTCC, the profit or loss relating to the trade had already been entered into the general ledger.  As such, if the "mismatch" in DTCC concerned the notional amount or otherwise impacted the trade value, once the mismatch was corrected, a corresponding change had to be made in Credit Suisse's general ledger, which impacted the profit or loss that had previously been recorded.

151.   The witness offered the following example:  If Credit Suisse recorded the trade at one fixed interest rate and the counterparty recorded the trade at another fixed interest rate (or a variable rate), then changes to the interest rate that were executed to ensure that the trade details matched in DTCC impacted the overall value of the trade and ultimately Credit Suisse's profit and loss on the trade.  Even variances in a trade detail as simple as the "start date" impacted the Company's profit and loss on trades because the interest rate started on a given date in

accordance with the agreed upon trade terms and any alteration of this date could cause Credit Suisse to have to pay or receive more or less interest.

152.    The witness further explained that trades were identified as unconfirmed and in need of resolution based on "scrub reports" from the DTCC systems that were run by the back office personnel each week.  Trades were assigned a "number" in the DTCC and unconfirmed trades were identified and tracked via the "trade number."  One of the witness' roles was to "work the older trades first," meaning that the witness was supposed to try to resolve unconfirmed trades that had been in the DTCC system for some time, usually longer than a month.  If either economic or non-economic differences were present in comparing the data entered into DTCC at Credit Suisse and by the counterparty, the back office personnel were responsible for liaising with the Traders to determine the reason for the difference and to resolve the issue.  If there was a $10 million difference in the trade value or Credit Suisse and the counterparty had different notional amounts recorded in DTCC for a given trade, as examples, the back office personnel emailed the Traders the differences and asked the Traders to research the issue and provide the correct data in a bid to match the data and confirm the trade.  The Traders, however, were busy with their current trades and the back office personnel often "did not want to pressure" the Traders for quick responses or resolutions regarding unconfirmed trades.

153.    The witness emphasized that "everyone" knew about the "unconfirmed trades" issue.  By the time the witness joined Credit Suisse, the Company had already attempted to put controls in place regarding confirmations of OTC derivative trades, but the controls were ineffective.  For example, such trades were supposed to be confirmed in "T + five," or within five days of the trade.  Traders were supposed to respond to requests for resolutions regarding

69

unconfirmed trades within 48 hours of receiving a request from the back office. However, throughout the witness' tenure, there were trades that remained unconfirmed for upwards of 90 days or more. In some instances, the witness said that trades remained unconfirmed for such an extended period of time that the trades had to be removed from the DTCC system and were supposed to be confirmed manually via the filing of various forms, if the mismatched data could ever be resolved.

154. The witness explained that unconfirmed trades were an issue for Credit Suisse for at least two reasons. First, each of the trades could be valued at "hundreds of millions" of dollars, so that unconfirmed trades represented considerable contingencies for Credit Suisse's P&L. Moreover, because various events pertaining to the reference assets or entities could happen before trades were confirmed, unconfirmed trades could have a serious and material impact on Credit Suisse's P&L. For instance, if Credit Suisse traded a CDS and the reference entity filed bankruptcy or defaulted on the reference asset payments before the trade was confirmed, then the ultimate goal of the trade was negated. In essence, if Credit Suisse had sought to push liability related to a particular CDS onto the counterparty through the trade and the trade was not confirmed before the credit event (*i.e.*, bankruptcy or default) relating to the reference entity materialized, then Credit Suisse retained the liability associated with the asset, despite the Company's intention to mitigate the liability through the execution of the trade.

155. Witness #5 was a product controller from late 2006 to April 2008. He was responsible for equity reporting including profit and loss ("P&L") reporting and "commenting" for daily "moves," or daily changes in positions for trades executed daily. The witness prepared reports for the P&L on a daily, weekly and monthly basis for each product line. The P&L

70

reports prepared by the witness contained P&L data for the derivatives books, including products such as CDO's and CDS's.

156. Witness #5 drafted the e-mails circulating the P&L reports to Defendants Dougan and Fassbind. According to the witness, significant losses were apparent in the P&L reports for the proprietary trading group beginning in at least November 2007. The witness believed that the $2.85 billion write-down was likely attributable to the Company's older trades.

157. Witness #6 was employed as an associate vice president in the valuation risk area in New York from 2005 to mid-2007. He was responsible for preparing monthly and quarterly reports regarding variances between marks derived by Traders and those derived by Product Controllers, that were provided to, *inter alia*, Fassbind.

158. Witness #6 described the history of the development of the variance reports. He explained that shortly before he began work at Credit Suisse, the Company had hired C. K. Zheng as the Managing Director of the Valuation Risk group. In early 2005 timeframe, Zheng hired Valuation Risk Director Matt Fahey. As the witness explained, during his tenure, the responsibilities of the Valuation Risk group grew in scope to include more formal and regular reporting and policy writing. The witness was tasked with formalizing the style and substance of valuation risk reports and creating policies regarding valuation variance thresholds. In essence, he evaluated valuation data and variances between marks set by Traders and those established by the Product Controllers, and implemented policies that dictated when a variance was significant or material enough to require resolution (i.e., when it was required that the Traders and Product Controllers come to agreement on the pricing of an asset).

159. The witness stated that variances in the marks set by the Traders and the Product Controllers typically resulted from different pricing inputs. For example, the witness noted that

71

the Trader and Product Controller attempting to price a given collateralized debt obligation ("CDO") might use different pricing methodologies that relied on two distinct correlation inputs or two distinct volatility inputs. The Trader may have deemed that the available correlation inputs –historical or otherwise – were not accurate for pricing a given CDO and used a "proxy" input instead, while the Product Controller may have assumed that the historical correlation inputs were the most accurate. In such an instance, the marks established by the Trader and Product Controller would be different. If the difference in the marks was material, the variance would be reported in the valuation risk report and the reason for the variance (i.e., different correlation inputs), as pinpointed by the Product Controller, were included as the explanation in the report.

160.    Witness #6 explained that, on average, there are "thousands" of variances each month, but only approximately four to 20 were material. That is, in a "low variance month," there may have only been four or five material variances per product line in the monthly report. In a more active month, there may have been as many as 20 material variances in each product line. Depending on the group of products to which the variance applied, material variances were typically in the "millions" to "tens of millions" dollar range. While he was there in 2007, he recalled that the summary graphs presented with the monthly valuation risk reports showed the number of variances were "trending down." Thresholds at which pricing variances between the marks set by the Trader and those established by the Product Controller had to be resolved were developed for the various products. He emphasized that the policies were typically set according to groups of products, such as "credit derivatives," as opposed to being set by product type (such as CDO). The witness said that the thresholds were generally set in the five percent range, but varied by groups of products. If the variance could not be resolved by the Trader and the

72

Product Controller – or as the witness described by the "Business" (i.e., the Trading Desk) and the Product Control Desk – then the matter was escalated. At the highest levels, Dan McHugh, the Head of Product Control, and the Head of the Business were tasked with resolving pricing variances. The Head of Fixed Income who discussed the variances with Zheng and McHugh was Jim Healey.

161. The valuation risk reports contained, on a general level, data that identified material variances between marks derived by the Traders and those established by the Product Controllers. The goal of valuation risk reporting was to "clearly articulate the variances [between marks set by the Product Controllers and those established by the Traders] and the reasons for them" and "bring transparency" to the activities of the Traders and Product Controllers. The reports were presented in Excel spreadsheets and made more formal before circulation by putting the reports into PDF format and adding summary graphs and charts. The final reports were printed and bound in hard copy format before being circulated to the recipients.

162. The recipients included Zheng, McHugh, the Heads of Product Control for each Business, and Fassbind. As Witness #6 further explained, each month, the Product Control and Valuation Risk leaders met to discuss the results of the reports. Zheng and McHugh received copies of these reports in preparation for the meetings. On a quarterly basis, Fassbind attended the meetings with Zheng, McHugh, and the Heads of Product Control for each Business. The witness was aware that Fassbind received the valuation risk report in bound, hard copy format on at least a quarterly basis because he prepared the report for Fassbind. As the witness further explained, Fassbind's quarterly valuation risk report, in which the data was presented by business line and level, had to be prepared for Fassbind one week prior to the preparation and

73

circulation of the same report to others, including Zheng and McHugh.  For instance, the third quarter report was made available to Fassbind by the second week in October, while Zheng and McHugh did not receive their same reports until the third week in October.  The witness understood that Fassbind required the report ahead of everyone else who received it on a quarterly basis so that he had time to review the report and "was not surprised" by issues pertaining to variances being raised in the meetings he attended with Zheng, McHugh, and the other Heads of Product Control for each Business or in other meetings he attended.  The data in the report prepared for Fassbind was presented by business line and level, and additional "drilled down" data was available to Fassbind as supporting documentation to the report.

163.    Witness #7 was employed as an associate with the "Alternative Investment" group from mid-2006 to late 2007.  The Alternative Investment group managed ABS CDO's and other products for firm clients that consisted primarily of banks, as opposed to individual investors.  The witness reported to the head of the structured product investment team in that group.  The witness was responsible for credit analyses pertaining to sub-prime and Alt-A mortgage-related securities and associated collateral underlying CDO's for the Alternative Investments group.  The witness noted that the Alternative Investment group dealt mainly in "high grade CDO's."

164.    Witness #7 was aware from analyses he performed on sub-prime and Alt-A mortgage-related products that values of products associated with these types of assets were declining as of March or April 2007.  As he further explained, beginning in this first half of 2007 ("1H07") timeframe the market was "overly bearish," so that "the numbers [*i.e.*, estimated valuation of the assets] did not support the prices [i.e., the current market value of the assets]."  In essence, some of the big hedge funds "massively shorted" their investments in mortgage-

related assets, which caused "large price drops" in subprime mortgage bonds and ABS CDOs. The witness recalled that one month during the early 2007 timeframe, prices were at a particular level, and then the next month, a hedge fund went short $1 billion on its ABS position, resulting in a "precipitous" drop in prices and the need for the Credit Suisse Traders to have to adjust their own corresponding pricing.

165.    The witness was concerned with the pricing of the underlying collateral of assets that were "under management."  The value of the underlying collateral of the ABS CDOs was determined based on reports that were issued by various banks.  The witness explained that each month banks released reports that provided details such as the delinquency rate in various loan pools, the number of foreclosures and "pre-paids" in the loan pools, and the number of months that loans in the pools were delinquent on payments.  The witness evaluated this data, along with the current price of bonds.  He then "made some assumptions" regarding future market conditions.  For example, the "assumptions" he utilized were based on scenarios regarding how certain amounts of defaults in a pool might impact credit ratings or whether the bonds associated with a given investment position "would make it" to maturity without default.  The assumptions were run using proprietary, internal programs that had been "put together" by personnel within Credit Suisse and were based on data such as the "rising interest rate environment" and the "availability of refinancing."  The assumptions included details such as "if a borrower had a 630 FICO score and the loan was at an 88 percent loan-to-value ratio," then, based on historical data, the probability of default would be "X."

166.    With respect to the reliability of the pricing models, the witness opined that the data input into the models was relatively accurate, however, the ability of the models to generate accurate output was not entirely reliable because the models were based on historical data and

75

the default levels associated with such data did not accurately predict the high levels of default that occurred beginning in early 2007.

167. The witness commented that he began to "tighten up the assumptions" in the models he used in early 2007, given that actual defaults were surpassing predictions from the models beginning in this early 2007 timeframe. As an example, the witness explained that the models had assumed a "40 percent loss" rate [i.e., this assumed that 40% of the value had deteriorated], but in early 2007, losses were exceeding 50 percent. At these loss rates, the witness said that bonds rated BBB were "in trouble." By mid-2007, losses increased to approximately 60 percent and the witness was forced to adjust his assumption models accordingly. The witnesses' direct observations were of steadily deteriorating conditions throughout the 1H07 and continuing thereafter which did not, as he saw it, justify an optimistic outlook on product valuations.

168. The witness' observations and concerns regarding increasing losses and rising defaults were discussed regularly during meetings he attended with his superiors in the Alternative Investments group.

169. The witness commented that he had discussed in the March and April 2007 monthly meetings that the value of the securities he reviewed were deteriorating. With respect to the July 2007 warning letter issued by the Alternative Investments group to their clients in July 2007, he explained that a "warning letter" to clients was not likely issued earlier, in March or April 2007, because no one wanted to issue such a letter before it was absolutely needed. He explained that issuing such a warning letter too soon could "create panic."

170. Witness #8 was employed as a Registered Sales Assistant from early 2006 to October 2007. She was in a support position for the Corporate Cash Management team,

particularly Julian Tzolov and Eric Butler, the two Credit Suisse officers who were recently indicted. As this witness described, the key players in the Cash Management group included Directors of Private Banking Michael Pease and Kevin Rundick, who worked out of Chicago, and Director of Private Banking USA, Matt Gorman and Barbara Ridge, assigned to New York. The witness explained that these individuals, along with Walter Buchtold, the CEO for the Private Banking division, and Patricia Sulfaro, who was with an outside legal firm hired by Credit Suisse in about August 2007, were the "high level executives" who were most involved in the issues pertaining to Tzolov, Butler and the Private Banking customers who complained about having been defrauded by the Company.

171. According to the witness, on August 6, 2007, the first auction rate securities ("ARS") in which Tzolov and Butler had invested client money failed. On that date, when the witness saw the ARS interest rate soar, she contacted Butler who explained to her that the high interest rate was in fact a failure rate and instructed her not to contact the affected clients. The witness explained that at least one of the ARS products that failed in that date, Lakeside Funding, was issued by Merrill Lynch.

172. The witness explained that several weeks after the August 6, 2007 ARS failures, she observed that there were "closed door meetings" between Tzolov, Butler, Gorman and the CFO's of the affected client companies. On the Wednesday before Labor Day, Tzolov and Butler were placed on "administrative leave for two weeks" following a meeting with Gorman, Ridge and Sulfaro. A meeting was then scheduled by Gorman with the witness and others who had worked for Tzolov and Butler, where they were told that Pease and Rundick would be taking over Tzolov's accounts and Butler's accounts. Gorman further advised the attendees not to inform customers about Tzolov and Butler being placed on administrative leave or any other

77

existing or potential issues with the clients' accounts. Instead, the attendees were told to paint a "happy picture" about the transfer of control of the client accounts to Pease and Rundick. In early September 2007, the witness also observed Walter Buchtold attending meetings in New York with Pease and Gorman about these issues.

173. The witness explained that the commissions paid by the issuers of the ARS that Tzolov and Butler sold to the cash management customers were much higher commissions than most ARS. For example, she explained that Tzolov's and Butler's trade books showed commissions earned at the rate of 12.5 basis points compared to average basis points commission payments of 3.5 (for seven day tax exempt ARS) and 7.5 (for monthly or taxable ARS). The result was that Tzolov and Butler each earned about $1.25 million in 2006, and that their earnings rate in 2007 was even higher. The Private Banking group itself earned $6.5 million in commissions on sales of asset-backed securities in 2006, largely due to sales by Tzolov and Butler. The witness emphasized that Tzolov and Butler were considered "high earners" for this unit. The witness believed that Tzolov and Butler received "greater incentives" for selling ARS issued by Credit Suisse.

174. The witness further explained that Tzolov and Butler worked closely with Traders from the Corporate Cash Management Short Term Liaison Desk. These Traders included Tombolini and Child. The witness stated that when Tzolov or Butler sought to invest their clients' money, they contacted Tombolini and Child and directed either of them to procure a certain amount of bonds or ARS from Merrill Lynch or another issuer. Tombolini and Child utilized a Credit Suisse proprietary account to make such acquisitions and then the newly acquired assets were passed on to Tzolov's or Butler's clients in exchange for the money they invested. However, she noted that Tombolini and Child were sometimes frustrated with Tzolov

78

especially because he often requested that they procure $12 million, as an example, in ARS or bonds, when he only needed $10 million (hypothetically) in assets for his clients. In such instances, the proprietary account had to hold these excess assets.

175. The witness described one particular internal control deficiency that allowed Tzolov and Butler to perpetrate securities fraud related to the information system that was used to put in "orders" for ARS - the Start System. The witness recalled that the brochures that were sent to STMicroelectronics and other customers indicated that the Start System had the ability to block investments in certain types of securities in which the clients did not want to invest. For example, STMicroelectronics' desire not to invest in mortgage-related assets could purportedly be programmed into the Start System so that such ARS could not be procured and sold to STMicroelectronics. The witness noted that the Legal and Compliance team reviewed the brochures and were knowledgeable that such a function did not exist in the Start System. However, the Legal and compliance team never advised Tzolov or Butler that such detail needed to be removed from the brochures.

176. The witness noted that activities pertaining to Teva Pharmaceuticals, one of the customers that has complained about the ARS purchased for its account by Tzolov and Butler, seemed suspicious but the witness noted they had been approved by many levels at Credit Suisse. For instance, Tombolini and the Short Term Desk approved such activity and Ridge "signed off" on it. Frank Brovin from legal and Compliance also gave his blessing to such transactions. For this reason, the witness said that it seemed as if Credit Suisse was aware of Tzolove's and Butler's illegal antics, but either condoned or facilitated such activity or "looked the other way" because of the amount of money that Tzolov and Butler were bringing into Credit Suisse.

**F.    Credit Suisse's Compensation Structure Created Severe Conflicts of Interest and Incentivized Inflated Asset Valuations.**

79

177. From the Executive Committee down to the traders who bought, sold and hedged Credit Suisse's multi-billion dollar portfolio of ABS, Credit Suisse had a company-wide policy of basing compensation on performance. The Company stated unequivocally in its 2006 and 2007 Annual Reports that *"[t]he pay of most employees is linked to performance*." (2006 Annual Report at 118; 2007 Annual Report at 145) (emphasis added). Credit Suisse further explained that it linked performance to pay by evaluating financial performance on a Group (*i.e.*, Company), divisional, team and individual level. (2006 Annual Report at 118; 2007 Annual Report at 145). The 2006 Annual Report, under "Investment Banking" also noted that, "[T]otal operating expenses rose 85% compared to fourth quarter 2005, primarily reflecting higher compensation expenses in line with higher revenues…."

178. Credit Suisse also stated in both its 2006 and 2007 Annual Reports that the Company's approach to compensation "has been developed according to the principles that compensation should be:

- *Based on performance*;

- *An incentive for employees to create value*; and

- Aligned with the marketplace in which Credit Suisse operates."

(2006 Annual Report at 117; 2007 Annual Report at 144) (emphasis added).

179. According to the Company, such "principles help ensure that *our approach to compensation achieves our objectives to [] support a performance culture* that is based on merit and differentiate and rewards excellent performance." (2006 Annual Report at 117; 2007 Annual Report at 145) (emphasis added).

180. The principles that drove Credit Suisse compensation applied with equal force to Executive management. Credit Suisse Executive compensation consisted of "a fixed salary and a

variable performance bonus," but, according to the Company, ***"[t]he annual performance bonus usually represents the most significant part of an executive's total compensation package*."** (2006 Annual Report at 124; 2007 Annual Report at 155).  As a result, the Company disclosed that, for fiscal year 2006, salary constituted an average of only 6% of the compensation paid to members of the Executive Board.  The same imbalance between salary and performance-based payments held true for fiscal year 2007 as salary continued to make up a very small portion of Executive compensation at Credit Suisse:

> [t]he members of the Executive Board (13 members) received on average, as a percentage of their total compensation, ***7% salary, 19% cash bonus, 71% share-based awards*** and 3% other compensation. (2007 Annual Report at 155) (emphasis added).

181.    In furtherance of a performance and bonus-based compensation scheme, the Credit Suisse Compensation Committee established a "bonus pool framework linked directly to our performance for the Executive Board, including the CEO" for fiscal year 2007.  (2007 Annual Report at 155).  According to the Company, "[t]he bonus pool was used to define the total amount available for bonus payments, which were then delivered in cash and deferred share-based compensation." (2007 Annual Report at 155).  After the end of the fiscal year, the Compensation Committee modified the bonus pool to reflect whether the Company had achieved or exceeded its financial results and "[t]he final bonus pool [is] distributed to the members of the Executive Board and CEO ***based on business performance***, individual contribution and competitive compensation levels."  (2007 Annual Report at 155) (emphasis added).

182.    Credit Suisse highlighted that the "performance criteria used" by the Compensation Committee "to determine the size of the total bonus pool for the Executive Board and CEO" for fiscal year 2007 included the following:

- ***The financial performance of the Group*** adjusted for extraordinary items compared to the strategic business plan [adopted prior to the beginning of the fiscal year];

- Consideration of ***the Group's performance against the performance of its peer companies***;

- Measurement against market information of companies with similar scope and complexity; and

- Measurement of shareholder satisfaction, ***assessed by reviewing objective data regarding the Group's financial performance***, with a focus on revenue growth, pre-tax margin growth, return on equity and earnings per share.

(2007 Annual Report at 155) (emphasis added).

183.    Dougan's compensation reflected Credit Suisse's focus on performance.  In fiscal year 2007, only 6% of Dougan's compensation was salary and fully 90% of his compensation was in the form of cash or stock bonuses.  (2007 Annual Report at 155).  For fiscal year 2007, Dougan received base salary of CHF 1.25 million, but the Company awarded him cash and stock bonuses totally more than CHF 21 million (2007 Annual Report at 156).  Although Credit Suisse does not disclose the base salaries of the other 12 members of the Executive Board, the most conservative analysis based on Credit Suisse disclosures indicates that, as a group, the Executives received CHF 16.5 million in salary and more than CHF 142 million in cash and stock bonuses.[3] (2007 Annual Report at 156).

184.    Compensation in the Investment Banking division reflected the performance-based strategy employed throughout Credit Suisse.  David Mathers, Head of Finance and Strategy for Credit Suisse Investment Banking stated during the 3Q07 earnings conference call that "***we look  at compensation on the basis of the results for the year-to-date, and the amount***

---

[3]    Credit Suisse disclosed that the base salary of each Executive Board member was between CHF 0.65 million and CHF 1.25 million.  This analysis assumes that each of the members of the Executive Board was paid CHF 1.25 million in fiscal year 2007, which was not the case according to Credit Suisse.  As a result, the members of the Executive Board necessarily received more than CHF 142 million in cash and stock bonuses, and total salaries were less than CHF 16.25 million.

*of compensation that we expect to pay people.    That's clearly driven by the revenue performance, it's driven by the business performance.*"

185.    Investment bankers at Credit Suisse were thus paid based on the value of the investments and trades they made for Credit Suisse.    As explained elsewhere herein, Credit Suisse priced its asset-backed securities and other similar investments and trading positions based on the "fair value" of the asset or position.    Under relevant accounting rules, "fair value" pricing required Credit Suisse to "mark" the assets to market value – *i.e.*, to value the asset at what it was worth on the open market on the day of the valuation.

186.    At all times during the Class Period, Credit Suisse relied on its Investment Banking division to determine the current fair value of the structured investments the division had made and mark those investments or positions to their market value.    Dougan specifically stated in the March 20, 2008 conference call that the very traders who made ABS investments for Credit Suisse were valuing the performance of those ABS positions:

> *the trading books are marked on a daily basis by the traders*, and those are actually signed off on a daily basis by trading management.  So that's the process that [sic] those are our processes; that's what's required.

187.    Analyst Huw van Steenis at Morgan Stanley openly questioned the Investment Banking compensation system that Credit Suisse had in place on the 3Q07 Conference Call when he observed that the fair value effect of an anomalous widening in credit spreads due to market turbulence had the effect of increasing the Investment Banking division's ratio of compensation to revenues during the quarter.  Van Steenis observed that traders being paid "a cut" of the gains "must be laughing all the way to the bank."

188.    Under the accounting method used by Credit Suisse every dollar of write-downs of the fair value of the trading assets in Credit Suisse's proprietary account resulted in a charge

to trading revenues and a reduction in compensation for each employee whose compensation was based on the income of the investment banking division.  This direct relationship is described by Fassbind in the February 19, 2008 conference call with analysts, when he explains that the $2.8 billion asset write down translated into a $1 billion reduction in after-tax income because of the $1.4 billion in employee compensation that will also be reduced when the trading revenues are reduced for the assets re-pricing:

> Whenever there is revenue, of course there is compensation associated with that. And when we have negative revenues, of course there is a negative compensation related to that.

189.    On that same call, in response to an analyst's question about the reasons for the trader's intentional misconduct in mismarking the CDO's, Dougan explained that the motivation was "obvious" -- "if you intentionally inflate the profits on your book, then, obviously, people will look at that performance and potentially you'll get paid more as a result of that."  During the call, Dougan also confirmed that the Executive Board's average compensation for 2007 was reduced by 35% as a result of the earnings revision and the Company's related share price performance.

190.    The Credit Suisse compensation and valuation system thus created a clear conflict of interest in that employees whose compensation was tied directly to the performance of investments made by themselves and those under their supervision had responsibility for properly valuing those same investments.  Moreover, no one in Investment Banking management had any incentive to proactively police valuations because their compensation was also dependent upon the performance of the division and Company.  The Executive Board, including Dougan and Fassbind, similarly had a strong incentive to, at the very least, bury their individual and collective heads in the sand because their compensation was also 90% performance-based --

84

and as described above, had the wrongful pricing gone undiscovered, their 2007 compensation would have increased by 35%. Writing down billions of dollars of assets therefore had a substantial, direct and negative impact on the personal income of individuals at every level of Credit Suisse, including those who had direct responsibility for properly valuing the assets and those who had ultimate responsibility for the accuracy of Credit Suisse's financial reporting and disclosures.

191. In a system that was open to and incentivized abuse, inaccuracy and inadequate supervision – the opposite of the strong internal controls about which Dougan, Fassbind and others boasted throughout the Class Period – the sub-prime mortgage crisis and its effect on the asset-backed securities market created a particular likelihood that assets would be improperly priced. Such was the case because the sub-prime mortgage meltdown and resultant credit crunch combined to reduce the liquidity of certain asset classes. As a result, valuing the affected assets became complex. While the condition of the mortgage market, the ABX Index and other benchmarks provided transparency and signaled the need to write-down RMBS and CDO's, Defendants did nothing to assure that the fair value of the Company's own analogous products reflected the well published changes in the market.

192. As the head of the Credit Suisse Investment Banking division until the beginning of fiscal year 2007, Dougan in particular was well aware of the risk posed by the combination of the market dislocation and the systemic conflict of interest that existed at the Company. Defendants were also warned about the increasing risk posed by systemic conflicts of risk by the FSA in January 2007 when the regulator issued a "Financial Risk Outlook." The FSA warning put Credit Suisse and other investment banks on notice that when asset and trading position valuations become more complex as a result of market dislocations, investments with decreased

liquidity can be "*difficult to value*, which raises . . . *conflict-of-interest risks*."  The FSA further stated:

> There is a continuing requirement for many parties involved in trading and pricing complex and illiquid assets to consider their inherent conflicts of interest. These arise when the same party makes investment decisions and also plays a key role in the pricing of the same instruments.  In particular, *this is important for those professionals whose remuneration is directly linked via an incentive arrangement to the declared investment performance of a portfolio containing investments for which the professional has assigned prices.*

193.    Despite the express warning from the FSA that the incentives created by the Credit Suisse compensation system were particularly likely to cause problems for the Company during the then-existing period of market instability that continued and worsened throughout the Class Period, defendants took no proactive steps to monitor or limit the potential damage that could be inflicted by the unchecked conflict of interest Credit Suisse had created.  Instead, as detailed herein, defendants "failed to put adequate systems and controls in place" and then "failed . . . to translate identified concerns about the pricing" of ABS positions by Credit Suisse traders and their supervisors "into tangible or timely actions." (FSA Final Notice at § 2.4).  As a result, Credit Suisse disclosed in its 2007 Annual Report, issued in March 2008, that a material weakness existed in its internal controls in fiscal year 2007.  (2007 Annual Report at 258).  Additionally, Credit Suisse's public auditors, KPMG, reported in their audit opinion that they had expressed an adverse opinion on Credit Suisse's internal controls over financial reporting.  (*Id.* 163).

## G.      Defendants Wrongfully Foisted Sub-Prime And Illiquid Investments On Unwitting Clients.

194.    Credit Suisse created money market accounts for its clients.  These accounts were then funded by Credit Suisse clients with cash.  Generally the client cash was its "operating cash," so Credit Suisse clients were looking to avoid risk and were willing to accept a low, but

very secure, return on their money as well as the return of their principal.  For instance, in at least two cases, the clients required that Credit Suisse invest only in federally guaranteed student loans with very short maturities.  Credit Suisse purported to manage the accounts according to investment guidelines determined by the client and in some cases Credit Suisse would be directed to purchase a specific security.

195.    Credit Suisse clients were provided with trading information related to their accounts through e-mail and "snail mail" confirmation statements.  E-mail notifications were generally sent within two days of a trade, however the paper confirmations sent through the mail could take a month to get to the client.  Because of the short term nature of the purported securities in the account, by the time a client received the paper confirmation the security may have been rolled over into another security.  Consequently, Credit Suisse's clients relied upon the e-mail confirmations to track trading activity in their accounts.

196.    Because these accounts are the equivalent of trust accounts, Credit Suisse clients retain ownership of the money deposited by them and the securities purchased by Credit Suisse for their purported benefit.  Thus, sub-prime assets transferred to or purchased for Credit Suisse clients were not reported on Credit Suisse's balance sheet for investment banking, and changes in the fair value of these assets were not reported on its income statement.  Because the client owns the securities in the account they are on the hook for any adverse performance of the underlying securities.  Likewise, Credit Suisse was inoculated from any adverse results within the client's account.

197.    As described herein, in 2006 the US sub-prime mortgage and housing market began to show signs of stress.  As a result investors began to question financial institutions about their exposure to these markets.  In response to these inquiries Credit Suisse asserted that it had

87

reduced its exposure to sub-prime mortgages and that it was in far better position than its peers. In response to the SEC's August 2007 letter questioning Credit Suisse about its sub-prime debt, the Company assured the SEC that it had reduced its sub-prime exposure in accordance with its "risk management" policies. These included through its efforts to "distribute" the remaining sub-prime loans "over the last several months of market dislocation." In slides presented at its March 20, 2008 earnings call for 2007, Credit Suisse further presented its "key collaboration efforts" in which it described its "alternative investments distribution" that were made "via [its] securities business" to "asset management." Thus, it appears that, in part, Credit Suisse used these cash management accounts to reduce its own exposure to sub-prime losses as well as to garner the much higher commissions associated with the sale of the high risk sub-prime securities.

198.    Credit Suisse purchased from other investment banks, or repackaged and sold, billions of dollars of sub-prime securities to money market accounts managed by them for the purported benefit of their clients -- and when it was caught, returned at least part of the toxic securities to its trading account. These toxic securities appeared as "assets under management," a division which included the money market accounts, for their clients, rather than as part of the Company's trading securities. So, an investor scrutinizing Credit Suisse's balance sheet would conclude that any risk of default on these toxic securities resided with a client and not Credit Suisse (which because of the impropriety of the placements was not the case). In fact it is unlikely any Credit Suisse investor would question what was in these client accounts since the underlying asset performance of these accounts is only tangentially related, through fees, commissions, and asset based charges, to Credit Suisse's financial performance.

199.    As Credit Suisse observed the early signs of cracks in the sub-prime mortgage market it embarked upon a systematic scheme to place high risk CDO and US sub-prime securities with its unsuspecting and vulnerable money market account clients.  However, as reflected in the recently filed indictment and civil actions, including by the SEC, these sales were wholly unsuitable, and often specifically unauthorized because, as defendants well knew, Credit Suisse's money market clients were seeking only high quality highly liquid securities in case they needed cash for operating purposes.  In October 2007 Credit Suisse was sanctioned by the New York Stock Exchange for failing to provide prospectuses to its clients.  Credit Suisse was also required to send confirmations of trade activity to their clients.

200.    In order to facilitate sales of illiquid and unauthorized ARS to its clients, officers of Credit Suisse falsified the description of the securities purchased and sold in the e-mail trade confirmations sent to the clients.  Copies of fake e-mail confirmations sent from mid-2006 to mid-2007 are attached to the complaint filed in the United States District Court for the Eastern District of New York by one of Credit Suisse's defrauded customers, STMicrosystems, NV (Switzerland) ("STM"), and are described in a United States Department of Justice ("DOJ") criminal indictment and a Securities and Exchange ("SEC") civil complaint against the two identified culpable officers, Julian Tzolov and Eric Butler.  For instance, when Credit Suisse sold a toxic security like "South Coast Funding V," a sub-prime CDO, it would send an e-mail describing the security as South Coast Funding *Student Loan*."  (*emphasis added.*)  The DOJ indictment and SEC Complaint confirm that this was no mere mistake, as this skullduggery persisted throughout 2005 and 2007 on a regular basis.

201.    Many of Credit Suisse clients' accounts had been sold ARS that were collateralized by CDO and US subprime securities.  ARS are bonds or preferred stock that

89

investment banks, including Credit Suisse, offered to corporate, institutional and (less frequently) high net worth individuals. ARS are municipal bonds, corporate bonds and preferred stocks with interest rates or dividend yields that re-set through a "Dutch auction" process. In Dutch auctions, potential investors submit bids indicating the lowest yield at which the investor would be willing to buy the ARS. The lowest bid represents the yield that applies to the ARS until the next auction. Typically, a Dutch auction would be held every 7, 28 or 35 days, depending upon the features of the particular ARS at issue. If investors do not make a sufficient number of bids in the Dutch auction for an ARS, the auction is said to have "failed." Although the issuer continues to pay pre-determined interest rate or yield to investors holding the ARS after a periodic auction fails, all of the current holders continue to hold the securities until a successful auction is held.

202. By combining long-term debt with short-term features, ARS offered certain advantages to both issuers and investors. For issuers, ARS were a lower-cost financing option than a formal bond offering or traditional variable rate debt obligations in that ARS did not require third-party bank support and the financing process for ARS typically involved a fewer number of parties. For buyers, ARS provided a slightly higher after-tax yield than other cash-equivalent investments (such as money market instruments) and were typically AAA-rated. Many investment banks, including Credit Suisse, marketed ARS as a little or no risk cash-equivalent investment that provided a mechanism by which to diversify cash-equivalent holdings while maintaining liquidity. By the beginning of the Class Period, the market for ARS had grown to more than $250 billion.

203. Some ARS are asset-backed instruments. Such asset-backed ARS can be collateralized by many different kinds of collateral, including corporate bonds and other instruments, such as federally guaranteed student loans. But collateral for asset-backed ARS

90

can, and did, include subprime mortgages and CDOs. As described herein, Credit Suisse had extensive involvement with subprime mortgage and CDO-collateralized ARS during the Class Period and has already acknowledged it was aware of cracks in the subprime mortgage market as early as the first half of 2006, and addressed these risks through its "distribution" of its toxic sub-prime securities to others.

204.    Beginning in about August, 2007, Dutch auctions for ARS began to fail leaving investors who had been sold purported cash-equivalent liquid ARS holding illiquid investments. Consequently, investors holding ARS backed by CDOs or subprime mortgages not only stood in the shoes of the investment banks that had bet on subprime and CDOs from the standpoint of credit risk, but were unable to convert the ARS back to cash as liquidity in the ARS market evaporated. As Credit Suisse's clients unsuccessfully attempted to liquidate these assets purchased through their money market accounts, Credit Suisse's unsuitable and unauthorized dealings in these accounts was discovered.

205.    Incredibly, even as the depth of Credit Suisse's fraud became known to its' clients Credit Suisse refused to take responsibility for its officers' misconduct and refused to make many of its defrauded clients whole -- and failed to record contingencies on its financial statement for these obligations. At least ten corporate clients have settled with Credit Suisse or initiated arbitration proceedings and/or lawsuits to recover losses they sustained as the underlying collateral collapsed, including:

- Compania Panamena de Aviacion SA (Panama) – settled for $3.6 million
- IncrediMail Ltd. (Israel) – wrote down $4.9 million
- Logitech International SA (Switzerland) – settled, but still wrote down $46 million
- Mind CTI Ltd. (Israel) – wrote down $15.2 million and filed arbitration
- Sarin Technologies Ltd. (Israel) – wrote down $1 million and filed arbitration
- STM – wrote down $75 million and filed suit
- Syneron Medical Ltd. (Israel) – wrote down $5.8 million and filed arbitration
- Tadiran Communications Ltd (Israel) - settled with Credit Suisse for $7.3 million

91

 – Teva Pharmaceutical Industries Ltd (Israel) – wrote down $52 million
 – Visonic (Israel) – negotiations have broken down

206.    STM, one of the largest defrauded purchasers, recently filed a complaint in the U.S. District Court for the Eastern District of New York, seeking to recover $415 million. There, Credit Suisse is accused of fraudulently representing that the account managed for STM would invest exclusively in student loans.  The complaint describes that Credit Suisse sent e-mails confirming purchases of securities whose descriptions had been altered to look like student loan securities.  Representative of numerous similar fraudulent transactions by Credit Suisse, the complaint explains that on June 19, 2006, Credit Suisse invested $25.35 million of STM funds in "South Coast Funding V," a sub-prime CDO security that the client had not authorized.  At the time of the purchase Credit Suisse transmitted by e-mail to STM a falsified e-mail confirmation describing the security as "South Coast Funding *Student Loan*."  (*emphasis added.*)  Copies of the phony e-mails are attached as an exhibit to the STM complaint.  The e-mails falsely report the following purchases on behalf of STM:

| E-mail From | Date of E-Mail | Amount | Securities Purportedly Purchased |
|---|---|---|---|
| Tzolov, Julian | 6/19/06 | $25,350,000 | South Coast Funding St. Loan |
| Tzolov, Julian | 7/19/06 | $50,000,000 | Student Finance Corp. |
| Tzolov, Julian | 8/14/06 | $55,700,000 | Camber Funding St. Loan Ser. 2006-1 |
| Tzolov, Julian | 9/11/06 | $18,200,000 | Camber Funding St. Loan Ser. 2006-1 (rolled) |
| Anderson, Ian (cc Tzolov) | 10/6/06 | $73,900,000 | Camber Funding St. Loan Ser. 2006-1 |
| Tzolov, Julian | 10/11/06 | $35,000,000 | Camber Funding St. Loan Ser. |
| Ferguson, Chris | 11/9/06 | $50,000,000 | Camber Funding Student Ln. Ser. 6 |
| Ferguson, Chris | 11/15/06 | $35,000,000 | Camber Funding St. Loan |
| Ferguson, Chris | 11/16/07 | $850,000 | Camber Funding St. Loan Ser. 5 |
| Ferguson, Chris | 2/13/07 | $22,150,000 | Camber Funding Student Ln. Ser. 5 (rolled) |
| Ferguson, Chris | 3/13/07 | $22,150,000 | Camber Funding Student Ln. Ser. 5 (rolled) |
| Ferguson, Chris | 4/10/07 | $22,150,000 | Camber Funding Student Ln. Ser. 5 (rolled) |

| Yuen, Dolly | 5/9/07 | $49,500,000 | Camber Funding Student Ln. Ser. 6 |
|---|---|---|---|
| Yuen, Dolly | 6/5/07 | $10,000,000 $13,400,000 | South Coast Funding Camber Funding Student Ln. Ser. 5 (rolled) |
| Ferguson, Chris | 6/6/07 | $39,200,000 $38,300,000 | Camber Funding Student Ln. Ser. 6 Independence Funding |
| Yuen, Dolly | 7/31/07 | $20,000,000 | Camber Funding |
| Yuen, Dolly | 8/1/07 | $11,400,000 $39,200,000 | Mantoloking Funding Capstan Funding Ser. 3 |

207.    The STM complaint reflects that the Defendants were fully aware of this scam since the summer of 2007; it reports that when STM became aware of the unauthorized trading, it directly confronted senior officers at Credit Suisse:

> When ST confronted Credit Suisse Group about the fraud in the summer of 2007, multiple Credit Suisse Group agents, including defendant's chief operating officer ("COO") and general counsel, and the general counsel of defendant's private banking division, privately admitted that ST had been defrauded by Credit Suisse Securities.  These Credit Suisse Group officers then falsely represented to ST that ST was the only customer deceived by Credit Suisse Securities.

*    *    *

> For instance, it was the general counsel of Credit Suisse Group's private banking division, who, on September 21, 2007, sent ST an email claiming incorrectly that Credit Suisse had sent ST prospectuses for the securities Credit Suisse Securities had purchased, even though Credit Suisse has now admitted that it knew at the time that its brokers had defrauded ST and other victims.  ST of course, never received any such prospectuses.

(STM Cmplt, ¶¶ 9, 62)  Witness #8, who worked for Tzolov and Butler, confirmed that the head of Credit Suisse's Private Banking division, as well as other senior officers at the Company, knew about the wrongdoing by the first half of September 2007, and that there were several red flags about the suspicious activities in these customer accounts long before that time.

208.    The damages sought by STM are $415 million.  Certainly by the summer of 2007 as a result of STM's meeting with these two key officers, the Defendants well knew that there was a major fraud being perpetrated by its asset management officers.  Despite this knowledge,

93

in 3Q07, Credit Suisse reported only CHF 146 million for the loss in fair value of the ARS, while concealing from customers and investors the true reasons for the write down and the CHF multi-billion exposures it faced.  Indeed, Credit Suisse staff were told to actively mislead their money market customers about the problems with their accounts.  Without disclosing the wrongdoing of its officers, or the true nature of the ARS scheme, beginning in 3Q07, Credit Suisse began to report that it had incurred certain losses for the decline in fair value for assets purchased from certain US money market funds "to address liquidity concerns caused by the US market's extreme conditions."  In a chart used in the fourth quarter 2007 ("4Q07") earnings conference call held on February 12, 2008, Credit Suisse revealed the enormity of its exposure and contingent liabilities that should have appeared long ago on the Company's financial statements for its fraudulent customer placements:

## Asset Management: money market fund repositioning

Securities transferred to bank balance sheet

| Roll-forward of exposure (CFH bn) | |
| --- | --- |
| **Purchased in 2H07** | **9,286** |
| Sold or matured | (4,445) |
| Losses | (920) |
| Exposure as of year-end 2007 | 3,921 |

| Gross exposure (CHF bn) | 4Q07 |
| --- | --- |
| Structured Investment Vehicles (SIV) | 2,481 |
| Asset Backed Securities (ABS) | 1,026 |
| *of which subprime-related* | *419* |
| Corporates / banks | 414 |
| Total | 3,921 |

| CHF m | 4Q07 | 2007 |
| --- | --- | --- |
| ***Losses*** | (774) | ***(920)*** |

- Responded to highly stressed market conditions affecting money market funds
  - **Bought CHF 9.3 bn of securities from its third party funds onto Credit Suisse balance sheet**
  - **Actions taken to maintain liquidity and to protect client franchise**

Money market funds are now operating normally
No material exposure to SIVs, CDOs or US subprime
Purchased securities caused significant losses
Valuations impacted as mortgage market stress began to affect higher rated securities
Positions are marked-to-market, and carry typical discounts to par of 15% to 20%
Portfolio reduced by 58% in 4Q07 and we continue to reduce/hedge positions

(Emphasis added)

209.    On April 24, 2008, for 1Q08, Credit Suisse announced another CHF 566 million in losses for write downs of the ARS buybacks.  As reported on CFO.com, on September 16,

2008, Credit Suisse agreed with regulators to buy back another $550 million in ARS from its customers:

> Under the settlement with North Carolina state securities regulators, Credit Suisse agreed to buy back about $550 million in ARS, according to Reuters. The investors include all individuals; legal entities forming an investment vehicle for family members, charities, and non-profits; and small- to medium-sized businesses with up to $10 million in accounts with Credit Suisse.

210.    Thus, Credit Suisse's own exposure for sub-prime and other illiquid securities improperly sold to its money-market accounts exceeded $10 billion (because Credit Suisse still has not bought back the tainted ARS from STM and other defrauded corporate clients), much of which represented 2006 exposures, and the losses in fair value that should have been reported on the Company's 2006 and/or quarterly income statements in 2007 exceeded $1 billion.

211.    In addition to the private civil actions currently pending, on September 3, 2008 the Securities and Exchange Commission (SEC) filed a civil suit against the two Credit Suisse registered representatives directly responsible for the fraudulent sales, Eric Butler and Julian Tzolov. In that complaint, both Butler and Tzolov are identified as former directors and vice presidents of Credit Suisse Securities. The SEC complaint confirms and describes, in a summary fashion, many of the same facts that the STM complaint lays out in detail. The $415 million in unauthorized purchases discussed by STM in its complaint is discussed by reference to the same $415 million dollar amount in the SEC's complaint. The SEC complaint explains that from at least February 2005 through August 2007, these defendants purchased, without authorization, over $1 billion in ARS collateralized by sub-prime mortgages, CDO's, mobile home contracts, and other non-federally guaranteed non-student loan collateral. Further, according to the SEC, the defendants sent or directed others to send e-mails to Credit Suisse clients in which the names

95

of the ARS purchased were altered to conceal that the securities were CDO's, mortgages, and other non-student loan collateral.

212.    In addition, on August 26, 2008 the Department of Justice (DOJ) revealed that these same defendants had been indicted for 1) conspiracy to commit securities fraud and wire fraud, 2) securities fraud, and 3) wire fraud.   The superseding indictment charges that the defendants solicited money from Credit Suisse clients to invest in low risk products guaranteed by the federal government.   It further states that the defendants sent or caused to be sent electronic e-mail communications that falsely described the ARS purchases as being student loan backed ARS, and, that the defendants did so by removing the term "CDO" from the security description and falsely adding the term "student loan."

213.    Although the SEC complaint discusses unauthorized trades of "over $1 billion," Credit Suisse's SEC filings, particularly the chart used on the February 12, 2008 earnings call, reflect that the Company's wrongful trading in its clients' money market accounts far exceeded this sum.  As the defendants discussed in the February 12, 2008 earnings call (and as set forth on the chart used during the call), during the second half of 2007 ("2H07") Credit Suisse purchased, at amortized cost, almost *CHF 9.3 billion* of these toxic securities from the money market funds it had created and managed for its clients.  These securities were purportedly repurchased from its money market customers, and included in Credit Suisse's own trading account "to maintain liquidity and to protect client franchise."

214.    In its 2007 Annual Report, as released in March 2008, Credit Suisse reiterated that, "[T]he securities transactions were executed in order to address liquidity concerns caused by the US markets extreme conditions."  These comments are a clear reference to the repurchase by Credit Suisse of illiquid and unsuitable ARS placements in its clients' money market

accounts.  Even the enormous amounts reported by Credit Suisse in February and March 2008, however, do not include Credit Suisse's exposure to STM and other swindled clients with whom litigation remains on-going, or future buy-backs forced by government regulators.

215.     When these toxic securities were shifted back onto Credit Suisse's balance sheet, as the owner of the securities, the Company was forced to write down their value because Credit Suisse could no longer treat them as "client money."  Once Credit Suisse admitted to being the legal owner, Credit Suisse was forced to recognize the losses attributable to the loss in value of these toxic securities -- though the Company had long had unreported "contingent" liabilities for these securities.  While the Company has announced it will buy back the ARS's of individual investors and smaller corporate clients it has not completely addressed the fate of all its corporate clients as is evidenced by the arbitration proceedings and civil suits currently pending.  Adding insult to injury, Credit Suisse had the audacity to state in its 2007 annual report when explaining why they were buying these securities back and taking the CFH 920 million charge to earnings that: "We had no legal obligation to purchase these securities."

**H.     Credit Suisse's Flawed Fair Value and Risk Reporting**

216.     Pursuant to Generally Accepted Accounting Principles ("GAAP"), Credit Suisse's ABS loans are considered to be investments in debt securities that are to be accounted for in accordance with the provisions of Statements of Financial Accounting Standards ("SFAS") No. 115, which provides that such investments are to be classified in three categories and accounted for as follows:

- Debt securities that the enterprise has the positive intent and ability to hold to maturity are classified as help-to-maturity securities and reported at amortized cost.

- ***Debt and equity securities that are bought and held principally for the purpose of selling them in the near term are classified as trading***

> ***securities and reported at fair value, with unrealized gains and losses included in earnings.***
>
> - Debt and equity securities not classified as either held-to-maturity securities or trading securities are classified as available-for-sale securities and reported at fair value, with unrealized gains and losses excluded from earnings and reported in a separate component of shareholders' equity.

(Emphasis added)

217.    Virtually all of the ABS purchased and held by Credit Suisse, including those involving sub-prime and "Alt-A" mortgages as direct or indirect collateral, were purchased as "trading securities" whose value fluctuations had to be immediately recognized in Credit Suisse's earnings.

218.    Pursuant to SFAS No. 107 (and later SFAS 157 and 159), "Disclosures About Fair Value of Financial Instruments" (as amended), Credit Suisse was required to disclose in its financial statements information about significant uncertainties of credit risk arising from financial instruments, including:

(a)    information about the (shared) activity, region, or economic characteristic that identifies the concentration;

(b)    the amount of the accounting loss due to credit risk the entity would incur if parties to the financial instruments that make up the concentration failed completely to perform according to the terms of the contracts and the collateral or other security, if any, for the amount due proved to be of no value to the entity;

(c)    the entity's policy of requiring collateral or other security to support financial instruments subject to credit risk, information about the entity's access to that collateral or other security, and the nature and a brief description of the collateral or other security supporting those financial instruments; and

(d)    the entity's policy of entering into master netting arrangements to mitigate the credit risk of financial instruments, information about the arrangements for which the entity is a party, and a brief description of the terms of those arrangements, including the extent to which they would reduce the entity's maximum amount of loss due to credit risk.

219.    U.S. GAAP, in the Statements of Financial Accounting Standards ("SFAS") No. 5, "*Accounting for Contingencies*" states, in relevant part, that financial statements are to disclose contingencies when "there is at least a reasonable possibility that a loss or an additional loss may have been incurred."  SFAS No. 5 defines a reasonable possibility as one where the chance of occurring is more than "***remote***."  In such instances, financial statements are to disclose the nature of the contingency and give an estimate of possible loss or range of loss or state that such an estimate cannot be made.

220.    With respect to its sub-prime (and Alt-A) losses in fair value, exposures and loss contingencies, Credit Suisse published misstated financial statements and made other false and misleading statements and omissions in its financial reports, its earnings releases and in analyst conference calls for violations of these GAAP requirements (as well as others).  In large part, these accounting violations and false statements and omissions occurred as a result of a massive, and knowing and/or reckless, breakdown in the Company's internal controls over these complex securities, a breakdown that itself also violated GAAP as well as SEC financial reporting requirements.

221.    Throughout the Class Period, as Credit Suisse's peers reported enormous valuation losses and exposures attributable to the sub-prime crisis, the Defendants repeatedly represented that the Company's exposures were "remote" and "de minimis," and refused direct entreaties of the SEC to quantify these amounts, beginning with respect to Credit Suisse's 2006

annual Form 20-F. Credit Suisse's position, that it had largely escaped the sub-prime bullet, was predicated on a series of artificial and baseless assumptions, including: (a) that the Company was marking its sub-prime securities to market on a daily basis; (b) that its internal controls were adequate to assure that its assets were being accurately reported and their risks hedged; (c) that the Company had effectively hedged its sub-prime exposures so that it could properly report its exposures on a "net" rather than "gross" liability basis; (d) that "Alt-A" mortgages did not increase its exposure to the sub-prime crisis; and (e) that it had no or minimal exposure for the ARS CDO's that had been improperly placed with its money-market customers.

222. Despite the criminal and civil lawsuits, and regulatory actions detailed in this complaint, to date, Credit Suisse has yet to restate and quantify its sub-prime exposures and losses for 2006 and each quarter in 2007. Various statements made by Defendants during and after the Class period, however, show that, throughout the Class Period, Credit Suisse's exposures and incurred and contingent losses attributable to the sub-prime crisis were neither "remote" nor "de minimis," but were, in fact, very significant, and contrary to Defendants' representations, similar to those being experienced, and being reported by its peers.

223. Although Credit Suisse never directly disclosed its true exposures and sub-prime losses as of December 31, 2006, it did acknowledge that, by that date, it had ceased originating these securities and was reducing its sub-prime trading portfolio, so that its December 31, 2006 holdings and exposure from the sub-prime crisis was at least as large as that later revealed in 2007. On February 12, 2008 (for its ARS buy-backs) and on March 20, 2008 in its slides and presentations to analysts about the Company's 2007 performance and sub-prime exposures, Defendants revealed:

100

(a) That as of 3Q07, Credit Suisse's "net" exposure for Alt-A mortgages was still CHF 7.1 billion (Credit Suisse has yet to disclose its "gross" exposure, *i.e.*, its true exposure before reduction for hedging);

(b) That as of 4Q07, Credit Suisse's "gross" exposure for sub-prime securities (apart from "Alt-A") was still CHF 13.6 billion, or CHF 14.7 billion before the CHF 1.1 billion write-down reported in the 2007 annual report;

(c) That in 4Q07, Credit Suisse understated its losses in fair value for the mis-marking of its sub-prime securities by CHF 1.1 billion;

(d) That, during 2H07, Credit Suisse conducted "buy-backs" of improperly placed ARS, including for ARS collateralized by sub-prime CDO, of CHF 9.3 billion;

(e) For the ARS buy-backs, Credit Suisse had fair value losses of CHF 920 million.

224. For 1Q08, on April 24, 2008, Credit Suisse reported a whopping CHF 5.3 billion asset write down in investment banking, of which CHF 2.7 billion related to the write down of sub-prime CDO's. At the same time, Credit Suisse announced another CHF 566 million write down on ARS it bought back from its money-market clients. On September 16, 2008, it announced yet another $550 million ARS buy-back. The STM complaint and other client lawsuits and arbitrations reveal another approximately $600 million in ARS that Credit Suisse *should have* "bought back."

225. Thus, as of December 31, 2006 and throughout 2007 Credit Suisse was "exposed" to the sub-prime crisis and for its manipulation of its money market customer accounts, for at least CHF 30 billion (7.1 + 14.7 + 9.3 + .55 + .6 billion), an amount that was clearly neither "remote" nor "*de minimis*." As Credit Suisse itself has admitted, these exposures led to losses in

101

fair value (and thus a reduction in net revenues) of more than CHF 2 billion (CHF 1.1 plus .92) in 2007, and billions more thereafter.

226.    The matters described in this complaint caused Credit Suisse's financial and risk reporting to be misstated in violation of GAAP with respect to Class Period financial reports for the amounts of investment banking (and company-wide) trading securities reported in its trading assets on its balance sheets, and investment banking net revenues, income, contingencies and calculated "VaR" and "position risks," as further described below.

## V.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS ABOUT THE COMPANY'S FINANCIAL PERFORMANCE, EXPOSURES AND RISK FROM THE SUB-PRIME CRISIS

227.    During the Class Period, Credit Suisse reported the following amounts in its 2006 annual report, and its quarterly financial reports filed with the SEC:

| Income Statements (CHF) (in millions) | 2006 | 1Q07 | 2Q07 | 3Q07 | 4Q07 (as announced 2/12/08) |
|---|---|---|---|---|---|
| Trading Revenues | 9,428 | 3,216 | 3,810 | (158) | 457 |
| Provisions for Credit Losses | (111) | 53 | (20) | 4 | 203 |
| Income (Loss) From Continuing Operations Before Taxes | 14,300 | 4,476 | 5,387 | 2,036 | 3,026 |
| EPS | 7.53 | 2.56 | 3.0 | 1.27 | 1.30 |
| | | | | | |
| Balance Sheet Trading Securities | 450,780 | 515,050 | 552,321 | 531,100 | 533,247 |
| | | | | | |
| Risk Disclosures Investment Banking VaR | 17,060 | 17,471 | 17,009 | 20,412 | 17,951 |
| | | | | | |
| Position Risk - Real Estate and Structured Assets | 4,970 | 4,749 | 3,841 | 4,759 | 3,252 |

228.    The reported amounts on the income statements, balance sheets and the risk disclosures were false and misleading, as provided in ¶¶ 216-26.  With respect to the ARS that

were improperly sold to money market clients, these securities were not accounted for as owned by Credit Suisse, but were instead treated as owned by clients with Credit Suisse bearing no market risk, resulting in balance sheet asset understatements in the reported trading assets account and overstatements of trading revenues, income from continuing operations and net income.  Because Credit Suisse would ultimately be obligated to buy back these securities, it should have, but failed to reflect the changes in fair value in trading revenues or record a charge to its provision for credit losses to reflect the obligation to "lift out" these securities at amortized cost in the future.  At a minimum these amounts should have been reported as loss contingencies under SFAS #5.  The financial reporting for 2006 was further false and misleading, and violated GAAP as further provided, *infra*, at ¶¶ 291-334.  Defendants' statements referring to their "conservative" and "disciplined" risk taking, "appropriate" control processes and their "comprehensive" and "accurately reported" risks, including VaR, ERC and position risk, were false and misleading because of the material weaknesses in the Company's internal controls and the major failures in the Company's risk management processes which are described at ¶¶ 103-226.

2006 Annual Results

229.    On February 15, 2007, Credit Suisse reported its results for 4Q06 and FY2006.  According to the press release issued by the Company:

> Credit Suisse Group today reported net income of CHF 11,327 million for the full year 2006, up 94% compared to net income of CHF 5,850 for 2005 . . . Basic earnings per share from continuing operations were CHF 7.53 for the full year 2006, compared to CHF 3.98 for 2005.  Basic earnings per share were CHF 10.30 for the full year 2006, compared to CHF 5.17 for 2005.  Fourth-quarter 2006 net income totaled CHF 4,673 million, compared to net income of CHF 1,103 million in the fourth quarter of 2005.  Credit Suisse recorded net new assets of CHF 95.4 billion for the full year 2006.

*        *        *

103

**Investment Banking**

*The investment Banking segment reported record income* from continuing operations before taxes of CHF 5,951 million for the full year 2006, an increase of CHF 4,352 million compared to 2005, with strong contributions across the underwriting, advisory, fixed income trading and equity trading businesses. Excluding the CHF 508 million of credits from insurance settlements for litigation and related costs in 2006 and the CHF 960 million charge to increase litigation reserves in 2005, income from continuing operations before taxes rose 113% in 2006. *Net revenues increased 32% to a record level in 2006*, driven by a strong performance across all key business areas and regions amid favorable market conditions, high levels of deal activity and improved market share in certain products . . . The pre-tax income margin was 29.1%, or 26.6% excluding the insurance settlements, compared to 16.5% excluding the litigation charge in 2005.

In the fourth quarter of 2006, income from continuing operations before taxes totaled a record CHF 2,342 million, an increase of CHF 2,056 million compared to the fourth quarter of 2005. Net revenues grew 63% to a record level in the fourth quarter of 2006, benefiting from strong performance sin both the investment banking and trading businesses.

*    *    *

**Outlook**

Credit Suisse believes that growth prospects for the global economy will remain good and expects client activity to continue at around the levels of 2006 . . . Credit Suisse has had a good start to 2007 and is well positioned to capture these growth opportunities with its integrated banking model.

(emphasis added)

230.    Also on February 15, 2007, Dougan, Fassbind and Calello discussed Credit Suisse's financial results and operations with analysts and investors on the Company's 4Q06 and FY2006 earnings conference call. Fassbind stated, in pertinent part:

*Credit Suisse recorded record income* of CHF4.67b for the fourth quarter. Our *pre-tax income* stood at close to CHF3.4b, *again a record result* and a significant increase compared to the previous quarter as well as the same period last year.

*    *    *

Earnings per share, again excluding the insurance business, increased to CHF2.42 for the quarter.

104

Strong performance this quarter was driven by the record pre-tax income of CHF2.3b achieved in Investment Banking . . . This reflected strong results in all key businesses and regions . . .

\* \* \*

When excluding the litigation charges and related insurance settlements received, pre-tax income for Investment Banking more than doubled to CHF5.4b in 2006.

\* \* \*

***We produced record fourth quarter and full year results [in Investment Banking]*** in both revenues and pre-tax income. We made progress in implementing our strategy to deliver a more profitable franchise. Consequently, we achieved a number of the financial objectives set out for this business two years ago, while continuing to make incremental progress in other areas of our strategy.

\* \* \*

Fixed income markets were favorable in the fourth quarter as credit spreads remained tight . . . Revenues during the quarter increased 76% from last year to CHF2.8b, and represents the second-best performance ever in this area. Only the first quarter of 2006 saw higher revenue levels.

\* \* \*

. . . let me briefly review our value-at-risk numbers. As you could see in our publication, the Investment Banking average value at risk in the forth quarter was down CHF9m from the prior quarter to CHF71m . . . ***we continue to conservatively manage our risk*** with controlled growth when we see the right opportunities in the market.

\* \* \*

We have significantly increased our pre-tax margin [in Investment Banking] in 2006 and, as mentioned at the Investor Day, we will continue to reduce the remaining gap against peer performance. We believe that there is still significant upside for the business to come. But the performance in the fourth quarter also shows that we are able to achieve a pre-tax margin level which is compatible to our peers.

When adjusting for the insurance settlements received, the full-year pre-tax margin was 27%, above our original pre-tax margin target of 20% . . . We recently increased our mid-term pre-tax margin target to 30% for Investment Banking. We will continue to build up on our existing strong franchises . . .

\* \* \*

> With this foundation in place, we are well positioned to leverage revenue synergies obtained with the integrated bank with a strong focus on delivering solutions to support Private Banking and Asset Management clients.

(emphasis added)

On the same call, Dougan stated, in part:

> the fourth quarter was really an exceptional performance across – very broadly across our [Investment Banking] businesses.  There were really no particularly lumpy areas there.  We had really strong performance across all of our business areas.  You can see from the numbers fixed income trading had a very strong quarter . . . So it was really a very good performance across a very broad spread of businesses.

> \*          \*          \*

> on the prop[rietary] trading side we – as we stated, part of our strategy is to continue to build our a diversified disciplined selection of prop[ietary] trading businesses.  I think in the fourth quarter we continued to make progress towards that . . . But it still a process where we're building, again, a diversified set of proprietary trading businesses where we can **take disciplined risk** and over time make very consistent returns.

> \*          \*          \*

> The fourth quarter we had a very good performance in the prop[ietary] trading . . . We had very good performance and I think a very good progression.  We continue to build out that business . . . So we've continued to build it and I think build it well and, again, **in a disciplined fashion**.

> I think our trading efficiency is actually quite good.  So, if you looked at our **trading revenues versus our VAR**, or however you want to look at it, I think in the fourth quarter it'd probably be **quite good**.  As I've mentioned before, it's probably more about scale . . . Fixed income is the area that we've been building up.  I think our efficiency's actually been good . . .

(emphasis added)

On the earnings conference call, Merrill Lynch analyst Jack De Vries asked Credit Suisse to "quantify and then qualify your exposure to subprime mortgages and subprime mortgage providers in the U.S."  Dougan responded, in pertinent part:

> **I don't know if I would get into details about quantifying our subprime exposure**.  What I would say is that obviously the residential mortgage, that

106

securitization business, is an important business for us in the U.S. We are, however, in the business of securitizing and selling out – originating, securitizing and selling out residential loans and clearly we are active in the subprime area as well.

. . . that business has continued to perform well for us because of the fact that we are not in a buy and hold business. We are in a securitization business. ***We basically did see signs that clearly the market was weakening late last year. We really took action on it at that time, in terms of reducing our originations*** and making sure the quality of our originations were good. And, as a result, our residential mortgage backed business had flattish revenue performance last year, but in our view that was pretty good performance given the conditions in the market.

***So we clearly do have a portion of our business in the subprime area. We originate, securitize and sell them, however, and the – our business, actually, in that area is performing pretty well***.

On the same call, Calello stated, in pertinent part:

As I had mentioned before and on Investor Day, we've had just an enormous amount of success in pushing forward the integrated bank. But I think we're just scratching the surface. And certainly ***I look forward, in my role in the Investment Bank, working very closely with Mr. Blumer and Berchtold across Asset Management and Private Banking to make sure that we continue to get a little bit further than the surface and continue to see the gains that the integrated bank can bring to Credit Suisse***.

(emphasis added)

231.    The above statements with respect to Credit Suisse's financial performance, and particularly Investment Banking's "record" results, were false and misleading for the reasons stated in ¶¶ 216-26. The statements with respect to the Company's "disciplined risk" taking and performance versus VaR, were false and misleading as described in ¶¶ 103-76. Credit Suisse's refusal to quantify its sub-prime exposure, in light of its statements about reducing its sub-prime originations and indicating that the Company was performing well in this area, was a false and misleading omission.

232.    On or about March 26, 2007, Credit Suisse published its annual Form 20-F and issued its annual report to shareholders. These documents were filed with the SEC and posted on

the Company's website.  In his "Dear shareholders" letter included in the annual report, the

Chief Executive Officer, Oswald J. Grübel stated:

> 2006 was a record year for Credit Suisse.  Our new integrated banking model proved successful and provided us with an effective platform to capture the growth opportunities arising from high levels of client activity while significantly improving our profitability.  Thanks to strong revenue generation and enhanced operating efficiency, *we posted the best ever result in the history of the bank*.  Net income totaled CHF 11.3 billion, including a net capital gain of CHF 1.8 billion from the sale of Winterthur, which was recorded in the fourth quarter of 2006.  Basic earnings per share were CHF 10.30.  Income from continuing operations was CHF 8.3 billion or CHF 7.53 per share.  Our return on equity improved significantly to 27.5% in 2006 from 15.4% in 2005.  We also generated net new assets of CHF 95.4 billion in 2006, compared to CHF 57.4 billion in 2005, reflecting our strength in asset gathering and our positioning as a trusted partner to private clients, companies and institutions worldwide.
>
> This outstanding performance is the result of our efforts to realign Credit Suisse and position it for success in a rapidly changing environment.
>
> \*       \*       \*
>
> *We achieved record results in Investment Banking last year . . . We generated record revenues in advisory and debt and equity underwriting and significantly increased our trading revenues.  Income from continuing operations before taxes grew by 272% compared to 2005.*

(emphasis added)

233.   The Company's 2006 annual report included the following description of its

"Critical accounting policies":

> Critical accounting policies
>
> In order to prepare the consolidated financial statements in accordance with US GAAP, management is required to make certain accounting estimates to ascertain the value of assets and liabilities.  These estimates are based upon judgment and the information available at the time, and actual results may differ materially from these estimates.  *Management believes that the estimates and assumptions used in the preparation of the consolidated financial statements are prudent, reasonable and consistently applied.*  For further information on significant accounting policies and new accounting pronouncements, see note 1 "Summary of significant accounting policies" and note 2 "Recently issued accounting

108

standards" in the Notes to the consolidated financial statements in the Credit Suisse Group Annual Report 2006.

The Group believes that the critical accounting policies discussed below involve the most complex judgments and assessments.

Fair value
The fair value of the majority of the Group's financial instruments is based on quoted market prices in active markets or observable market parameters or is derived from such prices or parameters. These instruments include government and agency securities, commercial paper, most investment-grade corporate debt, most high-yield debt securities, exchange traded and certain OTC derivative instruments, most *Collateralized debt obligations* (CDO), most mortgage-backed and asset-backed securities, certain residential mortgage whole loans and listed equity securities.

In addition, the Group holds financial instruments that are thinly traded or for which no market prices are available, and which have little or no price transparency. For these instruments, the determination of fair value requires subjective assessment and varying degrees of judgment depending on liquidity, concentration, pricing assumptions and the risks affecting the specific instrument. In such circumstances, ***valuation is determined based on management's best estimate of fair value.*** These instruments include certain investment-grade corporate debt securities, certain high-yield debt securities, distressed debt securities, certain CDOs, certain OTC derivatives, certain mortgage-backed and asset-backed securities, non-traded equity securities and private equity and other long-term investments. Valuation techniques for certain of these instruments are described more fully below.

Controls over the fair valuation process
***Control processes are applied to ensure that the fair value of the financial instruments reported in the consolidated financial statements, including those derived from pricing models, are appropriate and determined on a reasonable basis***. The Group determines fair value using observable market prices or market-based parameters whenever possible. In the absence of observable market prices or market-based parameters in an active market, observable prices or market-based parameters of comparable market transactions or other observable data supporting an estimation of fair value using a valuation model at the inception of a contract, fair value is based on the transaction price. ***Control processes are designed to assure that the valuation approach is appropriate and the assumptions are reasonable.***

These control processes include the review and approval of new instruments, review of profit and loss at regular intervals, risk monitoring and review, price verification procedures and review of models used to estimate the fair value of

financial instruments by senior management and personnel with relevant expertise who are independent of the trading and investment functions.

The Group also has agreements with certain counterparties to exchange collateral based on the fair value of derivatives contracts. Through this process, one or both parties provide the other party with the fair value of these derivatives contracts in order to determine the amount of collateral required. This exchange of information provides additional support for valuation of certain derivatives contracts. The Group and other participants in the OTC derivatives market provide pricing information to aggregation services that compile this data and provide this information to subscribers. This information is considered in the determination of fair value for certain OTC derivatives.

(emphasis added)

234. With respect to the Company's reported "Allowances and provisions for losses,"

the 2006 annual report states:

***The allowances for loan losses are considered adequate to absorb credit losses*** existing at the dates of the consolidated balance sheets. These allowances are for probable credit losses inherent in existing exposures and credit exposures specifically identified as impaired.

With respect to the "inherent loan loss allowance," the 2006 Annual Report states:

***The inherent loss allowance is for all credit exposures not specifically identified as impaired and that, on a portfolio basis, are considered to contain probable inherent loss.***

With respect to hedges for the Company's VIE derivatives, the 2006 Annual Report states:

Derivatives which are designated and qualify as fair value hedges are recorded in the consolidated balance sheet at fair value with the carrying value of the underlying hedged items also adjusted to fair value for the risk being hedged. ***Changes in the fair value of these derivatives are recorded in the same line item of the consolidated statement of income as the change in the fair value of the risk being hedged for the hedged assets or liabilities to the extent the hedge is effective.*** The change in the fair value representing hedge ineffectiveness is recorded separately in *Trading revenues*.

(emphasis added)

235. With respect to its reporting of "risk," the 2006 Annual Report states:

Overview

110

Market risk is the risk of loss arising from adverse changes in interest rates, foreign currency exchange rates, equity prices, commodity prices and other relevant market parameters, such as market volatilities.  The Group defines its market risk as potential changes in fair values of financial instruments in response to market movements.  A typical transaction may be exposed to a number of different market risks.

***Credit Suisse Group devotes considerable resources to ensuring that market risk is comprehensively captured, accurately modeled and reported, and effectively managed.***  Trading and non-trading portfolios are managed at various organizational levels, from Credit Suisse Group overall down to specific business area.  Credit Suisse Group uses market risk measurement and management methods designed to meet or exceed industry standards.  These include both general tools capable of calculating comparable exposures across the Group's many activities as well as focused tools that can specifically model unique characteristics of certain business areas' functions.  The tools are used for internal market risk management, internal market risk reporting and external disclosure purposes.  The principal measurement methodologies are VaR and scenario analysis.  Additionally, the market risk exposures are also reflected in the Group's ERC calculations.  ***The risk management techniques and policies are regularly reviewed to ensure that they remain appropriate.***

*Value-at-Risk*
***VaR measures the potential loss in terms of fair value changes*** over a given time interval under normal market conditions at a given confidence level.  VaR as a concept is applicable for all financial risk types with valid regular price histories.  Positions are aggregated by risk type rather than by product.  For example, interest rate risk includes risk arising from money market and swap transactions, bonds, and interest rate, foreign exchange, equity and commodity options.  The use of VaR allows the comparison of risk in different businesses, such as fixed income and equity, and also provides a means of aggregating and netting a variety of positions within a portfolio to reflect actual correlations and offsets between different assets.

Historical financial market rates and prices serve as a basis for the statistical VaR model underlying the potential loss estimation.  Credit Suisse Group uses a ten-day holding period and a confidence level of 99% calculated using, in general, a rolling two-year history of market data to model the risk in its trading portfolios.  These assumptions are compliant with the standards published by the Basel Committee on Banking Supervision and other related international standards for market risk management.  For some purposes, such as backtesting, disclosure and benchmarking with competitors, the resulting VaR figures are scaled down or calculated using one-day holding period values.

Credit Suisse has approval from the Swiss Federal Banking Commission, as well as from certain other regulators of its subsidiaries, to use its VaR model in the

111

calculation of trading book market risk capital requirements. Credit Suisse continues to receive regulatory approval for ongoing enhancements to the methodology, and the model is subject to regular reviews by regulators and auditors.

Assumptions

Credit Suisse Group uses a historical simulation model for the majority of risk types and businesses within its trading portfolios. Where insufficient data is available for such an approach, an "extreme-move" methodology is used. The model is based on the profit and loss distribution resulting from the historical changes of market rates applied to evaluate the portfolio using, in general, a rolling two-year history. This methodology also avoids any explicit assumptions on correlation between risk factors. *The VaR model uses assumptions and estimates that Credit Suisse Group believes are reasonable*, but different assumptions or estimates could result in different estimates of VaR.

Limitations

As a risk measure, VaR only quantifies the potential loss on a portfolio under normal market conditions. It is not intended to cover losses associated with unusually severe market movements (these are intended to be covered by scenario analysis). VaR also assumes that the price data from the recent past can be used to predict future events. If future market conditions differ substantially from past market conditions, then the risk predicted by VaR may be too conservative or too liberal.

Scenario analysis

Credit Suisse Group regularly performs scenario analysis for all of its business areas exposed to market risk to estimate the potential economic loss that could arise from extreme, but plausible, stress events. *The scenario analysis calculations performed are specifically tailored towards their respective risk profile.* In addition, to identify areas of risk concentration and potential vulnerability to stress events across Credit Suisse Group, the Group has developed a set of scenarios which are consistently applied across all business areas. Key scenarios include significant movements in interest rates, equity prices and exchange rates, as well as adverse changes in counterparty default rates. The scenario analysis framework also considers the impact of various scenarios on key capital adequacy measures such as regulatory capital and economic capital ratios. *The Board of Directors and senior management are regularly provided with scenario analysis estimates, scenario analysis trend information and supporting explanations to create transparency on key risk exposures and to support senior management in managing risk*.

\*        \*        \*

VaR results and distribution of trading revenues

112

*Various techniques are used to assess the accuracy of the VaR model used for trading portfolios, including backtesting.* Backtesting of the trading portfolio is performed at various organizational levels, from Credit Suisse Group overall down to more specific business areas. The backtesting process compares daily backtesting profit and loss to VaR calculated using a one-day holding period. Backtesting profit and loss is a subset of the actual trading revenues and includes only the profit and loss effects due to changes in financial market variables such as interest rates, equity prices, foreign exchange rates and commodity prices on the previous night's positions. It excludes such items as fees, commissions, certain provisions and any trading subsequent to the previous night's positions. It is appropriate to compare this measure with VaR for backtesting purposes, since VaR assesses only the potential change in position value due to overnight movements in financial market variables. An accurate one-day, 99% VaR model should have no more than four backtesting exceptions per year. A backtesting exception occurs when the daily loss exceeds the daily VaR estimate.

*Credit Suisse Group had four backtesting exceptions in 2006*, after a period of two years with no exceptions. The four backtesting exceptions occurred during the second quarter of 2006 and were driven by equity and foreign exchange market volatility during May 2006. During this period, equity and foreign exchange market volatility was significantly larger than the volatility reflected in the VaR model, which uses historical data on a preceding two-year rolling basis. The VaR model is subject to regular assessment and evaluation to seek to maintain accuracy given current market conditions and positions.

*    *    *

Economic risk capital

Introduction
Economic Risk Capital represents current market best practice for measuring and reporting all quantifiable risks. It is called economic risk capital because it measures risk in terms of economic realities rather than regulatory or accounting rules. *Credit Suisse Group uses an economic risk capital model as a consistent an comprehensive tool for risk management*, capital management and planning and performance measurement.

As the Group's standard for assessing risk, *ERC provides a strong framework for managing the Group's risk profile* on a consolidated basis and to assess aggregate risk appetite in relation to the financial resources. By providing a common terminology for risk across the Group, *ERC has also increased risk transparency* and knowledge-sharing across the Group. *The ERC model is subject to regular methodology reviews to ensure it appropriately reflects the risk profile of our portfolio in the current market environment.*

113

The development and usage of ERC methodologies and models has increased across the industry over recent years.  In the absence of a standardized ERC approach, comparisons across firms may not be meaningful.

Concept
The ERC model is designed to measure all quantifiable risks associated with the Group's activities on a consistent and comprehensive basis.  ERC is the economic capital needed to remain solvent and in business even under extreme market, business and operational conditions, given the institution's target financial strength (i.e., long-term credit rating).

ERC is calculated separately for position risk, operational risk and expense risk.  These three risk categories measure very different types of risk:

- *Position risk - the level of unexpected loss in economic value on the Group's portfolio of positions over a one-year horizon that is exceeded with a given, small probability (1% for risk management purposes; 0.03% for capital management purposes).*
- Operational risk - the level of loss resulting from inadequate or failed internal processes, people and systems or from external events over a one-year horizon that is exceeded with a small probability (0.03%).  Estimating this type of ERC is inherently more subjective, and reflects both quantitative tools as well as senior management judgment.
- Expense risk - the difference between expenses and revenues in a severe market event, exclusive of the elements captured by position risk and operational risk.

Position risk, operational risk and expense risk are used to determine the Group's utilized economic capital.

Application
ERC represents Credit Suisse Group's core top-level risk management tool.  ERC is used to assess, monitor, report and limit risk exposures at many levels of the organization. *The Board of Directors and senior management* at the Group and the segments *are regularly provided with ERC results, trends and ratios, together with supporting explanations to create risk transparency and to support senior management in managing risk.*

(emphasis added)

236.    Footnote 29 to the 2006 annual financial statements purported to present aggregated exposures for different types of asset groups, which included, *inter alia*, sub-prime

114

debt.  Footnote 29 identifies the following exposures and sensitivities for Credit Suisse's retained

interests in CMBS, RMBS, CDO and miscellaneous ABS:

*The following table sets forth the fair value of retained interests from securitizations, key economic assumptions used to determine the fair value and the sensitivity of the fair value to immediate adverse changes in those assumptions:*

| December 31, 2006, *in CHF* m, except where indicated | CMBS[1] | RMBS | CDO[2] | ABS |
|---|---|---|---|---|
| Carrying amount / *fair value of retained interests*[5] | **634** | **4,223** | **744** | **66** |
| Weighted-average life, in years | 3.9 | 4.2 | 6.0 | 1.4 |
| Prepayment speed assumption (in rate per annum), in % [-] | - | 0-74.8 | - | 25.0-68.0 |
| Impact on fair value from 10% adverse change | - | (19.0) | **-** | (1.0) |
| Impact on fair value from 20% adverse change | - | (36.0) | **-** | (3.0) |
| Cash flow discount rate (in rate per annum), in %[4] | 1.0-14.8 | 6.5-21.5 | 4.2-14.5 | 26.2 |
| Impact on fair value from 10% adverse change | (7.4) | (61.7) | (10.3) | - |
| Impact on fair value from 20% adverse change | (16.1) | (122.0) | (19.4) | (1.3) |
| ***Expected credit losses (in rate per annum), in %*** | 2.1-10.8 | 0.4-0.7 | 0.1-10.6 | 21.5 |
| Impact on fair value from 10% adverse change | (2.7) | (6.3) | (5.3) | - |
| Impact on fair value from 20% adverse change | (5.4) | (11.4) | (10.5) | (1.3) |

1) To deter prepayment, commercial mortgage loans typically have prepayment protection in the form of prepayment lockouts and yield maintenances.  2) CDOs are generally structured to be protected from prepayment risk.  3) Prepayment speed assumption (PSA) is an industry standard prepayment speed metric used for projecting prepayments over the life of a residential mortgage loan.  PSA utilized the Constant Prepayment Rate (CPR) assumptions.  A 1200% prepayment assumption assumes a prepayment rate of 0.2% per annum of the outstanding principal balance of mortgage loans in the first month.  This increases by 0.2% thereafter during the term of the mortgage loan, leveling off to a CPR of 6% per annum beginning in the 30th month and each month thereafter during the term of the mortgage loan.  100 PSA equals 6 CPR.  4) The rate is based on the weighted-average yield on the retained interest.  *5) of which CHF 55 million, or 9%, CHF 570 million, or 13%, CHF 82 million, or 11%, and CHF 66 million, or 100% relating to CMBS, RMBS, CDO and ABS, respectively, is non-investment grade.*

According to the footnote, the above-described sensitivities do not reflect the benefits of

hedging.

237.    In the Company's 2006 Form 20-F filing, Grübel and Fassbind signed

certifications (the "SOX certificates") asserting:

1.  I have reviewed this annual report on Form 20-F of Credit Suisse Group;

2.  Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this report;

3.    Based on my knowledge, *the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant* as of, and for, the periods presented in this report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act

115

Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and *we have*:

a) *designed such disclosure controls and procedures*, or caused such disclosure controls and procedures to be designed under our supervision, *to ensure* that *material information relating to the registrant, including its consolidated subsidiaries, is made known to us* by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to *provide reasonable assurance regarding the reliability of financial reporting* and the preparation of financial statements for external purposes in accordance with generally accepted accounting practices;

c) *evaluated the effectiveness of the registrant's disclosure controls* and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the periods covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrants internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is likely to materially affect, the registrants internal control over financial reporting.

5. The registrant's other certifying officers and *I have disclosed*, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) *all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting*, which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) *any fraud*, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(emphasis added)

238.    The quoted, and particularly the highlighted statements by the Company and Individual Defendants with respect to the reported 2006 "record" income from continuing

116

operations, net income, trading revenues, and provision for credit losses, and the reported balances of trading securities were false and misleading, and omitted information needed to make the reported amounts not misleading, as provided in ¶¶ 216-26, and further violated GAAP as provided in ¶¶ 291-334. Among other things, the Alt-A and sub-prime securities that were required to be accounted for using "fair value" were not, and the financial statements lacked transparency with respect to these assets and risks. The exposures described in Footnote 29 were false and misleading for failing to disclose the actual Alt-A and sub-prime "gross" exposures that were revealed in 2007. Credit Suisse's exposures for ARS were improperly buried in client accounts, and the Company failed to recognize losses for changes in the assets' fair value in accordance with FAS 115. With respect to the ARS that were improperly sold to money market clients, these securities were not accounted for as owned by Credit Suisse, but were instead treated as owned by clients with Credit Suisse bearing no market risk, resulting in balance sheet asset understatements in the trading assets account and overstatements of trading revenues, net revenues, income from continuing operations and net income. At a minimum, these amounts should have been reported as contingencies under SFAS #5. Defendants' statements referring to their "conservative" and "disciplined" risk taking, "appropriate" control processes and their "comprehensive" and "accurately reported" risks, including the purportedly reasonable assumptions and estimates used for reporting VaR, ERC and position risk, were false and misleading because of the material weaknesses in the Company's internal controls and the major failures in the Company's risk management processes described in ¶¶ 103-226. The statements in the SOX certificates were false and misleading because the financial statements were misstated, and the statements about the Company's internal controls and risk management were false and misleading for the reasons described above.

117

First Quarter 2007 ("1Q07") Results

239.    On May 2, 2007, Credit Suisse reported the Company's results for 1Q07.  The

Credit Suisse release stated, in pertinent part:

> Income from continuing operations grew 17% in the first quarter of 2007 compared to the first quarter of 2006.  The return on equity improved to 25.2% in the first quarter of 2007, from 24.4% in the same period of 2006.  Diluted earnings per share were CHF 2.42 in the first quarter of 2007, compared to CHF 2.21 in the first quarter of 2006.

> *        *        *

> In the first quarter of 2007, Credit Suisse reported income from continuing operations before taxes on a core results basis of CHF 3,576 million, up 16% compared to the first quarter of 2006.  Net revenues grew 11% to CHF 10,669 million compared to the first quarter of 2006.  Total operating expenses increased 6% to CHF 7,040 million compared to the first quarter of 2006.

> **Investment Banking**

> The Investment Banking segment reported income from continuing operations before taxes of CHF 1,990 million for the first quarter of 2007, up 27% compared to the first quarter of 2006.  Net revenues increased 14% in the first quarter of 2007, mainly reflecting record revenues in debt underwriting, equity and fixed income trading.  Provisions for credit losses increased compared to the first quarter of 2006 but remained low in the generally stable credit environment . . . The pre-tax margin rose to 30.2% in the quarter, compared to 27.2% in the first quarter of 2006.

240.    On May 2, 2007, Fassbind and Mathers discussed Credit Suisse's financial results

and operations with analysts and investors on the Company's 1Q07 Earnings Conference Call.

Fassbind stated, in pertinent part:

> . . . we had a strong start into 2007.  In the first quarter, we maintained the momentum we established last year, our first year as an integrated bank.

> net revenues for the quarter increased 11% over the same period last year, and 9% over the previous quarter.  Revenue increases were broad based, with good contributions from our three divisions . . . Income from continued operations, the banking businesses if I may call it like that, after tax, increased 17% to CHF2.7 billion from the first quarter last year.  And net income, which from past periods included the results from the insurance business, also stood at CHF2.7 billion this quarter.

118

Diluted earnings per share stood at CHF2.42 increasing at a higher growth rate than net income . . .

\*     \*     \*

*We achieved another record first quarter* . . . The banking sector continued to experience a generally attractive business environment, with low interest rate spreads, low risk premiums, and low levels of credit provisions.  All divisions continued to grow pre-tax income.

Investment banking pre-tax income increased to CHF 2 billion for the quarter, with a pre-tax income margin of 30.2%.  The global investment banking fee pool grew by 10% compared with the first quarter last year.  It was down by 16% sequentially.  Against the backdrop of this supportive environment, *recent subprime challenges remained contained*, although it did result in a reduced volume of RMBS and ABS transactions.

\*     \*     \*

Overall, the good performance this quarter reflects our efforts to grow and further diversify our revenue streams . . .

\*     \*     \*

Risk weighted assets increased by CHF17.6 billion, primarily related to commercial and private lending activities, derivative trading positions, and an increase in market risk equivalents . . .

\*     \*     \*

In Investment Banking, we continued to deliver strong results during the first quarter.  This was achieved amid more volatile markets and a more challenging fixed income trading environment.  The pre-tax income was almost CHF2 billion, the second best result ever.

\*     \*     \*

In fixed income, *the adverse impact from dislocation of the US subprime mortgage market was contained*, and lower revenues in our RMBS and ABS businesses were more than offset by strong revenues in other areas of our fixed income business . . . Additionally we also recorded lower revenue levels in fixed income prop[ietary] trading, an area that we continue to build over time.

(Emphasis added)

On the earnings conference call, ABN Amro analyst Kinner Lakhani asked Credit Suisse "in terms of the RMBS, and particularly the subprime business, to what extent the weakness was due

119

to lower activity as you mentioned, and to what extent they were market downward adjustments relating to any carry that you have on your books at this point in time?"  Mathers, Head of Finance and Strategy for Credit Suisse, responded, in pertinent part:

> ***In terms of the RMBS business, we wouldn't comment on the split between those issues.***  Clearly, as a I said before, there has been a substantial reduction in activity, origination volumes in that market, and certainly compared to a year ago when the market was more active.

(Emphasis added)

241.    In the 1Q07 financial review published on or about May 2, 2007, Defendants stated:

> ***In Investment Banking, we had record quarterly revenues*** in our debt underwriting and fixed income trading businesses, which benefited from our strong position in leveraged finance, emerging markets and high grade debt. ***The adverse impact from the dislocation of the US subprime mortgage market was contained***. . . .

(Emphasis added)

242.    The quoted, and particularly the highlighted statements by the Company and Individual Defendants with respect to the "record" first quarter income from continuing operations, net income, trading revenues, and provision for credit losses, and the trading securities were false and misleading, and omitted information needed to make the reported amounts not misleading, as provided in ¶¶ 216-26 and further violated GAAP as provided in ¶¶ 291-334.  Among other things, the securities that were required to be accounted for using fair value were not, and the financial statements lacked transparency with respect to these assets and risks in violation of FAS 157 and 159, which Credit Suisse adopted as applicable to its accounting beginning in 1Q07.  Credit Suisse's exposures for ARS were improperly buried in client accounts, and the Company failed to recognize losses for changes in the assets' fair value in accordance with FAS 115.  With respect to ARS that were improperly sold to money market

120

clients, these securities were not accounted for as owned by Credit Suisse, but were instead treated as owned by clients with Credit Suisse bearing no market risk, resulting in balance sheet asset understatements in the trading assets account and overstatements of trading revenues, net revenues, income from continuing operations and net income. At a minimum these amounts should have been reported as contingencies under SFAS #5. Defendants' statements referring to the "contained" sub-prime challenges and adverse impacts, and their omissions with respect to the actual Alt-A and sub-prime exposures and losses, were false and misleading as provided in ¶¶ 216-26.

Second Quarter 2007 ("2Q07") Results

243. On August 2, 2007, Credit Suisse reported the Company's results for 2Q07. The Credit Suisse release stated, in pertinent part:

> Credit Suisse Group today announced net income of CHF 3,189 million for the second quarter of 2007. Income from continuing operations increased 70% from the same period a year earlier. Diluted earnings per share were CHF 2.82, up from CHF 1.86 in the same period a year earlier.
>
> \*       \*       \*
>
> **Investment Banking**
>
> The Investment Banking segment reported ***record net income*** from continuing operations before taxes of CHF 2,502 million for the second quarter of 2007, up 94% compared to the second quarter of 2006. Net revenues increased 70% to record levels, with substantial increases in all major businesses areas . . . The pre-tax income margin rose to 33.2% in the quarter from 29.0% in the second quarter of 2006.
>
> \*       \*       \*
>
> **First-half 2007 Results**
>
> Credit Suisse Group posted net income of CHF 5,918 million in the first half of 2007. Income from continuing operations increased 40% from the same period a year earlier. Diluted earnings per share improved to CHF 5.24 in the first half of 2007 from CHF 4.07 in the same period of 2006, and the return on equity

121

amounted to 27.4% in the first half of 2007, up from 23.1% in the first half of 2006.

The release also quoted Dougan as stating, in pertinent part:

> The record operating results for the second quarter continue to build on the strong earnings momentum we have established over the past year . . . I am particularly pleased with our performance given the fact that we had more challenging conditions in some markets, which we expect to continue.  However, I am very optimistic about the long-term growth prospects for Credit Suisse, and I believe that our client-focused, integrated business model for ***disciplined risk-taking*** will enable us to deliver superior value to shareholders through market cycles.

(Emphasis added)

244.    Also on August 2, 2007, Dougan, Fassbind and Calello discussed Credit Suisse's financial results and operations with analysts and investors on the Company's 2Q07 Earnings Conference Call.  Fassbind stated, in pertinent part:

> We achieved [sic] ***record operating results*** in the second quarter of this year by building on the strong momentum we have established over these last several quarters . . . In the second quarter, we have recorded net income of close to CHF 3.2billion.  Diluted earnings per share stood at CHF2.82 . . . .
>
> \*        \*        \*
>
> Pre-tax income in Investment Banking increased to CHF4.5 billion with a pre-tax income margin of 31.8% building on the strong momentum and performing also well in recently more challenging fixed income markets.
>
> \*        \*        \*
>
> ***We again significantly exceeded market expectations*** [in Investment Banking]. Strong pre-tax income growth benefited from the increased diversification of our business mix.  The pre-tax margin in the quarter stood at 33.2% . . .
>
> Fixed income trading revenues increased 29% in the first half and 69% in the quarter, and we exceeded the previous record first quarter by 18%.  Despite the more challenging environment, our record revenues primarily reflect the good market opportunities across various fixed income business lines . . . We saw lower revenues in RMBS as a result of lower origination volumes and valuations following the dislocation in the US subprime housing market.
>
> \*        \*        \*

122

> VaR in the second quarter was CHF 110 million compared to CHF 95 million in the same quarter last year and CHF 77 million in the first quarter. This increase was primarily due to increased equity exposure . . . total VaR reached a maximum of CHF 141 million during the quarter and was subsequently reduced to CHF 101 million at quarter end, so not much higher than at the start of the quarter. The VaR development during the quarter was in line with market opportunities while always *maintaining a disciplined approach to risk management*.

(emphasis added)

On the same conference call, Dougan stated, in pertinent part:

> We believe we are well positioned to generate sustained earnings through market cycles; *our risk management will be key* to achieving this.
>
> *        *        *
>
> Our clients' needs are changing; they are converging and are becoming far more complex, far more global. And this requires us to work across asset classes, capabilities and the traditional boundaries between businesses, markets and regions. And at a time when many firms seem to have focused much of their attention and resources on committing capital for their own account, there are very significant opportunities for a firm like Credit Suisse that is *focused on the needs of its clients*. Our model allows us to meet those needs.
>
> *        *        *
>
> The growth and earnings momentum we've established serves as the wind at our back enabling us to close gaps and accelerate the implementation of our strategy. We have identified several important areas of focus to achieve this and drive the Bank to a significantly higher level of performance.
>
> *The first focus is clients*. The sophisticated clients we serve are at the center of global economic expansion and wealth creation in a literal sense. As I mentioned a moment ago, our *client centered approach* offers exceptional opportunities for growth that are best realized as an integrated Bank. Our focus is on *covering our clients more effectively than any of our competitors, innovating at the client level and on making sure we're delivering all the capabilities of our global integrated Bank to all our customers*. If we succeed at this, we will win.
>
> *        *        *
>
> We've placed *strong emphasis on risk management*, those of you who attended our presentations on the subject this Spring can attest to that. And current markets provide ample contacts for *why we have built such a strong risk management platform*.

123

We also benefit from a strategy with is client and distribution focused and ***our approach to business and deal selection is disciplined***.

\*    \*    \*

We are convinced that by taking a ***systematic, disciplined approach*** to our business, concentrating on the areas of focus I've outlined, and on the advantage of our integrated platform, we can accelerate the execution of our strategy and deliver superior value to shareholders through market cycles.

Now I know a lot of your focus today will be on markets and risk, particularly some of the risk that we manage in our Investment Bank . . . ***It's a critical part of our long-term strategy to ensure that we are prudently approaching the risks in our business***. We believe we are extremely well positioned to perform through the market cycle. I believe the second quarter, which had its share of challenging markets, shows that ***we have successfully taken a disciplined approach to risk in markets***.

\*    \*    \*

So the integrated Bank is clearly working, it has terrific momentum, there are ***many areas where we've got big increases in the amount of business that we're doing across the integrated Bank***.

(emphasis added)

Also on the earnings conference call, Calello stated, in pertinent part:

I think it's very important that we stress that we run a client focused business overall.

\*    \*    \*

I think we've shown some vision with regards to the turbulence that we're now seeing in the market, and I think that's evidenced in some of what we've brought to you previously within the fourth quarter of '06, that we started scaling back our exposure to subprime and the related vulnerables there.

\*    \*    \*

And then in May, as you may recall once again, we held a risk meeting there and we went through [what we] consider are ***very robust risk processes*** that we have overall. But we also introduced at that time the fact that we were employing a series of ***risk management tools***, including and related to the credit markets, CDS hedges, synthetic hedges, index hedges including CDX and ABX in particular. I think it proved very important for us in managing through this period.

124

I think one needs only look at the second quarter results that Renato [Fassbind] presented to see that *we successfully managed two very turbulent markets* I think. And *it was largely attributed to strong diversification in our business, and strong risk management*. And we feel that's not only a reflection for the second quarter, but it really reflects positively as we look forward with the interesting markets we have.

\*    \*    \*

With regards to subprime, we certainly have seen historically high levels of default . . . it was just the fourth quarter of last year that we started scaling back our exposure. There we scaled it back quite significantly, and I can say that our second quarter was, in fact, a profitable quarter for our RMBS business . . . we're quite comfortable with our positions and how we're positioned going forward in the RMBS business.

\*    \*    \*

So in summary I think our second quarter earnings were record in the Investment Bank; they were record for both revenues and pre-tax income. I think it speaks to the diversification of our business. I think *it speaks to a strong risk management culture*. I think it speaks to somewhat the success of working together with my colleagues in Asset Management and Private Banking, to the success of what we're beginning to see rewards of the integrated Bank model.

(Emphasis added)

During the conference call, Bear Stearns analyst Christopher Wheeler asked Credit Suisse about

the increase in risk taken on by the Company during 2Q07, including, in particular, about

increased risk within Investment Banking. In response, Dougan stated, in pertinent part:

On the VaR side, I think as you've seen, we actually had an increase in the second quarter, and in fact as you can see, the maximum numbers that we reached were reached during the quarter, but we actually came down towards the end of the quarter.

\*    \*    \*

So what you can see is really an increase during the quarter, but a reduction towards the end of the quarter, which I think represents a good, opportunistic approach . . .

125

Also during the conference call, JP Morgan analyst Kian Abouhoussein asked about the CHF 3.6 billion of position risk reported by Credit Suisse in "real estate and structured products."  The analyst asked Credit Suisse to "be a bit more specific about the CHF 3.6 billion of position risk" because he was "trying to understand what kind of risk are we talking about in the part of the business."  Fassbind responded, in pertinent part:

> . . . you can have a look at the report, the quarterly report on page 53, on the risk management, you see the position risks.  We have a line called Real Estate and Structured Assets.  You will see that last year in the same quarter we were [CHF 8 billion], and at the end of the year CHF 4.3 billion, and now we are down again to CHF 3.8 billion.

At the direction of Dougan, Fassbind defined "what's included in that" by further stating:

> ***It's the real estate investment of the Group, it's commercial and residential real estate, it's asset-backed exposure*** and real estate acquired auction.

245.    On August 3, 2007, Credit Suisse published its 2Q07 financial report with the SEC.  The report included a section on "Key position risk trends," which included the following statement:

> The reduction in real estate and structured assets position risk was mainly due to increased hedging of the residential mortgage exposure . . .

246.    The quoted, and particularly the highlighted statements by the Company and Individual Defendants with respect to the reported "record" quarterly income from continuing operations, net income, trading revenues, and provision for credit losses, and the trading securities were false and misleading, and omitted information needed to make the reported amounts not misleading, as provided in ¶¶ 216-26, and further violated GAAP as provided in ¶¶ 291-334.  Among other things, the securities that were required to be accounted for using fair value were not, and the financial statements lacked transparency with respect to these assets and risks in violation of FAS 157 and FAS 159.  Credit Suisse's exposures for ARS were improperly

126

buried in client accounts, and the Company failed to recognize losses for changes in the assets' fair value in accordance with FAS 115. With respect to the ARS that were improperly sold to money market clients, these securities were not accounted for as owned by Credit Suisse, but were instead treated as owned by clients with Credit Suisse bearing no market risk, resulting in balance sheet asset understatements in the trading assets account and overstatements of trading revenues, net revenues, income from continuing operations and net income. At a minimum these amounts should have been reported as contingencies under SFAS #5. Defendants' statements referring to their "disciplined" and "prudent" risk taking, and "robust" and "strong" risk processes and management culture, and their failure to disclose the Company's true sub-prime and asset-backed exposures were false and misleading because of the material weaknesses in the Company's internal controls and the major failures in the Company's risk management processes described in ¶¶ 103-226.

247. Credit Suisse's persistent (and false) statements of its superior controls and risk management were believed by its rating organizations who relied upon these statements in fixing the Company's own credit ratings. As Fitch reported on August 23, 2007:

**Rating Rationale**
- Credit Suisse Group's (CSG) Long- and Short-Term IDRs and Individual Rating are in line with those of its main subsidiary Credit Suisse (CD), reflecting the close integration of the holding company and the operating subsidiary bank in terms of governance, capital, funding and liquidity management and risk controls.
- CS's ratings reflect its good franchise in its diversified core businesses of private, retail and corporate banking, investment banking and asset management. They are also based on CS's sound risk management, strong capitalisation and structurally improved performance.
- CSG reported good performance for 2006 and H107. In H107, operating profit increased by almost 50% as all divisions reported strong earnings growth. Investment banking generated strong growth in trading revenue, but also benefited from tighter cost control. Results in private banking reflected continued good growth in assets under management (AuM), while results in

127

the asset management division are gradually improving after weak performance in 2006.

- ***Credit risk management systems are well established and sophisticated, which should help the bank manage the impact of the more difficult credit markets in 2007***.
- ***Market risk is closely controlled***.  Market risk exposure has gradually risen as trading activity has increased, but ***the bank has demonstrated that it can generate adequate revenue from its increased risk exposure***.

\*       \*       \*

**Risk Management**
- Well-established risk management framework
- Investment banking risk exposure has increased by diversification has improved
- Moderate risk exposure in private banking and asset management

CSG's board of directors is responsible for formulating the group's overall propensity to assume risks and for providing its strategic direction.  CSG and CS's executive management, assisted by audit committees and an internal audit function, is responsible for implementing the group's strategy and managing risk within the defined strategy.  Specific responsibility lies with the CSG and CS chief risk officers, assisted by committees that provide guidance, approve risk limits and review major exposures.  An independent risk management function, together with controlling, legal and compliance areas, is in place to ensure the integrity of the risk control processes.  Within CS and CSG, capital allocation and risk management committees (CARMC) supervise and direct the group's risks.

\*       \*       \*

**Loan Loss Experience and Reserves:**  Loans are classified as non-performing if in arrears for 90 days (or fewer, in the judgment of the loan officer).  Other impaired loans also include potential problem loans where the bank does not expect full repayment and restructured loans.  Loan loss provisions are calculated against specific impaired loans and to cover the inherent loss within the portfolios.

***CSG's asset quality has improved significantly in recent years, as the group has concentrated on less risky segments and more highly rated counterparties***.

(Emphasis added)

128

248.   Fitch was an unwitting conduit for the Defendants' statements about the Company's risks and risk management, which were false and misleading for the reasons stated in ¶¶ 103-226.

False and Misleading Statements and Omissions in Correspondence With the SEC

249.   On August 28, 2007, the SEC Division of Corporation Finance wrote to Fassbind commenting, *inter alia*, on the inadequacy and lack of transparency of disclosures made in the Form 20-F for 2006 filed on March 26, 2007 about the Company's exposures to the sub-prime crisis.

250.   By letter dated September 26, 2007, Fassbind wrote back, stating:

- [U]nder normal market conditions, credit risk is managed by securitizing or selling the subprime loans we acquire promptly after acquisition. We do this through a series of forward sales/commitments and the creation of a securitization program that allows us to distribute the credit risk associated with the loans to the capital markets. Further, when there is a default or other credit event in a subprime loan acquired by us in our ordinary course of business, *we manage this risk through a series of controls including: a robust mark down policy;* the strict enforcement of our contract rights, which may result in the originator repurchasing the loan; having the loans serviced by our affiliated loan servicing company; and our distribution strategy for such loans. We try to ensure that the loans we acquire are sufficiently liquid to allow us to distribute the credit risk (through loans sales and securitizations) concurrently with our acquisition or shortly thereafter and to manage the loans that are not sold or securitized as efficiently and quickly as possible.

- When the residential subprime mortgage-backed securitization markets become dislocated, our primary risk management is to reduce the number of loans acquired, adjust the characteristics of the loans acquired to ensure that such loans are as liquid as possible given market conditions and, at the same time, distribute the remaining loans owned by us. *We have engaged in this strategy over the last several months of market dislocation and in doing so, have significantly reduced our risk.* In addition, when markets become significantly dislocated, we may look to enter into long and short positions using various securities, indices and other instruments to manage our risks and potentially offset the reduction in revenues.

129

\*    \*    \*

*We carry our subprime residential mortgage loans at the lower of cost or market* (originated loans) *or fair value* (purchased loans) and do not recognize an allowance for loan losses or a provision for loan losses, but rather recognize the impact of credit impairment as a component of the change in fair value of the loans.

\*    \*    \*

[I]t is impracticable to quantify the delinquencies relating only to our retained securitized subprime residential mortgages.  Further, we carry our retained interests at fair value, which we determine using a market participant view of a number of characteristics or inputs, one of which is the underlying loan delinquencies.  To determine the fair value of an individual securitization tranche, we must consider delinquencies and other inputs, including prepayment speeds, probability of default, amount of loss given default and structural enhancements in the transaction.  Because numerous inputs are used in determining fair value of a securitization tranche, we do not believe it is meaningful to quantify delinquencies alone.

\*    \*    \*

As part of the normal course of business, we provide standard representations and warranties regarding the loans we sell in our securitization transactions. These representations and warranties generally relate to loan data, sufficiency of documentation supporting the loans, and enforceability of security interests in loan collateral.  These representations and warranties generally do not relate to delinquencies or losses associated with the loans.  The representations and warranties apply to all loans included in the securitization transaction.  The number of loans repurchased from securitization trusts as a result of breaches of the representations and warranties is historically de minimis.  Given our historical experience, we have not quantified the total amount of loans that remain outstanding in our cumulative securitization transactions as of the requested dates.

\*    \*    \*

We believe that *a material adverse impact* on our financial condition, results of operations or liquidity resulting from our involvement in subprime lending *is remote* due to the reduction of our subprime residential mortgage loan exposures, our active management of our subprime risks and our economic hedging of such risks.

(Emphasis added)

130

251.    On October 16, 2007 the SEC wrote back, again cautioning Fassbind as to the apparent inadequacies of the Company's disclosures about the Company's sub-prime exposures, and on November 13, 2007 Fassbind responded and "acknowledged" the SEC's concerns.  This series of correspondence was filed with the SEC on or about the dates of the respective letters.

252.    Defendant Fassbind's statements were false and/or misleading and contained material omissions because Credit Suisse did not have a "robust markdown policy" -- the Company through its massive breakdown in internal controls, including with respect to its compensation incentives, tolerated and indeed encouraged the failure to mark down its ABS.  An adverse impact on the Company's financial statements as a result of sub-prime crisis was not "remote," and the Company continued to have significant sub-prime exposure, as provided in ¶¶ 216-26.    The Company's hedging was ineffective and did not significantly reduce the Company's sub-prime exposures because of the internal control and risk management weaknesses described in ¶¶ 103-76.  As the Company's exposures were not "remote," the Company's refusal to make the transparent disclosures directed by the SEC violated GAAP, including FAS #5, FAS 157 and FAS 159, as described in ¶¶ 216-26 and in ¶¶ 291-334.

Third Quarter 2007 ("3Q07") Results

253.    On November 1, 2007, Credit Suisse released its 3Q07 financial results and results of operations.  The Company's release stated, in part:

> Credit Suisse Group today reported income from continuing operations and net income of CHF 1,302 for the third quarter of 2007, reflecting lower results in Investment Banking and Asset management.

*    *    *

> **Investment Banking**
>
> Investment Banking reported income from continuing operations before taxes of CHF 6 million in the third quarter of 2007, down from CHF 648 million in the same period of 2006.    Its performance was significantly affected by the

131

dislocation in the structured products and credit markets, which led to a sharp downturn in results in fixed income. The structured products businesses, including residential and commercial mortgages and collateralized debt obligations (CDOs), recorded a valuation reduction of CHF 1.1 billion, net of fees and hedges. Net revenues also reflected a valuation reduction of CHF 1.1 billion on leveraged loan commitments, net of fees and hedges . . . For the first nine months of 2007, pre-tax income margin was 27.7%, compared to 25.1% for the same period of 2006.

254.   Also on November 1, 2007, Fassbind and other Credit Suisse officers in New York participated in the Credit Suisse 3Q07 Earnings Conference Call with investors and analysts. Fassbind stated, in part:

> ***For the first nine months of the year, net income totaled CHF 7.2 billion, driven by record contributions from Private Banking and Investment Banking.*** Diluted earnings per share for the nine months period increased 31% to CHF 6.43.
>
> *       *       *
>
> Our overall operating performance, although affected by the challenging market has ***outperformed compared to our peers.  We know our risk exposures, and although the market impact was more severe than expected we continue to manage and monitor the risks diligently through these challenging markets*** . . . Pre-tax income in Investment Banking stood at CHF 4.5 billion for the first nine months of the year with a pre-tax margin of close to 28%.
>
> *       *       *
>
> In structured products, the mortgage sector continued to experience liquidity challenges and increased delinquencies. The recorded markdowns of CHF 1.1 billion related to our structured products business including RMBS, CMBS, and CDOs, net of fees and hedges. On a gross basis, we recorded markdowns of CHF 2.5 billion. Let me give you some further detail on this CHF 1.1 billion markdown. In broad terms, the markdown is equally split across the three product areas mentioned; RMBS, CMBS and CDOs.
>
> ***In addition, it's important to note that the impact from subprime exposures was slightly positive in the quarter***. As we indicated with our second quarter results, we continue to feel comfortably positioned in terms of our balance sheet exposure to residential subprime, as evidenced by the positive contribution during the third quarter. And our CDO exposure is a fraction of what has been recently disclosed by some of our peers and is de minimis.
>
> ***In our trading operations, our specialists are responsible for making their positions on a daily basis with price testing and verification performed by a***

132

*separate and independent function, our product control department, which, by the way, reports to me. We have processes in place to ensure that the reported fair values, including those derived from models, are appropriate and determined on a reasonable basis.* Independent functions review and refine the mathematical models used to calculate the value of our complex products.

\*       \*       \*

First, *we saw significant outflows in our money market funds and, as a result, we took steps to reposition certain of our US money market funds and purchase securities from these funds.* These securities, including asset backed commercial papers, floating rate notes, and notes issued by structured investment and CDO vehicles.

*We put valuation reductions on these securities in the amount of CHF 146 million. We purchased these securities to address liquidity concerns caused by the US market's extreme conditions.*

\*       \*       \*

[L]et me conclude with a few comments on the relative strength of our results. Our performance in the third quarter meant the progress made on the nine-month basis reaffirmed the importance of our integrated global business model, in driving revenues and enhancing efficiency throughout the entire market cycle. We recognize the importance of an integrated Bank, with expanding and diversifying our revenue streams, particularly within investment banking.

On the conference call, Fassbind had the following exchange with Lehman Brothers analyst John

Peace:

PEACE: I just wondered if you could give us a bit more color on the level of CDOs, RMBS and CMBS against which you took your charges? I think you said your CDO was de minimis, do you mean less than CHF 1 billion? And what was the size of RMBS and CMBS? And the charges you took on those instruments, are you happy with those charges as you see things today on November 1, having seen the market deterioration in the last month?

FASSBIND: *We are not giving our present exposures we have on the balance sheet in numbers on the items you mentioned. As we said, both in subprime and in CDOs, they are de minimis.* I think on the residential mortgage are, we are pretty well positioned there . . . So coming back to your questions, if the charges reflect on what we feel it should be. I have to be very clear on that, that this is at the end of September, and we fair value our positions on an almost daily basis in some of the areas and that is what we felt according to the models and according to the market data we had the right positioning.

133

On the same conference call, Fassbind and David Mathers, the Company's Head of Finance and Strategy in Investment Banking in New York, stated in an exchange with JP Morgan analyst Kian Abouhossein, in pertinent part:

> MATHERS:  On the Investment Banking subprime, I think I'd make two points. I'd reiterate what Renate said, that ***our position subprime is [once] net of our hedging and risk mitigation efforts essentially is de minimis basically***.

> FASSBIND:  Well, the same goes for [Credit Suisse] Group.  We have our exposure to really the largest extent in Investment Banking.

Responding to a question from Helvea analyst Peter Thorne, Mathers further stated:

> I think, on the subprime point, ***I think we have said that our position is de minimis*** and that is partly a competent position and partly a result of the positions and partly a result of the risk mitigation we've taken, and I'd caution that risk mitigation is not simply index hedges, it's a more complex strategy than that. ***But the position is, net-net, is de minimis in a risk sense*** basically, so one can presume what one wants form that basically, but ***that's where we are***.  But that's on regard to subprime residential.

(Emphasis added)

255.    The quoted statements by the Company and Individual Defendants with respect to the nine month "record" contributions by Investment Banking to net income, the "slightly positive" impact from sub-prime assets and the Company's "out performance" versus its peers were false and misleading, and omitted information needed to make the reported amounts not misleading, as provided in ¶¶ 216-26, and the reported results violated GAAP as provided in ¶¶ 291-334.  The Defendants' statement that its CDO exposure was "a fraction" of its peers and "de minimis," was false and misleading, and the Company's refusal to disclose its true exposures from the sub-prime crisis was a misleading omission, for the same reasons.  The Defendants' assurances that they had "processes in place" to ensure that reported fair values were reasonable were false and misleading for the reasons stated in ¶¶ 103-76.

134

256.    The statements hinting at the fraudulent, and criminal, placements and cover-up of ARS collateralized by ABS and other illiquid securities were false and misleading in that they grossly understated the amounts of losses for which Credit Suisse was responsible, and the statements and omissions of the true reasons for the buy-backs were misleading, and concealed the Company's enormous exposures and fair value losses on these securities.

Dougan's False and Misleading January 2008 Interview

257.    On or about January 1, 2008, Dougan gave an interview to Reuters in which he was asked the following questions and provided the following responses:

Q.    *How did Credit Suisse manage to avoid excessive subprime exposure?*

A.    *It was a result of our risk management processes*, in which the business was closely involved.  *We have solid processes, part of which are weekly calls to monitor our exposure*.  Yet our positioning also had to do a lot with the experience of the people involved in the process and with common sense.

*One of the odd things about the whole subprime crisis is that it is probably the longest anticipated crisis we have ever seen.*  The truth is we took some hits a year ago back, in November and December 2006, and we dramatically adjusted the size of our positions and the size of our business, and also did more hedging. We were a little surprised that the market became fine again in January and February [2007].  In March, we had a bad spell, then it was good again in April and May and by the summer there were serious problem.

But all along we had a clear view that this was a market that was going to have difficulty.  The people involved in the business [at Credit Suisse] said we needed to have a more defensive position and so *we kept our exposures under control.*

Q.    Has your trading background helped you to identify risk?

A.    At the time, I was running the investment bank.  Ossi Grubel [Oswald Grubel, former CEO of Credit Suisse] was in charge of the bank and he has got a strong trading background as well.  *Avoiding excessive exposure was a result of good risk management systems, good people in the business who recognized the trends and flagged them, and good decision-making processes.*

We do have a lot of focus on our risk profile and in that period, *we would have a weekly call.  Ossi Grubel would be on it, I would be on it, looking at all our*

*risks and exactly where we were.  That kind of focus helped us to flag up the issues and make sure we were well positioned.*

Q.    In the third quarter, you marked to market your liabilities and added CHF622m to the income?  Is that fair value accounting taken to the extreme?

A.    We do not have a choice in the matter.  It is fair value accounting and it is something we elected to do at the beginning of the year.  We did not opt to mark our liabilities to market because there was a crisis.  Everyone who reports under US Generally Accepted Accounting Principles (GAAP) has to follow the same requirements.  On the other hand, this accounting treatment certainly reflects the way we think about the business and the balance of our risks.  If overall credit spreads move out, our liabilities will also move out and that offsets our overall risk position.  It is part of how we manage the business.  *It is not an artificial accounting thing.*

Q.    Why did you see such strong outflows from your money market funds in the third quarter?

A.    We have been focused on rebuilding the fixed income side of the asset management business.  The flows in those money markets funds are volatile and in the third quarter, a lot of people took money out of these funds and put it in short-term government funds.  We were not in a position to offer all of our clients an alternative; as a result, some money was put elsewhere.

*In terms of the money market lift outs, from a reputational point of view, we thought it was the right thing to do*, to purchase some of these assets out of our money market funds to make sure they maintained their liquidity and functioned normally.

258.    Dougan's statements that the Company had avoided excessive sub-prime exposure as a result of its "solid processes" and risk management were false and misleading, and omitted material facts.  The Company had substantial sub-prime exposure as provided in ¶¶ 216-26, and the Company suffered massive breakdowns in its internal controls and risk management that exacerbated the exposures and losses as provided in ¶¶ 103-216.  Moreover, Dougan's statements that the subprime meltdown is "probably the longest anticipated crisis we have ever seen" and that the money market lift outs were done because "from a reputational point of view, we thought it was the right thing to do," also demonstrate his awareness of the massive sub-

136

prime problems and the ARS wrong-doing, and thus show "scienter" at the highest levels of the

Company.

Fourth Quarter 2007 ("4Q07") and 2007 Annual Results

259.    On February 12, 2008, Credit Suisse released its 4Q07 and FY2007 results.  The

Company's release stated, in pertinent part:

> Credit Suisse Group reported income from continuing operations of CHF 8,549
> million for the full year 2007, an increase of 3% compared to 2006.  Net revenues
> on a core results basis also increased 3% to CHF 36, 130 million in 2007.  Net
> income in 2007 was CHF 8,549 million . . . Diluted earnings per share from
> continuing operations for 2006 were CHF 7.65 compared to CHF 7.19 for 2006,
> and were CHF 1.21 for the fourth quarter of 2007 compared to CHF 2.29 for the
> fourth quarter of 2006.

*        *        *

> **Investment Banking**
>
> Investment banking reported income from continuing operations before taxes of
> CHF 4,826 million for the full year 2007, a decrease of 19% compared to 2006,
> reflecting the challenging operating environment in the second half of the year.
> Net revenues decreased 2% in the full year, as higher revenues in equity trading,
> equity underwriting and advisory and other fees were offset by significantly lower
> revenues in fixed income trading and debt underwriting
>
> In the fourth quarter of 2007, income from continuing operations before taxes was
> CHF 328 million, a decrease of 86% compared to the strong fourth quarter of
> 2006.  Net revenues declined 36% from the same period a year earlier . . .
>
> Net revenues reflected net writedowns in the leveraged finance and structured
> products businesses of CHF 1.3 billion in the fourth quarter of 2007 . . . The
> residential mortgage-backed securities (RMBS) business had net writedowns of
> CHF 480 million in the fourth quarter of 2007.  Within this business, ***the net US
> subprime exposure was CHF 1.6 billion at the end of the quarter, down from
> CHF 3.9 billion at the end of the third quarter.***  Other RMBS non-agency
> exposure was CHF 7.1 billion at the end of the fourth quarter, down CHF 12.4
> billion at the end of the previous quarter.  ***The asset-backed securities
> collateralized debt obligations (CDO) origination, warehousing and synthetic
> businesses had net writedowns of CHF 164 million in the fourth quarter.  The
> CDO business had net subprime exposure of CHF 2.7 billion*** at the end of the
> quarter, compared to CHF 2.3 billion at the end of the third quarter.

*        *        *

137

**Asset Management**

\*       \*       \*

In the fourth quarter of 2007, income from continuing operations before taxes was a loss of CHF 247 million, mainly due to valuation reductions of CHF 774 million from securities purchased from our money market funds. In the fourth quarter of 2006, income from continuing operations before taxes was CHF 89 million. ***The above-mentioned securities were purchased in order to address liquidity concerns caused by the extreme conditions in the US market***.

The release quoted Dougan as stating, in pertinent part:

> ***I am pleased to announce record results for 2007, which we achieved in an extremely challenging environment.  Our integrated business model, global reach, strong risk management capabilities and capital position proved important competitive advantages***, as we delivered year-on-year growth and sustained profitability.

\*       \*       \*

> ***The resilience of our business model and our disciplined approach were clearly reflected in our fourth-quarter results . . . We contained the impact of the credit market dislocation in Investment Banking*** and increased revenues from the previous quarter . . .

> ***Our performance in 2007 provides a strong foundation for 2008*** . . . ***Our risk management capabilities are strong*** and we are befitting from increasing bank-wide efficiencies . . . Most importantly, our integrated model sets us apart from many of our peers and gives us attractive opportunities for sustained growth and value creation even in the face of difficult markets.  These strengths make me confident in our ability to deliver a superior performance over market cycles.

260.    Also on February 12, 2008, Dougan, Fassbind, Ervin and Calello participated in the Credit Suisse Earnings Conference Call with investors and analysts.  Dougan stated, in pertinent part:

> ***We're pleased to have been able to announce record earnings for the full year 2007***, ending with a strong capital base and an increased dividend in 2007 in the face of challenging conditions for our industry.

\*       \*       \*

> What we will present to you today will essentially boil down to three major points – we have outperformed much of the industry, ***we have managed our risks well***, we have a resilient business with attractive growth prospects.

138

First, Credit Suisse has outperformed much of the industry over the last year by virtue of its high-quality business franchises, diversified business model, strong capital and solid funding base and *strong risk management culture*.

*       *       *

Second, *our net write-downs in the fourth quarter and for the year were relatively small*.

*       *       *

With regard to [revenue generation from the integrated Bank model across] Asset Management/Investment Banking, we are seeking to increase the distribution of alternative investments through our securities and Investment Banking coverage.

*       *       *

Despite the continuing turmoil in the credit markets and the difficult conditions that we expect to continue at least in the near term, we believe our integrated model sets us apart from many of our peers and gives us attractive opportunities to build long-term value for our shareholders . . . *In 2007, we demonstrated our ability to manage through challenging market conditions* . . .

Additionally, during the question and answer portion of the conference call, Dougan stated in response to analysts' questions about subprime exposure:

Even on a year-to-date basis, *in subprime we're probably breakeven to plus/minus around breakeven in subprime*, so we've not had any even net write-offs in the subprime area.

*       *       *

. . . the subprime performance in the fourth quarter was probably approximately breakeven for the year.  So, as a result, you can see that we did not think it was exposure that – *there was not material exposure and there clearly wasn't*.

On the same call, Fassbind stated, in pertinent part:

We are pleased with our record results for 2007, which we achieved despite the severe market dislocation in the second half of the year.  Our diversified business mix, integrated operating model and strong risk management culture enabled us to deliver year-on-year growth in revenues and income from continuing operations.

And we exceeded the original net income target of CHF 8.2b for 2007 . . . *In Investment Banking, we navigated well through the problems emerging from the credit crisis, successfully avoiding excessive exposures and losses*.

139

\*       \*       \*

The quarterly pre-tax income [in Investment Banking] stood at CHF 328m, an improvement from the previous quarter. And while our overall investment banking business was down 19%, lower profits in fixed income were offset by record years in equity and banking, showing the resilience of the overall business.

The results reflect the importance of our ***strong risk management culture*** in a stressed environment. On the full year, our fixed income business was profitable, a strong achievement in very difficult markets. ***Write-downs were well contained as we made good progress inroads to reducing risk positions***.

\*       \*       \*

As we realigned the Asset management division during 2006, implemented and executed on our growth strategy in 2007, we have quickly seen the benefits come through . . . Including the money market losses on a reported basis, this business reported a loss of CHF 247m for the quarter, resulting in a reduction in pre-tax income for the year from CHF 508m in 2006 to CHF 354m in 2007.

Since releasing the securities from the funds, we have reduced the portfolio on our balance sheet by 60% to CHF 3.9b. ***The money market funds themselves have been stabilized at a strong liquidity position and no longer contain material exposures to subprime, CDOs or SIVs.***

\*       \*       \*

While markets were clearly difficult in the second half of the year, we still delivered a record full-year result in both revenues and income . . . ***In Investment Banking, we maneuvered well through the challenging environment, benefiting from the bank-wide risk management culture***. And while performance in Asset Management was affected by the situation in the money market business, the underlying performance was very strong . . .

We have the capital and strong balance sheet today to weather further disruptions in the market, as conservative liquidity planning and ***strong risk management culture*** positioned us well going into the crisis and also thereafter.

Also on the earnings conference call, Ervin gave a presentation on Credit Suisse's risk and exposures. Ervin stated, in pertinent part:

I last met with many of you at a risk management Investor Day we held back in May [of 2007] . . . We used that day to set out the key features of our risk management approach . . . These features included a strong focus on proportionality, making sure risk was sized correctly to your balance sheet and your business franchise, mobility of assets, making sure you're active in the markets and you close tight through trading flows, and hedging to protect assets

140

while they're on your balance sheet. *We also talked about structural features, like a proactive risk culture, independent risk control and strong governance*. These topics may have seemed a bit academic in the benign markets of last spring, but *they have been critical in helping Credit Suisse get through the challenges of late 2007*.

\*        \*        \*

My objective today is to show you how we've navigated through these difficult markets and why our write-downs are small in the context of our peer group.

\*        \*        \*

Our Investment Banking business navigated effectively through difficult markets. We took total 2007 net write-downs of approximately CHF 2b, which is among the lowest in our peer group . . . We avoided excessive subprime and DO risks. Our positions are actively managed and they reduced significantly in the fourth quarter.

In Asset Management we addressed stress conditions in the money market sector. Securities were taken on balance sheet and marked to market, and that caused some significant losses.

\*        \*        \*

*We have a strong risk management framework in governance*. *We have an independent risk function that reports to the CEO, with strong senior oversight*. *We have independent pricing controls and consistent fair value disciplines across these key sectors, reporting to Renato [Fassbind], our CFO* . . .

\*        \*        \*

In [the residential mortgage and subprime CDO] sector . . . It's difficult to identify what gross exposure means in these markets. It simply doesn't make any sense, given the current business model. So we use net exposures here as a better measure for these businesses and that's how they're shown . . .

\*        \*        \*

In the residential mortgage line . . . we worked on our subprime exposures before the market dislocation was in full swing. *Our net exposures were small at that time and have been further reduced* in Q4 to CHF 1.6b.

As Renato [Fassbind] also told you, *our exposure to CDOs was minimal* at the end of the third quarter. Our CDO positions fluctuate up and down as part of normal trading activities and our net position at the end of the year was actually up slightly versus Q3, as we saw opportunities near year end.

141

In addition to the trading hedges that are included in the net exposures within the trading-base lines in [the presentation] chart, we have two additional categories of hedges . . . All of these hedge categories are important and have helped us *keep our net write-downs to manageable levels*. As you can see [in the presentation slide], *our net write-downs were CHF1.3b in Q4 and CHF2.0b for the year, which is among the lowest of the major banks.*

Let me address two questions up front. First, some of you may ask how did Credit Suisse achieve such a low annual write-down total, given the numbers disclosed for Q3 and now Q4. There are a couple of elements of this. First, some of our hedge positions were quite profitable in the first half, as they often reacted more quickly to deteriorating markets than the underlying assets. Second, we're showing our write-downs on a net basis to be consistent with our peers. And lastly, we've added back the embedded carry in these positions for a consistency, which was not included in our Q3 figures.

\*          \*          \*

Now let's turn to our trading positions in RMBS and the CDOs. *First, lets talk about RMBS, or residential mortgages. The story here is further reduction in exposures, especially to subprime and Alt-A credits.* As I mentioned before, in the absence of underwriting activity the residential mortgage business has essentially become a trading activity . . . Our portfolios have all been in the secondary trading book and we do business with clients on both the long and the short side, so it makes sense to look at this business on a net basis.

We currently have net subprime positions of about CHF 1.6b, reflecting both our cash and our derivatives books. This is down 58% from the already modest levels of Q3 . . .

We did record some net write-downs in the quarter as the market stress levels continue to be high. Only a portion of that write-down was due to subprime . . .

*We mark these books to market based on market trading levels* and related cash instruments and derivatives . . . *As a benchmarking test, we checked our valuations by pricing all of our positions against the nearest ABX index, and that exercise produced results consistent with the valuations on our books.*

The other area where we carry subprime risk is [the] CDO activities . . . our exposures are relatively small.

\*          \*          \*

The first line [of the presentation slide] is titled ABS and indices, and this designates security positions backed by subprime loans. You can see here that we held roughly CHF 3.7b of exposure at the end of Q4, primarily in the higher-rated tranches. The second line, called synthetic ABS CDOs, designates bonds that are backed in turn by ABS securities. These are held in derivative form and we were

142

short about CHF 1b in this sector.  The third line is cash CDOs, which are bonds backed by ABS positions in cash form, and this was quite small for us overall.

We did suffer some net write-downs in the quarter, after net gains earlier in the year.  Our net positions are quite small overall and we continue to trade actively.  And we have some index hedges against these positions as well.

So, in summary, our mortgage-related exposures in RMBS and CDO have been repositioned in the secondary trading businesses.  *Our exposures are modest in size* and we took steps to lighten them further in Q4.

*    *    *

Let's now turn to the Asset Management division.  In the second half of this year, conditions in the money market sector became highly stressed.  Credit Suisse responded to these conditions and took actions to maintain liquidity and protect its client franchise.  Specifically, *we bought CHF 9.3b of securities from our asset management third party funds onto our balance sheet.*  That restored liquidity to our money market funds, which are now operating normally.  We also addressed some structural shortcomings to make sure these issues did not recur, *and there is no material exposure to SIVs, CDOs or U.S. subprime in these lines*.

*    *    *

In summary, we acted swiftly to protect our [money market] funds and our client franchise and address the stresses in the markets . . . We took securities onto our balance sheet and we've worked those down by 58%.  We continue to reduce and hedge these positions and are working hard to put this matter behind us.

*    *    *

Back at the risk Investor Day in May, *we talked about a risk philosophy and maintaining strong disciplines across the Bank*.  Those strong foundations were important to us then and remain doubly so today.  We maintain a broad perspective and the tools that are sophisticated enough so that we can capture our positions effectively and systematically, but we don't lose sight of common sense, which is perhaps the most important tool in the toolbox.

*We have a strong risk culture that takes a proactive approach to managing positions and an independent risk function that reports straight to the CEO. While we work in close partnership with the business, we're empowered to say no.  We have strong management oversight, including executives with strong trading floor experience in complex markets, and we have an active Board. Our management and governance has helped us to make good decisions both before and during this event.*

*    *    *

143

Taken together, these actions have helped us *keep net write-down to among the lowest levels in our industry* and helped us to deliver record earnings for 2007. Perhaps more importantly, it enables us to remain active with our clients and focused on doing business and executing our strategy . . .

(Emphasis added)

261.    The quoted, and particularly the highlighted statements by the Company and Individual Defendants with respect to the reported "record" 2007 earnings, and the reported amounts for net income, trading revenues, and provision for credit losses, sub-prime exposures and write down losses, and the trading securities were false and misleading, and omitted information needed to make the reported amounts not misleading, as provided in ¶¶ 216-26, and further violated GAAP as provided in ¶¶ 291-334.  Among other things, the securities that were required to be accounted for using fair value were not, and the financial statements lacked transparency with respect to these assets and risks in violation of FAS 157 and 159.  For the same reasons, Defendants' statements about "contained" sub-prime, CDO and SIV exposures and write-downs were false and misleading.  With respect to ARS that were improperly sold to money market clients, while a significant portion (but not all) of the true exposure and losses was revealed, the Defendants misled the market by concealing the wrongdoing that had caused the buybacks, and which, contrary to Defendants' representations, would likely result in additional exposures and losses to the Company, as provided in ¶¶ 216-26.  At a minimum these additional amounts should have been reported as contingencies under SFAS #5.  The Company's traders had not, in fact, been marking its sub-prime securities to market and these valuations were not checked against the ABX index, as the Company would later reveal to the FSA and others.  Defendants' statements referring to their "disciplined" approach and "strong" risk management, and their successful "management" and "navigation" of the challenging market conditions and credit crisis, were false and misleading because of the material weaknesses in the Company's

144

internal controls and the major failures in the Company's risk management processes described in ¶¶ 103-216.

262.    As would be disclosed one week later, on February 19, 2008, and further quantified on March 20, 2008, there were severe mis-markings of asset values in the trading assets of Credit Suisse.  These mis-markings caused trading revenues, net revenues, income from continuing operations, and net income to be materially overstated.  Additionally, these mis-markings caused Credit Suisse's trading assets and total assets to be overstated.  As Credit Suisse reported on March 20, 2008, the fair value of certain ABS that had been included in trading assets as of December 31, 2007 were overstated by CHF 1.1 billion, and income from continuing operations and net income for these false asset valuations was overstated by CHF 789 million. As the Company would admit in its March 20, 2008 disclosures, the sub-prime asset mis-markings occurred in 2007, as a result of "material weaknesses" in the Company's internal controls.

## VI.    <u>THE TRUTH SLOWLY LEAKS INTO THE MARKET</u>

263.    While defendants were repeatedly and falsely asserting to investors and regulators that a material adverse impact to the Company due to its sub-prime exposure was "remote," that the Company's risk of loss from the sub-prime crisis was "de minimis", and that, unlike its peers, the Company had emerged relatively unscathed from the sub-prime meltdown, and Defendants were falsely concealing the Company's true sub-prime losses and exposures, the market slowly began to realize that the Company's claims lacked credibility as the Company slowly leaked out facts suggesting the truth.  Beginning on November 1, 2007, the Defendants began to leak information into the market that raised suspicious about whether Credit Suisse had, in truth, escaped the industry-wide asset write downs associated with the sub-prime crisis,

145

including for the fair value losses on the structured assets dumped into client money market accounts. As these facts were absorbed into the market, Credit Suisse's stock declined in a series of individually small but statistically significant declines versus other market events affecting its peers. In total, Credit Suisse's stock declined 23% from a $67.70 closing price on October 31, 2007 to $51.91 on April 14, 2008, at the end of the Class Period. Much of the decline was attributable to revelation of the true facts, as described below.

264. On November 1, 2007, Defendants announced Credit Suisse's 3Q07 financial results, issuing a press release, publishing slides relating to the Company's financial performance and conducting a conference call with analysts. The press release stated, in significant part:

> **Credit Suisse Group today reported income from continuing operations and net income of CHF 1,302 million for the third quarter of 2007, reflecting lower results in Investment Banking and Asset Management. Private Banking remained strong, with significant increases in both income from continuing operations before taxes and net revenues compared to the third quarter of last year.**
>
> Brady W. Dougan, Chief Executive Officer of Credit Suisse Group, said: "The extreme market conditions that characterized the third quarter affected many of our businesses. However, our global diversification and balanced business mix helped us mitigate the impact on our overall performance, maintain solid profitability and deliver a record result for the first nine months of the year."
>
> Commenting on the operating environment, Mr. Dougan continued: "We are seeing encouraging signs that activity in the credit markets is increasing, although it is too early to predict when all of the affected markets will return to more normal levels. The events of the third quarter have reaffirmed the importance of our integrated global model in driving revenues and enhancing efficiency throughout the entire market cycle."
>
> **Segment Results**
>
> **Investment Banking**
> Investment Banking reported income from continuing operations before taxes of CHF 6 million in the third quarter of 2007, down from CHF 758 million in the same period of 2006. Its performance was significantly affected by the dislocation in the structured products and credit markets, which led to a sharp downturn in results in fixed income. ***The structured products businesses,***

146

*including residential and commercial mortgages and collateralized debt obligations (CDOs), recorded a valuation reduction of CHF 1.1 billion, net of fees and hedges. Net revenues also reflected a valuation reduction of CHF 1.1 billion on leveraged loan commitments, net of fees and hedges.* Lower fixed income trading results were partly offset by strong performances in interest products, life insurance finance and emerging markets trading. Lower equity trading results reflected a weak performance in proprietary trading, including a loss of approximately CHF 300 million in quantitative trading strategies, partly offset by strong results in the cash equities, equity derivatives and prime services businesses. Fixed income and equity trading also benefited from fair value gains of CHF 622 million due to the widening credit spreads on Credit Suisse debt. Total underwriting and advisory results were down, reflecting lower revenues in debt underwriting, partly offset by higher revenues in equity underwriting and advisory compared to the third quarter of 2006.

*        *        *

**Asset Management**
Asset Management reported income from continuing operations before taxes of CHF 45 million for the third quarter of 2007. *This decrease of CHF 113 million compared to the third quarter of 2006 was mainly attributable to fair value reductions on securities* and lower private equity and other investment-related gains. Net revenues declined by 14% compared to the third quarter of 2006. Total operating expenses increased by 3%. The pre-tax income margin was 7.6% in the third quarter of 2007, compared to 22.8% in the third quarter of 2006. For the first nine months of 2007, the pre-tax income margin was 27.0% compared to 19.7% for the same period of last year. As of September 30, 2007, assets under management totaled CHF 714.1 billion, a decrease of 4.7% from June 30, 2007.

(Emphasis added)

265.    In the conference call conducted at 5:00 a.m. EST, Fassbind elaborated upon the fair value writedowns in Investment Banking and in Asset Management:

Investment Banking results declined sharply, driven to a large extent by the dislocation of structured products and credit markets.…

*        *        *

*In structured products, the mortgage sector continued to experience liquidity challenges and increased delinquencies. The recorded markdowns of CHF 1.1 billion related to our structured products business including RMBS, CMBS, and CDOs, net of fees and hedges. On a gross basis, we recorded markdowns of CHF 2.5 billion.* Let me give you some further detail on this CHF 1.1 billion

147

markdown.  In broad terms, the markdown is equally split across the three product areas mentioned; RMBS, CMBS and CDOs.

***In addition, it's important to note that the impact from subprime exposures was slightly positive in the quarter.  As we indicated with our second quarter results, we continue to feel comfortably positioned in terms of our balance sheet exposure to residential subprime, as evidenced by the positive contribution during the third quarter.  And our CDO exposure is a fraction of what has been recently disclosed by some of our peers and is de minimis.***

***In our trading operations, our specialists are responsible for making their positions on a daily basis with price testing and verification performed by a separate and independent function, our product control department, which, by the way, reports to me.  We have processes in place to ensure that the reported fair values, including those derived from models, are appropriate and determined on a reasonable basis.  Independent functions review and refine the mathematical models used to calculate the value of our complex products.***

*        *        *

Asset Management recorded a pre-tax income of CHF45 million in the quarter, down significantly against both comparable periods.  Market conditions, primarily reflecting the extreme liquidity situation, adversely impacted our overall results in two areas.

First, ***we saw significant outflows in our money market funds, and, as a result, we took steps to reposition certain of our US money market funds and purchase securities from these funds.***  These securities, including asset backed commercial papers, floating rate notes, and notes issued by structured investment and CDO vehicles.

***We put valuation reductions on these securities in the amount of CHF146 million.  We purchased these securities to address liquidity concerns caused by the US market's extreme conditions.***

In response to analyst questions, Fassbind steadfastly refused an analyst's request for "a bit more color" on the CDOs, RMBS and CMBS against which charges had been taken, particularly with respect to the CDO exposure that had been described as "de minimis."  Fassbind:

***We are not giving our present exposures we have on the balance sheet in numbers on the items you mentioned.  As we said, both in subprime and in CDOs, they are de minimis.***  I think on the residential mortgage area, we are pretty well-positioned there, and of course CMBS is an important business for us, as you know from the past, and that is an area where we count upon being more comfortable with the assets as well.  So coming back to your question, if the

148

charges reflect on what we feel it should be.  I have to be very clear on that, that *this is at the end of [] September, and we fair value our positions on an almost daily basis in some of the areas* and that is what we felt according to the models and according to the market data we had the right positioning.

Larry Haber, Credit Suisse's Chief Operating Officer for Asset Management, advised analysts:

*[w]e actually did make a small net profit in our purely subprime positions in the third quarter.*

With respect to the fair value write-downs in Asset Management, Haber stated:

On the value adjustment that we provided *for the money market securities acquired* by (inaudible), *we're comfortable with the valuations that were provided, and those valuations were managed through exactly the same process controls and in many instances the same individuals that do similar work for the Investment Bank*. *So we're comfortable with those valuations at the end of the quarter.*

(Emphasis added)

266.    Defendants' statements with respect to the fair value write-downs in Investment Banking contained a mix of corrective disclosures and additional false statements as described in ¶¶ 253-56.  The discussions about the write-downs in asset management were the first, but wholly inadequate, partial disclosures of the scam related to the fraudulent placements of ARS in customer money-market accounts.  Between the evenings of October 31, 2007 and November 1, 2007, the price of Credit Suisse's shares declined from $67.70 to $64.30; on November 2, 2007, the shares declined to $63.01, and on the next trading day, November 5, 2007, the stock declined to $61.75, or a total three trading day "raw" dollar decline of $5.95, or 9%.  Versus its peers, and eliminating other market events and disclosures unrelated to the fraud, the Company's stock declined a statistically significant 5.51% over this period.

267.    Comments by various news reports and analysts show that the market was confused over the Company's mixed message about its performance relative to its peers, and was uneasy about Defendants' refusal to disclose its sub-prime exposures.  As, *e.g.*, Dow Jones

149

Newswire reported in October 31, 2007:

> Despite the sharp drop in profits, the earnings are set to showcase Credit Suisse as a "much better managed investment bank than its peers," Deutsche Bank analyst Matt Spick wrote in a note to investors.
>
> That is because Credit Suisse has managed to avoid some major missteps that caused dramatic losses for competitors such as UBS AG (UBS) and Merrill Lynch & Co. Inc. (MER) in the period.
>
> ***Nonetheless, analysts say they will be looking for more information from Credit Suisse as to how exposed the bank is to residential mortgage-backed securities, collateralized debt obligations, or leveraged loans for major buyouts, some areas which have been hardest hit by the subprime crisis and credit crunch.***

(Emphasis added).

268.    The unease over the lack of transparency in Credit Suisse's reporting of its true sub-prime and ARS exposures was reflected in other market commentators' reports:

- "Credit Suisse on Thursday said that its exposure to collateralized debt obligations remained minimal compared to peers, but declined to offer details. 'We are not disclosing any number on those but I can tell you that they are minimal compared to some of our peers so we're pretty comfortable in our CDO's' said Chief Financial Officer Renato Fassbind in an interview with broadcaster CNBC." (Reuters, 11/11/07)

- "DISAPPOINTMENT. Others pointed to weaker inflows of money into Credit Suisse's wealth management unit compared with UBS. … Chief Financial Officer Renato Fassbind left open the possibility of Credit Suisse having to make further valuation changes, which may include writedowns to its credit markets exposure, cautioning that 'fair value accounting is subject to market developments.' He also declined to say how large the bank's exposure was to CDOs – repackaged mortgage-backed loans – which have proved a major source of woes for its local rival UBS." (Reuters, Update 4, 11/1/07)

- "In its outlook, Credit Suisse said it sees encouraging signs of credit market activity, but that it is still too early to predict when markets will return to normal levels. The earnings come shortly after hometown rival UBS AG (UBS) was forced to disclose a quarterly loss after massive write-downs of subprime securities. ***By contrast, Credit Suisse said it actually made a small profit on subprime holdings in the quarter, though it didn't disclose how. The group's exposure to the subprime securities, which have wreaked havoc for other banks, is minimal, Credit***

150

*Suisse executive David Mathers told a conference call.*  Credit Suisse sees 'encouraging' signs that market activity for selling big buyout loans on to investors is picking up, Chief Financial Officer Renato Fassbind told a conference call.  At quarter's end, the bank held CHF60 billion in commitments for leveraged loans, which is a sharp rise from CHF48 billion the prior quarter.  *Credit Suisse shares slipped in early trade on what results analysts termed of 'disappointing' quality,* amid a mildly higher broader Swiss blue-chip market.  At 0845 GMT, the stock was down CHF1.10, or 1.4%, at CHF76.80, giving the bank a market capitalization of about $77 billion.  (Dow Jones, 6th Update, 11/1/07).

269.    Concerns about Credit Suisse's true exposures to the sub-prime crisis and related write-downs continued.  On January 7, 2008, Bloomberg news reported, "Credit Suisse Group dropped the most in three weeks in Zurich trading after Sonntag reported Switzerland's second-biggest bank may have further writedowns related to the U.S. sub-prime collapse in the fourth quarter."

270.    On January 7, 2008 Reuters reported:

*Credit Suisse may face losses on a money market fund that went sour* but is unlikely to make big fourth-quarter writedowns on its commercial mortgage and leveraged-finance business, analysts said on Monday.

Swiss newspaper Sonntag said on Sunday CS would have to write down 2.5 billion Swiss francs ($2.24 billion) on leveraged loans and commercial mortgage business in the fourth quarter.  Analysts said they were sceptical [sic] of the report.

Shares in CS dropped as much as 3.2 percent and were trading 2.1 percent lower at 64.30 francs by 1345 GMT.

Concerns that the bank's exposure to commercial mortgages could come back to haunt it have weighed on the bank's stock for months.  Its shares fell 19.7 percent last year.

"It is hard to square (reconcile) a 2.5 billion Swiss franc writedown figure with results from the U.S. investment banks in the fourth quarter, where you saw some gains on leveraged loans previously written down in the third quarter," said Matthew Clark, an analyst at Keefe, Bruyette and Woods (KBW).

CS, which reports fourth-quarter results on Feb. 12, has so far emerged relatively unscathed from the U.S. subprime mortgage crisis which forced many banks,

151

including its local Swiss rival UBS, to make huge writedowns.

*But losses at a money market fund which invested some of its funds in asset-backed securities, whose value was wiped out by the subprime crisis, may force CS to take more charges in the final quarter.*

*"The writedowns I can see are on money market funds,"* said Dirk Becker at Landesbanki Kepler in Frankfurt. *"They (Sonntag) talk of the bank taking 6.5 billion francs onto their balance sheet and writing off 1.3 billion francs. This sounds plausible,"* said Becker.

*CS made a 146 million franc writedown on the money market fund in the third quarter. "They swallowed the loss to avoid reputational damage and potential litigation,"* he said.

(Emphasis added).

271.    On January 8, 2008 the New York Times also reported its concerns about future ARS writedowns, stating, "Credit Suisse may face losses on a money market fund that went sour …."

272.    Between the evenings of January 4, 2008 (the last trading day before the January 7, 2008 disclosures) and January 7, 2008, Credit Suisse's stock declined from $58.62 to $57.34, and on the next trading day, January 8, 2008, the stock declined to $55.23, for a total "raw" dollar decline of $3.39 or 5.9%.  Versus its peers, and eliminating other market events and disclosures unrelated to the fraud, the Company's stock declined a statistically significant 4.57% over this period.

273.    On January 15, 2008, the broker for Standard & Poor's European Marketscape stated his concerns about a severe downside risk at Credit Suisse, reporting that he, "is also concerned about the lack of disclosure on sub-prime and CMBS exposures."  On January 17, 2008 a Deutsche Bank analyst published a research report on Credit Suisse, stating that they had downgraded their private banking forecasts for the Company and noting they, "expect absolute AuM and profit declines in 2008, as market moves and the unwind of leverage within client

portfolios (minus 10% to AuM) offsets net new money (plus 6%)."

274.    Between the evenings of January 14, 2008 and January 18, 2008, Credit Suisse's

stock declined from $58.32 to $51.57, for a raw decline of $6.75 or 12.09%.  Versus its peers,

and eliminating other market events and disclosures unrelated to the fraud, the Company's stock

declined a statistically significant 8.22%.

275.    In a research report issued on February 8, 2008, Societe Generale reported:

CREDIT SUISSE
Q4 07 – another likely "bullet dodger" but 2008 revenue concerns remain

**Update** – Credit Suisse will publish its Q4 07 results before the open on 12/02.
We are forecasting net income of €1247m, close to the Q3 07 number of €1303m.
Group revenues are expected to be SF7944m vs SF6842m in Q3 07 and operating
expenses SF6210m vs SF4802m in Q3 07.  The detailed consensus provided by
Credit Suisse points to net income of SF1375m, revenues of SF8504m and
operating expenses of SF5862m.  The major swing factor will be whether Credit
Suisse has continued to manage the credit crisis well as was the case for Deutsche
bank (Sell TP €64), hedges effectively covering any further needs for writedowns
vs subprime/monocline/ CMBS/LBO exposures or whether further net
markdowns will be needed.  In Q3 07 CS took net writedowns of SF1.1bn on
structured products and SF1.1bn markdowns on LBO exposures (SF60bn
commitments and Q3).  Gross writedowns of SF4.7bn were partly balanced by
fees and hedging, as well as SF622m of fair value gains from widening liability
spreads.  Q3 also saw a SF148m hit vs US money market funds.  SG's forecast for
Q4 07e Investment banking revenues of SF3.7bn (ex any further writedowns) is in
line with consensus.

**Impact** – *The issue for Credit Suisse in Q307 was the lack of disclosure on its
exposure to the credit issues ex the LBO exposure that was provided.  With
leveraged Finance and CMBS both being major businesses for CS, uncertainty
over activity levels and potential further writedowns is weighing on sentiment
for Credit Suisse*, as for the other investment banks.  *More transparency may
help sentiment but the near-term outlook is not good.  Further major
writedowns would impair credibility.*

(Emphasis added)

276.    On February 11, 2008, Societe Generale reported with respect to Credit Suisse,

"Group formally denies speculation of a EUR2bn writedown against asset-backed securities. …

153

*As a reminder, the group has virtually no exposure to US subprime assets*.  (Emphasis in the original)

277.    On February 12, 2008, Defendants announced the Company's 4Q07 financial results, conducted an earnings conference with analysts and published slides addressing, *inter alia*, the purported strong financial performance and minimal "net" exposures of its investment banking division to sub-prime losses.  The Company also, however, revealed its CHF 9.3 billion ARS buy-back, and related CHF 920 million loss.  In making these latter disclosures, Defendants still misrepresented and concealed the true facts underlying these purchases, and that additional exposures and losses remained and continued to be unrecognized on the Company's financial statements.  As described in ¶ 260, in its conference call with analysts, Defendants crowed about how its superior risk management and internal controls had permitted the Company to avoid the enormous sub-prime write downs and losses of its peers.    Because of Defendants' overwhelmingly positive (but false) statements made on this date, the market failed to react to the adverse news of the ARS CHF 9 billion buybacks and CHF 920 million losses.  As the Wall Street Journal noted on February 11, 2008, shortly before the announced 4Q07 results, "While analysts don't expect an unblemished quarter from Credit Suisse, if the write-downs were large enough to hit earnings significantly, the bank would have been forced to disclose the losses previously."  And, as  Reuters reported immediately after the February 12, 2008 disclosures by the Company, "Credit Suisse reduced total write-downs from the sub-prime crisis on Tuesday in dramatic contrast to rising charges by rivals. … Credit Suisse unveiled 1.259 billion francs in writedowns on various exposures in the fourth quarter, confirming it had escaped almost unscathed from the debacle in U.S. subprime mortgages."

278.    Then, on February 19, 2008, the Company issued a press release constituting a

154

stunning reversal of its earlier sunny representations about its "remote" exposures and the strong and effective internal controls and risk management that had purportedly insulated it from the fair value losses suffered by its peers as a result of the sub-prime crisis.  As the release, which was filed with the SEC on a Form 6-K, stated:

> Media Release
>
> Repricing of certain asset-backed positions
>
> Zurich, February 19, 2008. ***Further to its commitment to provide transparency, Credit Suisse today announced that in connection with the operation of ongoing control processes, it has undertaken an internal review that has resulted in the repricing of certain asset-backed positions in its Structured Credit Trading business within Investment Banking. The current total fair value reductions of these positions, which reflect significant adverse first quarter 2008 market developments, are estimated at approximately USD 2.85 billion (having an estimated net income impact of approximately USD 1.0 billion).*** In the first quarter to date, we estimate we remain profitable after giving effect to these reductions. The final determination of these reductions will depend on further results of our review and continuing market developments. We will also assess whether any portion of these reductions could affect 2007 results. Finally, our internal review, which has identified mismarkings and pricing errors by a small number of traders in certain positions in our Structured Credit Trading business, is continuing.
>
> This disclosure is being made in connection with the closing, on February 19, 2008, of USD 2 billion 5.75% Subordinated Notes due 2018.

(Emphasis added)

279.    On February 19, 2008 at 9:00 AM, EST, Defendants also conducted a conference with analysts.  There Defendants explained that the $2.85 billion re-pricing of the ABS in investment banking occurred, in part, as a result of mis-marking by traders.  Tellingly, Defendants suggested that they would have ordinarily chosen to withhold this information, except that a bond issue was set to close that day (which required KPMG's sign off).  As Brady Dougan stated in his opening remarks to analysts:

> ***This was a voluntary disclosure.  This is not normally something that we would***

*disclose.    But I think, in connection with our bond issue which we had launched and which we're settling today, as well as just generally our view on transparency, we felt it was the right thing to make these disclosures today* and to basically make -- be transparent and make disclosure, whether we have positive or negative news to report.

You saw the basics of the announcement today, which was that *we have had to reprice certain of our asset-backed trading positions in our Structured Credit Trading business*.    Current fair value of those positions, which reflect really pretty adverse market developments in the first quarter, are estimated at *about $2.85b*, which we then made just a simply calculation to come up with a new income impact of about $1b.

We've also made the statement that in the quarter to date we remain profitable, despite these losses, in terms of quarter to date.    *The losses were against* positions which were really the positions which we laid out last week in our earnings, which were the residential *mortgage-backed section and the CDO section*.    So it's really positions across a number of those different categories and therefore is contained in a few of those different categories that we laid out last week.

The positions, I would say, are not broadly different from what we actually disclosed for the end of the quarter.    It's basically the same kinds of positions. And, as you know and as we discussed, we have long and short positions in each of those areas, which obviously there are market moves and then there are also basis moves between some of the long positions and also the hedges on the other side.

In terms of how this came about, we -- last week, we identified issues which are coming up in terms of pricing as part of our normal control process, so this was something that was identified internally by our front office and risk management people.    We have very quickly been reviewing these positions.    Largely, at this point, we believe that the positions are -- there are no issues around the positions that we actually have on the books, so there are no positions that were not part of what we had in our books.    But *there have been some valuation issues, some issues around pricing, where the pricing processes did not meet our standards,* and the end result of that is obviously the valuation adjustments that we are laying out today.

I would say that the markets have moved a lot, so a lot of the number that's out there is really the result of the movements in the market, but there also are adjustments made, as we said, from the pricing processes that we have out there.

*In terms of the individuals involved and the risk management of these books, they are still employees of the Bank but they're suspended right now* pending the outcome of the review, and so that's something that we obviously continue to

156

work through.

(Emphasis added)

Comments made in response to analyst questions, by Wilson Ervin, the Company's Chief Risk Officer, and Paul Calello, head of Investment Banking, demonstrated that these belated revelations resulted from serious internal control and risk management deficiencies at the Company, for which the Individual Defendants were directly responsible:

**Omar Fall** - *ABN AMRO - Analyst*

Hi.  Apologies if a lot of my questions have been answered already. I'm sure they have.  But could you just give us an indication, from a process perspective, as to how these issues were discovered during, I guess, what would be a pretty routine due diligence prior to a bond issue, when they were not seen  ahead of the Q4 results?  That's the first question.

And then the second one would be, do I need to look at this $2.85b in relation to the 27b of index hedges on indices that you disclosed as of Q4, rather than the underlyings, the net underlying numbers, the 8.7 plus 2.7 in RMBS and CDOs? Thanks.

**Brady Dougan** - *Credit Suisse - CEO*

Thank you.  I guess I'll have Wilson address those.  Wilson?

**Wilson Ervin** - *Credit Suisse - Chief Risk Officer*

Let me -- I'll address the first question, may need to come back to you for the other ones.  As I mentioned before, we have a number of pricing controls that we have looked at.  Some are daily processes, some are monthly processes.  In addition, particularly in markets that are stressed, *we do ad hoc reviews* and put in additional levels of scrutiny around different books.  And through the course of those reviews, which was cross-checking across some different areas, various procedures, this came to light.

**Brady Dougan** - *Credit Suisse - CEO*

The other question was just on the $2.85b, how to think of that in relation to the 27b of index hedges that we talked about, we disclosed.

**Wilson Ervin** - *Credit Suisse - Chief Risk Officer*

157

So, as I said before, probably the best way to think about that event, some of it is related to, if you will, difficult markets and markets have been difficult this year. *Some of it is also related to the basis risk between long and short positions.* We do have significant hedges on. Those are helpful in protecting us against overall market downturns. But *clearly those are things you always have to manage* and there will be fluctuations between your long positions and your hedges from time to time. So a portion of that would attributed to that.

\*       \*       \*

**John Glover** - *Bloomberg - Media*

And finally, I wanted to ask about the reporting lines within the trading room. Does the chief trader, who does -- the risk manager with responsibility for a particular sector, who does he report to, the chief trader or someone higher, or how does it go?

**Paul Calello** - *Credit Suisse Group - CEO Investment Banking*

Sure. There's obviously a very clear system of responsibility in terms of the hierarchy of the trading desk. *There's trading* specifically in the product areas and down to the book level, with people individually responsible. *They report to a Head of the Structured Product group, reports to -- who reports to the Head of Securities, who in turn reports to myself*, Head of the Investment Bank.

**John Glover** - *Bloomberg - Media*

Can I ask a supplementary question, please, on that? The Head of Securities, is he part of the trading function or is he part of the risk management function?

And the other question, I have actually a further question about the marks, if I can come back to that in a second.

**Paul Calello** - *Credit Suisse Group - CEO Investment Banking*

Yes. The Head of Securities, Mike Ryan, is a part of the senior management of the firm, on the Investment Bank Management Committee.

**John Glover** - *Bloomberg - Media*

Right, but is he in the risk management side, as it were, or is he --?

**Paul Calello** - *Credit Suisse Group - CEO Investment Banking*

No, in fact we have -- *our risk management side is completely independent, separate, reporting into Wilson Ervin, who's here with us today, who in turn*

158

*reports directly to the CEO of the Group, Brady Dougan*.    So it's an independent line, risk management, from the trading side.

**John Glover** - *Bloomberg - Media*

Okay, thank you.  The question about the -- *you're saying now that it was that you were tardy in marking the books.  In the statement you put out, you said it was mismarking.  Does that mean that you were marking books and just putting inflated prices to hide the losses, or does it mean something else?*

**Wilson Ervin** - *Credit Suisse - Chief Risk Officer*

*No.  In our view, it's the same thing*.  We mark our books to market on a daily basis and this marking had been delayed, and marking to us is the same thing.

**John Glover** - *Bloomberg - Media*

So, mismarking is the same as tardiness, being late?  It's as good as getting it wrong?

**Brady Dougan** - *Credit Suisse - CEO*

I'm sure on a daily basis that's absolutely right.    Thanks.    Next question, operator.

(Emphasis added)

262.    The heading of the February 19, 2008 research report issued by Merrill Lynch on Credit Suisse summed up Credit Suisse's new disclosures:  "Not singing anymore."    As this analyst commented:

> **Announcement of $2.9 bil of mis-marked securities**
> In conjunction with placing US$ 2 billion of subordinated notes, Credit Suisse has announced that it has uncovered $2.85 billion of mis-marked securities.  The press release from Credit Suisse states that the bottom line impact is US$ 1 billion – which sounds optimistic.  Most of this loss will be booked in the first quarter, although some of the losses could be booked in the fourth quarter.  *This makes us question how big the book is if US$ 2.85 billion of mis-marking can go undetected.  Clearly, this announcement makes us question a lot.*

(Emphasis added)

263.    Bernstein Research reiterated the market's concerns about the implications of

159

Credit Suisse's disclosures:

> The surprise announcement of USD 2.85bn write-downs in the RMBS and CDO positions does not constitute a case of "rogue trader" similar to Society Generale but is still a serious failure in risk management processes. We believe the mis-pricing had at least a material indirect impact on the reported losses as it increased the basis risk in Credit Suisse' trading book.

280.    The February 19, 2008 research report by Ladders provided further details on the February 19th announcement, including that KPMG had likely forced the surprise disclosures:

> Credit Suisse's CDO headache
> The bank's $2.85 billion charge traces back to highly-rated CDOs traded in London whose valuation was questioned by auditors, sources say.
>
> New York (Fortune) – *Credit Suisse's stunning announcement that it is taking a $2.85 billion charge because it failed to properly value some bonds is a major black eye for a firm that has not been shy in touting its success in avoiding the pitfalls that have befallen its competitors*.
>
> According to sources inside and outside the firm, Credit Suisse's pricing errors centered on a portfolio of collateralized debt obligations owned by the firm's London securitized product trading desk.
>
> In discussing the debacle, Credit Suisse (CS) used the word "mismark," and has suspended (with pay) the traders it claims are responsible, but the difference in valuations on asset-backed securities CDOs appears at this point not to have been intentional, according to sources inside the bank.
>
> Sources told Fortune that the losses were taken in a proprietary trading account – a so-called back-book in trader parlance – where Credit Suisse was betting its own funds, as opposed to a regular trading account, which would be used to hold bonds prior to sale to customers.
>
> The pending close of a $2 billion bond offering may have helped push Credit Suisse to disclose the loss.
>
> The securities in question are said by bank sources and clients to be in the so-called super-senior tranches of ABS CDOs, where price declines or upwards of 50 cents on the dollar or more in the past quarter have become standard. Fortune could not find out the size of the CDO portfolio.
>
> *Apparently, according to sources at Credit Suisse, in an otherwise routine post-quarter review, Credit Suisse's auditors at KPMG questioned the trading desk's valuation methodology.* One aspect of the current CDO market that almost

160

certainly hurt CS are the wide bid-offer spreads of the CDO tranches in question, often more than 20 or 30 points.  This is taken as a clear indication of not only poor liquidity in the market, but a sharp difference in opinion over valuation.  It also invites the opportunity for a sharply favorable, if unwarranted, valuation.

For example:  A trader owns a (hypothetical) CDO tranche whose market is quoted by rival investment banks at between $40 and $80.  Many pricing models would allow that bond to be valued anywhere around the $80 level, despite the fact that it is almost certainly trading around $40.

*        *        *

Combining the $2.85 billion charge with the announcement of $1.89 billion writedowns last week, Credit Suisse has now reduced the value of its fixed-income holdings by $4.74 billion.

A Credit Suisse spokesman in New York declined to comment.  In a conference call, bank chief executive Brady Dougan refused to disclose how much of the $2.85 billion was related to "adverse market conditions" and how much was the traders' "lateness in marking."

281.    On February 20, 2008, the Guardian continued to reveal pieces of the story:

Credit Suisse suspends traders for over-pricing

***Credit Suisse yesterday suspended a "handful" of traders based in London who are suspected of "delinquent" over-valuing of asset-backed securities – a new blow to the credibility of the banking sector.***

The Swiss bank warned that its first quarter net income would be cut by about $1bn (£500m) and shocked investors by saying it had been forced to write down $2.85bn of mortgage-related assets within its investment banking division.

Brady Dougan, chief executive, refused to name the traders, who remain employed on full pay while an internal review is under way.

But it is understood that it was a City-based group involved in structuring and trading synthetic collateralized debt obligations (CDOs) and headed by Kareem Serageldin, global head of synthetic CDOs.  The exotic financial instruments tend to be based on the sub-prime mortgages at the heart of the current financial crises.

Dougan, insisting that the bulk of the writedowns arose from deteriorating market conditions in the first six weeks of this year, said the rest came from "mismarking" and late or "delinquent" pricing of open positions.

But he played down any similarity with the alleged rogue trading by Jérôme

161

Kerviel that cost French rival Société Générale €4.82bn (£3.64) of losses last year, while refusing to rule out fraud. He refused to comment on suggestions the traders had acted to guarantee substantial bonuses.

Brady said initial evidence gave no reason to restate 2007 results, with the positions in question properly booked and showing no gaps or discrepancies. The former investment banker said on a conference call: "Yes, we are satisfied that this is an isolated incident."

***The Swiss bank had emerged relatively unscathed from the sub-prime and credit crises, writing down a net $2bn last year when it made record earnings. But the latest revelation, exactly a week after it supposedly laid bare its entire exposure to sub-prime and other mortgage-related assets, angered analysts and investors.***

The bank's shares plummeted more than 7% as analysts said the surprise announcement was a disaster and the "tip of the iceberg". Bigger Swiss rival UBS has so far written down $18.1bn and could, analysts warn, face a further $20bn hit.

***It is understood that the losses first came to light on the day Credit Suisse published its results and was on the verge of closing a $2bn, 10-year bond issue. The full scale of the incident became clear at the weekend when auditors working on the bond issue unraveled the pricing errors and refused to sign off on their review.***

Dougan insisted that the bank's internal controls had caught the mismarking "very rapidly", but failed to allay investors' concerns. Wilson Ervin, chief risk officer, admitted that the bank would have to tighten its procedures. "Our expectations of people is that we should do much better than this," Ervin said. "We obviously wish we had caught this earlier."

He added: "This was instigated as a result of our normal control procedures, not as a result of the Kerviel incident."

282. Between the evenings of February 15, 2008 (the last trading day before the February 19th announcement) and February 21, 2008, Credit Suisse's stock declined from $50.88 to $47.72, for a total raw dollar decline of $3.16, or 6.2%. Versus its peers, and eliminating other market events and disclosures unrelated to the fraud, the Company's stock declined a statistically significant 6.61% over this period.

283. On March 16, 2008 financial advisor Ric Edelman explained how certain banks

162

had used customer money market accounts to make inappropriate investments.  In identifying

Credit Suisse, it grossly under-estimated the Company's exposures for its wrong-doing:

> In an effort to offer investors higher yields, some money-market funds have invested in securities called structured investment vehicles (SIVs), some of which are tied to subprime mortgages.  Because many borrowers have defaulted on these loans, as has been widely reported, many SIVs are not earning the interest that was expected.  As a result, Wall Street has been downgrading the value of many of these securities.

> This means that some money-market funds are paying lower yields than investors hoped.  And if the lower valuation of these SIV securities is sustained, it's possible that some money-market funds might break the buck – meaning the share price of a money market fund might fall below $1.

> The parent companies of some of those funds have taken action to reduce the risk that their funds might break the buck.  For example:

> \*       \*       \*

> **Credit Suisse reported that its SIV exposure has cost it $125 million.**

> \*       \*       \*

> Although it's disappointing to learn of these losses, it's reassuring to see the parent companies step in to protect investors.  But will every money-market fund receive such financial support, and will that support be sufficient to protect investors of such funds?  Time will tell.

> In the interim, if you have invested in a money-market fund at another organization, you should verify that the fund is not incurring problems because of the subprime-lending crisis.

> **It would be a shame if an investor lost money by investing in a money-market fund that has offered a "high" yield, because those yields really aren't so high.**

> **Compared to a money-market fund that avoided investing in SIVs, a fund that invested in SIVs might have offered an annual yield that was only three-tenths of a percent higher – before taxes.**

> **Why would a consumer be willing to gamble the safety of $100,000 in an effort to earn an extra $300?**

(Emphasis added)

284.    On or about March 20, 2008, Defendants publicly filed a "revised" 4Q07 financial review, slides detailing the Company's financial performance and certain asset exposures, and the Company's 2007 Form 20-F and annual report.  At 4:00 a.m. EST, Defendants also conducted an earnings call with analysts.  These disclosures admitted that the ABS mis-markings and the Company's internal control material weaknesses had resulted in material misstatements in the Company's earlier 4Q07 and annual 2007 financial reporting.  The 2007 annual report stated:

**Revaluing of certain asset-backed securities positions**

As announced on February 19, 2008, in connection with ongoing internal control processes, we identified mismarks and pricing errors by a small number of traders in certain ABS positions in CDO trading in our structured product business within Investment Banking, and immediately undertook an internal review of this business.

As a result of this internal review, which is now complete, we recorded total valuation reductions of CHF 2.86 billion (USD 2.65 billion) as a result of revaluing these positions.  A significant portion of the reductions reflected adverse market developments in the first quarter of 2008.  ***These valuation reductions include a CHF 1,177 million reduction in net revenues and a CHF 789 million reduction in net income from the amounts we previously reported for the fourth quarter and full-year 2007***, and such reductions are reflected in the consolidated financial statements and related discussion of our financial condition, results of operations and cash flows, and other information included in this Annual Report.

The internal review, commissioned by our Executive Board and assisted by outside counsel, commenced after the release of our unaudited 2007 condensed consolidated financial statements.  Based on the results of the internal review and the conclusions of outside counsel, we have determined that these mismarks and pricing errors were, in part, the result of intentional misconduct by a small number of traders.  These employees have either been terminated or have been suspended and are in the process of being disciplined under local employment law.  ***The controls we had in place to prevent or detect these mismarks and pricing errors, including the supervision and monitoring of the valuations of these positions by trading and the related price testing and supervision by product control, were not effective.  Our price testing of these positions included modeling techniques that failed to accurately value these positions as of December 31, 2007.  As a result, management concluded that a material***

164

***weakness in internal control over financial reporting existed as of December 31, 2007.***
(Emphasis added)

285.   The annual report also revealed that, for 2007, the Company had nine VaR backtesting exceptions, and 15 backtesting exceptions using backtesting profit and loss.

286.   With respect to the Company's reporting of its retained interests in structured assets, key economic assumptions and sensitivity analysis, the disclosures by the Company showed that its exposures from the sub-prime crisis were anything but remote.  The Company reported the following expected percentage losses per asset type:

| CMBS | RMBS | CDO | ABS |
|------|------|-----|-----|
| 26-85% | 20-26% | 77-81% | 87% |

287.   The 2007 annual report included KPMG's adverse opinion on the Company's internal controls:

> We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Group's internal control over financial reporting as of December 31, 2007, based on criteria established in *Internal Control--Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission, and our report dated March 18, 2008 ***expressed an adverse opinion on the effectiveness of the Group's internal control over financial reporting.***

The 2007 annual report included a second report by KPMG which stated:

> A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. ***The following material weakness has been identified and included in management's assessment controls over the valuation of asset-backed securities positions in the collateralized debt obligations trading business in Investment Banking relating to the supervision and monitoring of the initial valuations of these positions by trading personnel and the related price testing and supervision by product control, which is segregated from trading, were not effective.*** We also have audited, in accordance with the standards of the public Company Accounting Oversight Board (United States) and Swiss Auditing Standards, the consolidated balance sheets of the Group as of December 31, 2007 and 2006, and the related

165

consolidated statements of income, changes in shareholders' equity comprehensive income, and cash flows, and notes thereto, for each of the years in the three-year period ended December 31, 2007. This material weakness was considered in determining the nature, timing and extent of audit tests applied in our audit of the 2007 consolidated financial statements, and this report does not affect our report dated March 18, 2008 which expressed an unqualified opinion on those consolidated financial statements.

In our opinion, ***because of the effect of the aforementioned material weakness on the achievement of the objectives of the control criteria, the Group has not maintained effective internal control over financial reporting as of December 31, 2007*** based on criteria established in *Internal Control--Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

288.    In coverage of Credit Suisse's disclosures, Dow Jones on March 20, 2008 reported:

ZURICH (Dow Jones) -- Swiss Credit Suisse Group AG (CS) said Thursday that it's unlikely to be profitable in the first quarter, as it announced the completion of an internal review related to the revaluation of certain asset-backed securities positions in the Collateralized Debt Obligations trading business within its Investment Banking division. . . .

289.    Between the evenings of March 19, 2008 to March 20, 2008, the price of Credit Suisse's shares declined from $49.85 to $49.48, for a one-day "raw" change of $.37 or .74%. The market, however, was sharply up that day, so that versus its peers, and eliminating other market events and disclosures unrelated to the fraud, the Company's stock declined a statistically significant 2.83%, equating to a $1.41 one-day loss as a result of the partial revelation of the fraud.

290.    On April 13, 2008 Reuters warned of additional First Quarter 2008 write-downs:

ZURICH, April 13 (Reuters) - Credit Suisse could announce further writedowns of up to 5 billion Swiss francs ($4.99 billion) when it posts its first-quarter results later this month, Swiss media reported over the weekend.

Swiss newspaper Tages-Anzeiger reported on Saturday the bank could face a first-quarter loss of up to 2 billion francs and further writedowns of around 4 billion francs, according to its own research.

166

> NZZ am Sonntag said on Sunday the bank would announce writedowns of between 3 billion francs and 5 billion francs when it posts its figures for the first quarter on April 24, without giving any sources.
>
> Credit Suisse has so far written down 5.8 billion francs and last month said it could report its first quarterly loss in five years as unprecedented market conditions in March had introduced new uncertainty.

In fact, 11 days later Credit Suisse would reveal net writedowns of CHF 5.281 billion for 1Q08, which included amounts for writedowns of ABS positions in the collateralized debt trading business in Investment Banking.  Between the evenings of April 11, 2008 (the last day of trading before the April 14th announcement) and April 14, 2008, the price of Credit Suisse's stock declined from $53.65 to $51.91, for a raw dollar decline of $1.74 or 3.24%.  Versus its peers, and eliminating other market events and disclosures unrelated to the fraud, the Company's stock declined a statistically significant 2.97% over the one day trading period.

## VII.    THE DEFENDANTS' VIOLATIONS OF GAAP

291.    The Defendants caused the Company to falsely report its financial position and results of operations as of and for the 2006 annual report and Form 20-F, and quarterly periods ended, March 31, 2007; June 30, 2007; September 30, 2007 and December 31, 2007 (the "relevant timeframe"), by, among other things, overstating net earnings, misrepresenting the Company's true financial position and misrepresenting and concealing its true risk from the sub-prime crisis. The Company's financial statements for the year ended December 31, 2006 (the "2006 annual financial statements"), and interim financial statements for the quarterly periods ended March 31, 2007, June 30, 2007, September 30, 2007 and December 31, 2007 (the "2007 quarterly financial statements", and collectively, the "relevant financial statements") did not present fairly the Company's financial position and results of operations, and/or were not presented in conformity with GAAP and SEC rules.

167

292. Generally Accepted Accounting Principles ("GAAP") are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"). GAAP consists of a hierarchy of authoritative literature. The highest priority is comprised of Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Standards ("FAS"), followed by FASB Interpretations ("FIN"), Accounting Principles Board Opinions ("APB"), AICPA Accounting Research Bulletins ("ARB"), and AICPA Statements of Position ("SOP"). GAAP provides other authoritative pronouncements including, among others, the FASB Concept Statements ("FASCON").

293. As a publicly traded company, the Company is responsible and required to maintain books and records in sufficient detail to reflect the transactions of the Company and therefore prepare financial statements in accordance with GAAP. Specifically, the Securities and Exchange Act of 1934, 15 U.S.C. § 78m (b) (2) ("the Exchange Act"), requires public companies to:

(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

   i. transactions are executed in accordance with management's general or specific authorization;

   ii. transactions are recorded as necessary (i) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (ii) to maintain accountability for assets;

   iii. access to assets is permitted only in accordance with management's general or specific authorization; and

168

iv. the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

294.    SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. (17 C.F.R. § 210.10-01(a))

295.    The responsibility for preparing the financial statements in conformity with GAAP rests with the Company's management, as, for example, set forth in the AICPA Auditing Standards ("AU"), in relevant part:

> The financial statements are management's responsibility… Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, authorize, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management… Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility. (Footnote omitted.)

(AU 110.03)

296.    As alleged elsewhere herein, prior to and throughout the relevant timeframe, the Defendants caused the Company to recklessly originate, purchase, securitize, and trade inherently risky loans, primarily mortgages, and related securities (collectively, the "subprime-related securities").

169

297.    The Company's practices regarding subprime-related securities (including its Alt-A mortgages) exposed the Company to a significant and risky concentration of high risk debt obligations.  That concentration, in combination with certain prevailing market conditions, such as declining home values and increasing credit delinquencies and defaults (discussed in greater detail elsewhere herein), adversely affected the Company's financial position and caused significant but unreported declines in the Company's results of operations throughout the Class Period.  The Company's 2006 annual and 2007 quarterly financial statements, however, not only failed to recognize known losses in the fair value of the Company's trading securities but also failed to even disclose its exposure to such a significant concentration of highly risky securities and related losses.  Instead, Defendants repeatedly and insistently falsely represented that the Company's exposure was "remote" and "*de minimis*."

298.    The Company's assets with exposure to the subprime crisis were materially overstated (or loss reserves were materially understated, as applicable), and, as a result, the Company's net earnings was materially overstated (or net losses were materially understated, as applicable).  The Company also reported false and misleading assessments of risk, including its "VaR" and "Position Risk," which were predicated upon the incorrect asset values, ineffective hedges and models that failed to account for current default rates.  Additionally, the Company's 2006 annual financial statements and 2007 quarterly financial statements lacked required (under GAAP) disclosures, omitting material facts regarding the Company's exposure to and losses from subprime-related securities. Additionally, throughout the Class Period, the Company lacked adequate disclosure controls and procedures, and internal control over financial reporting, to the extent that there were "material weaknesses" in the Company's internal controls over its financial reporting, despite repeated certifications signed by certain Defendants and other

170

statements to the contrary.  Indeed here, the CEO and CFO personally vouched for the reliability

of the internal controls and risk assessment processes that purportedly directly reported to them.

299.    Further, the Company's relevant financial statements presented the Company's

financial position and results of operations in a manner which, among other things, also violated

the following fundamental accounting principles:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASCON 1 ¶34);

(b)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (FASCON 1 ¶40);

(c)    The principle that financial reporting should provide information about an enterprise's financial performance during a period.  "Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance." (FASCON 1 ¶42);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. "To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general." (FASCON 1 ¶50);

(e)    The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (FASCON 2 ¶¶58-59);

(f)    The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASCON 2 ¶79);

171

(g)     The principle that financial reporting should be verifiable in that it provides a significant degree of assurance that accounting measures represent what they purport to represent (FASCON 2 ¶81); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. (FASCON 2 ¶¶95, 97).

*300.*    Each of the improper accounting practices, misrepresentations and omissions engaged in by the Defendants, and discussed further herein, standing alone, was a material breach of GAAP and/or SEC regulations.

<u>Overstatement of U.S. ABS CDOs and Other Subprime-related Securities</u>

301.    The Defendants caused the Company's relevant financial statements to materially overstate the reported values (under GAAP) of U.S. Asset-Backed Securities ("ABS") Collateralized Debt Obligations ("CDOs") and other subprime-related securities.  Defendants also failed to report loss reserves or to include disclosures about the contingent liabilities attributable to the unsuitable and unauthorized ARS placed in money market customer accounts.

302.    The Company's positions in U.S. ABS CDOs were primarily held as trading assets (or liabilities, as applicable) in the form of mortgages, mortgage-backed, and asset-backed securities; investment securities classified as trading assets; and derivative instruments.  Trading securities are securities that are held principally for the purpose of selling them in the near term. (FAS No. 115, *Accounting for Investments in Certain Debt and Equity Securities* ("FAS 115"), ¶12a). Derivative instruments, generally, are financial instruments or other contracts that derive their value from one or more underlying assets.

303.    GAAP requires debt instruments classified as trading to be measured at fair value in the statement of financial position and changes in fair value (i.e., unrealized gains and losses) to be recognized in earnings. (FAS 115 ¶¶12a, 13). GAAP requires debt instruments classified as trading ABS to be measured at fair value in the statement of financial position and requires

172

changes in fair value (i.e., unrealized gains and losses) to be immediately recognized in income.

Further, GAAP requires derivative instruments, not specially designated as a hedge to be

measured at fair value and requires changes in fair value to be recognized currently in earnings.

(FAS No. 133¸ *Accounting for Derivative Instruments and Hedging Activities* ("FAS 133"),

¶¶17, 18a. FAS No. 107, *Disclosures about Fair Values of Financial Instruments* ("FAS 107")

defines fair value as follows, in relevant part:

> …***[Q]uoted market prices, if available, are the best evidence of fair value of financial instruments.*** Prices for financial instruments may be quoted in several markets; generally, the price in the most active market will be the best indicator of fair value.

(FAS 107 ¶20) (Emphasis added.)

> ***For financial instruments that do not trade regularly, or that trade only in principal-to-principal markets, an entity should provide its best estimate of fair value.*** Judgments about the methods and assumptions to be used in various circumstances must be made by those who prepare and attest to an entity's financial statements. The following discussion provides some examples of how fair value might be estimated.

(FAS 107 ¶22) (Emphasis added).

> ***An estimate of the fair value of a loan or group of loans may be based on the discounted value of the future cash flows expected to be received from the loan or group of loans.*** The selection of an appropriate current discount rate reflecting the relative risks involved requires judgment, and several alternative rates and approaches are available to an entity. A single discount rate could be used to estimate the fair value of a homogeneous category of loans; for example, an entity might apply a single rate to each aggregated category of loans reported for regulatory purposes. ***An entity could use a discount rate commensurate with the credit, interest rate, and prepayment risks involved, which could be the rate at which the same loans would be made under current conditions. An entity also could select a discount rate that reflects the effects of interest rate changes and then make adjustments to reflect the effects of changes in credit risk. Those adjustments could include (a) revising cash flow estimates for cash flows not expected to be collected, (b) revising the discount rate to reflect any additional credit risk associated with that group of loans, or some combination of (a) and (b).***

(FAS 107 ¶27) (Emphasis added.)

173

304.     In the first quarter of 2007 the Company adopted FAS No. 157, *Fair Value Measurements* ("FAS 157") and FAS No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities* ("FAS 159"). FAS 157 defines fair value, establishes a framework for measuring fair value in GAAP, and expands disclosures about fair value measurements. This standard applies to previous accounting pronouncements that require or permit fair value measurements, but does not require any new fair value measurements. FAS 159 permits entities to choose to measure many financial instruments and certain other items at fair value. Its objective is to improve financial reporting by providing entities the opportunity to mitigate earnings volatility caused by measuring related assets and liabilities differently without having to apply complex hedge accounting GAAP requirements. This pronouncement does expand the use of fair value measurements. For all assets and liabilities reported at fair value, such value is determined based upon observable inputs (market data obtained from sources independent of the reporting entity) and/or unobservable inputs (the reporting entities own assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances). Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets and liabilities that the reporting entity has the ability to access at the reporting date. (FAS 157 ¶24). Level 2 inputs are inputs other than quoted prices included in Level 1 that are observable for the asset or liability, either directly or indirectly. *Id.* at 28. Level 2 inputs include; quoted prices for similar assets or liabilities in active markets, quoted prices for identical assets or liabilities in inactive markets, inputs other than quoted prices that are observable, or inputs from corroborated or observable market data that is correlated to the asset or liability being fair valued. *Id.* Level 3 inputs are unobservable inputs for the asset or liability. *Id. at* ¶30. Level 3 inputs shall be used to measure fair value to the extent

174

that observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at the measurement date. *Id.* FAS 157 further states;

> To increase consistency and comparability in fair value measurements and related disclosures, the fair value hierarchy prioritizes the inputs to valuation techniques used to measure fair value into three broad levels. The fair value hierarchy gives the highest priority to quoted prices (unadjusted) in active markets for identical assets and liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3). ….. The level in the fair value hierarchy within which the fair value measurement in its entirety falls shall be determined based upon the lowest level input that is significant to the fair value measurement in its entirety.  (FAS 157, ¶22)

Because Level 3 inputs are more subjective than quoted market prices for identical assets or liabilities the disclosures required in FAS 157 related to assets or liabilities that are fair valued using Level 3 inputs are more extensive than those using Level 1 inputs.

305.    Further, FAS No. 5, *Accounting for Contingencies* ("FAS 5") requires a loss to be recognized in the financial statements when it is both "probable" and "reasonably estimable." (FAS 5 ¶8).

306.    The Company's relevant financial statements materially overstated the fair value of its U.S. ABS CDO positions. For the reasons alleged elsewhere herein, the Defendants knew, or recklessly disregarded, that U.S. ABS CDO positions were concentrated in subprime-related securities and knew of, or recklessly disregarded, the inherent credit risk and the market factors indicating the true value of its subprime-related securities throughout the Class Period as fully described herein.

307.    Additionally, the Defendants, because of the nature of the Company's business, the projects that were on-going, the reports they received, the meetings which they or their subordinates attended, and their own reports to regulators, had extensive nonpublic credit and market information indicating the true value of its subprime-related securities.

308.    Therefore, the Defendants knew of or recklessly disregarded the significant declines in the fair value of its U.S. ABS CDO positions. However, Credit Suisse avoided recognizing the related losses, which were ***probable and reasonably estimable***, in violation of GAAP (FAS 5, FAS 107, FAS 115, FAS 133, FAS 157 and FAS 159), and thereby overstated its U.S. ABS CDO positions and artificially inflated its net revenues in the Company's relevant financial statements.

309.    In addition to its U.S. ABS CDO positions, the Company had exposure to subprime-related securities with respect to its U.S. subprime residential mortgage-related positions, including whole loans, residuals, residential mortgage-backed securities, and warehouse lending. For the reasons alleged elsewhere herein, the Defendants knew of or recklessly disregarded the significant declines in the fair value of its U.S. subprime residential mortgage-related positions. However, the Defendants avoided recognizing losses, which were ***probable and reasonably estimable***, in violation of GAAP (FAS 5, FAS 107, FAS 115, FAS 133, FAS 157 and FAS 159) and thereby artificially inflated its U.S. subprime residential mortgage-related positions and artificially inflated its net revenues in the Company's relevant financial statements.

Lack of Sufficient Disclosures

310.    In addition to the fundamental principles of financial reporting established by the FASCONs above, GAAP requires certain disclosures to prevent financial statements from being false and misleading. FAS No. 5, *Accounting for Contingencies* ("FAS 5") states as follows, in relevant part:

> If no accrual is made for a loss contingency because one or both of the conditions in paragraph 8 are not met, or if an exposure to loss exists in excess of the amount accrued pursuant to the provisions of paragraph 8, ***disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an***

176

*additional loss may have been incurred.* [Footnote omitted.] The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made…

*After the date of an enterprise's financial statements but before those financial statements are issued, information may become available indicating that an asset was impaired or a liability was incurred after the date of the financial statements or that there is at least a reasonable possibility that an asset was impaired or a liability was incurred after that date.* The information may relate to a loss contingency that existed at the date of the financial statements, e.g., an asset that was not insured at the date of the financial statements. *On the other hand, the information may relate to a loss contingency that did not exist at the date of the financial statements*, e.g., threat of expropriation of assets after the date of the financial statements or the filing for bankruptcy by an enterprise whose debt was guaranteed after the date of the financial statements. In none of the cases cited in this paragraph was an asset impaired or a liability incurred at the date of the financial statements, and the condition for accrual in paragraph 8(a) is, therefore, not met. *Disclosure of those kinds of losses or loss contingencies may be necessary, however, to keep the financial statements from being misleading. If disclosure is deemed necessary, the financial statements shall indicate the nature of the loss or loss contingency and give an estimate of the amount or range of loss or possible loss or state that such an estimate cannot be made. Occasionally, in the case of a loss arising after the date of the financial statements where the amount of asset impairment or liability incurrence can be reasonably estimated, disclosure may best be made by supplementing the historical financial statements with pro forma financial data giving effect to the loss as if it had occurred at the date of the financial statements. It may be desirable to present pro forma statements, usually a balance sheet only, in columnar form on the face of the historical financial statements*. (Emphasis added.) (FAS 5 ¶¶10- 11)

311.    For the reasons alleged elsewhere herein, the Defendants knew of or recklessly disregarded the inherent credit risk and the market factors indicating the true value of its subprime-related securities and the resulting significant declines in the fair value of the Company's subprime-related securities throughout the Class Period.  Defendants also knew or recklessly disregarded Credit Suisse's responsibility for and fair value losses in the ARS fraudulently placed with its money-market customers.  As such, disclosure of the material decline in the fair value and related losses of the Company's subprime-related securities, because of the significance to the financial statements, was necessary to prevent these financial

177

statements from being misleading. Although the losses on its subprime-related securities were, at a minimum, *reasonably possible*, the Company's 2006 annual financial statements, in violation of GAAP (FAS 5), did not include such disclosures.

312.   Furthermore, the Company's 2007 quarterly financial statements, in addition to failing to *recognize* the losses on its subprime-related securities, and its ARS, as discussed above, did not even *disclose* such losses, which were, at a minimum, *reasonably possible*, in violation of GAAP (FAS 5), misleading investors with regard to its true financial position and results of operations.

313.   In addition to the aforementioned FAS 5 disclosure requirements, FAS 107, as amended by FAS 133, requires disclosure of all significant concentrations of credit risk arising from all financial instruments, including the following:

> a. ***Information about the (shared)*** activity, region, or ***economic characteristic that identifies the concentration***
>
> b. ***The maximum amount of loss due to credit risk that, based on the gross fair value of the financial instrument, the entity would incur if parties to the financial instruments that make up the concentration failed completely to perform according to the terms of the contracts*** and the collateral or other security, if any, for the amount due proved to be of no value to the entity
>
> c. The entity's policy of requiring collateral or other security to support financial instruments subject to credit risk, information about the entity's access to that collateral or other security, and the nature and a brief description of the collateral or other security supporting those financial instruments
>
> d. The entity's policy of entering into master netting arrangements to mitigate the credit risk of financial instruments, information about the arrangements for which the entity is a party, and a brief description of the terms of those arrangements, including the extent to which they would reduce the entity's maximum amount of loss due to credit risk. (FAS 107, as amended by FAS 133, ¶15A)

(Emphasis added).

314.   Beginning in the first quarter of 2007 the Company was also required to comply with the new disclosure requirements of FAS 157 and FAS 159. In order for users of its financial

178

statements to assess the inputs utilized by the Company to determine the fair value for its assets and liabilities that are measured at fair value on a recurring basis the Company, for each interim and annual reporting period, must disclose separately for each major category of assets and liabilities:

    a.  The fair value measurements at the reporting date

    b.  The level within the fair value hierarchy in which the fair value measurements in their entirety fall, segregating fair value measurements using quoted prices in active markets for identical assets or liabilities (Level 1), significant other observable inputs (Level 2), and significant unobservable inputs (Level 3)

    c.  For fair value measurements using significant unobservable inputs (Level 3), a reconciliation of the beginning and ending balances, separately presenting changes during the period attributable to the following:

        1.  Total gains or losses for the period (realized and unrealized), segregating those gains or losses included in earnings (or changes in net assets), and a description of where those gains or losses included in earnings (or changes in net assets) are reported in the statement of income (or activities)

        2.  Purchases, sales, issuances, and settlements (net)

        3.  Transfers in and/or out of Level 3 (for example, transfers due to changes in the observability of significant inputs)

    d.  The amount of total gains or losses for the period in subparagraph (c)(1) above included in earning (or changes in net assets) that are attributable to the change in unrealized gains or losses relating to those assets or liabilities still held at the reporting date and a description of where those unrealized gains or losses are reported in the statement of income (or activities)

    e.  In annual periods only, the valuation technique(s) used to measure fair value and a discussion of changes in valuation techniques, if any, during the period.

(FAS 157 ¶32, footnotes and footnote references omitted)

315.    For assets and liabilities that are measured at fair value on a nonrecurring basis in periods subsequent to initial recognition (for example, impaired assets) the reporting entity for each interim and annual reporting period must disclose separately for each major category of assets and liabilities:

179

a. The fair value measurements recorded during the period and the reasons for the measurements

b. The level within the fair value hierarchy in which the fair value measurements in their entirety fall, segregating fair value measurements using quoted prices in active markets for identical assets or liabilities (Level 1), significant other observable inputs (Level 2), and significant unobservable inputs (Level 3)

c. For fair value measurements using significant unobservable inputs (Level 3), a description of the inputs and the information used to develop the inputs

d. In annual periods only, the valuation technique(s) used to measure fair value and a discussion of changes in valuation techniques, if any, in the valuation technique(s) used to measure similar assets and/or liabilities in prior periods.

(FAS 157 ¶33)

FAS 157 requires these disclosures to be presented in a tabular format and encourages, but does not require, that the disclosures be combined with other fair value disclosures (for example FAS 107), if practicable.

316.    Because the Company elected to measure at fair value financial instruments and certain other items, which were not required by current accounting authority to be measured at fair value,   the Company was required to comply with FAS 159's additional disclosures applicable to those assets and liabilities, as follows:

**Required Disclosures as of Each Date for Which an Interim or Annual Statement of Financial Position Is Presented**

18. As of each date for which a statement of financial position is presented, entities shall disclose the following;

a. Management's reasons for electing a fair value option for each eligible item or group of similar eligible items

b. If the fair value option is elected for some but not all eligible items within a group of similar eligible items:

(1) A description of those similar items and the reasons for partial election

(2) Information to enable users to understand how the group of similar items relates to individual line items on the statement of financial position

180

    c.  For each line item in the statement of financial position that includes an item or items for which the fair value option has been elected:

        (1)  Information to enable users to understand how each line item in the statement of financial position relates to major categories of assets and liabilities presented in accordance with Statement 157's fair value disclosure requirements

        (2)  The aggregate carrying amount of items included in each line item in the statement of financial position that are not eligible for the fair value option, if any

    d.  The difference between the aggregate fair value and the aggregate unpaid principal balance of:

        (1)  Loans and long-term receivables (other than securities subject to Statement 115) that have contractual principal amounts and for which the fair value option has been elected

        (2)  Long-term debt instruments that have contractual principal amounts and for which the fair value option has been elected

    e.  For loans held as assets for which the fair value option has been elected:

        (1)  The aggregate fair value of loans that are 90 days or more past due

        (2)  If the entity's policy is to recognize interest income separately from other changes in fair value, the aggregate fair value of loans in nonaccrual status

        (3)  The difference between the aggregate fair value and the aggregate unpaid principal balance for loans that are 90 days or more past due, in nonaccrual status, or both

    f.  For investments that would have been accounted for under the equity method if the entity had not chosen to apply the fair value option, the information required by paragraph 20 of APB Opinion No. 18, *The Equity Method of Accounting for Investments in Common Stock* (excluding the disclosures in paragraphs 20(a)(3), 20(b), and 20(e) of that Opinion).

**Required Disclosures for Each Period for Which an Interim or Annual Income Statement Is Presented**

19. For each period for which an income statement is presented, entities shall disclose the following about items for which the fair value option has been elected;

    a.  For each line item in the statement of financial position, the amounts of gains and losses from fair value changes included in earnings during the period and in which line in the income statement those gains and losses are reported (This Statement does not preclude an entity from meeting this requirement by disclosing amounts of gains and losses that include amounts of gains and losses for other items measured at fair value, such as items required to be measured at fair value.)

    b.  A description of how interest and dividends are measured and where they are reported in the income statement (This Statement does not address the methods used for recognizing and measuring the amount of dividend

181

income, interest income, and interest expense for items for which the fair value option has been elected.)

c. For loans and other receivables held as assets:
    (1) The estimated amount of gains or losses included in earnings during the period attributable to changes in instrument-specific credit risk
    (2) How the gains or losses attributable to changes in instrument-specific credit risk were determined

d. For liabilities with fair values that have been significantly affected during the reporting period by changes in the instrument-specific credit risk:
    (1) The estimated amount of gains and losses from fair value changes included in earnings that are attributable to changes in the instrument- specific credit risk
    (2) Qualitative information about the reasons for those changes
    (3) How the gains and losses attributable to changes in instrument-specific credit risk were determined.

20. The disclosure requirements in paragraphs 18 and 19 do not eliminate disclosure requirements included in other GAAP pronouncements, including other disclosure requirements relating to fair value measurement.

**Other Required Disclosures**

21. In annual periods only, an entity shall disclose the methods and significant assumptions used to estimate the fair value of items for which the fair value option has been elected.

22. If an entity elects the fair value option at the time one of the events in paragraphs 9(d) and 9(e) occurs, the entity shall disclose the following in financial statements for the period of the election:
    a. Qualitative information about the nature of the event
    b. Quantitative information by line item in the statement of financial position indicating which line items in the income statement include the effect on earnings of initially electing the fair value option for an item.

(FAS 159 ¶¶18-22, footnotes and footnote references omitted)

317.    Credit Suisse's disclosures failed to provide investors with adequate information to properly assess the Company's exposure to certain toxic securities, including its subprime mortgage holdings, CDOs, and other securities by burying these holdings in one line of its balance sheet disclosures called "trading assets" and describing the securities included therein in a vague single paragraph following the FAS 157 hierarchy balance sheet. This class of assets

182

was $731 billion and $877 billion, or 72% and 76% of the Company's fair valued assets, at March 31, 2007 and December 31, 2007, respectively, and included subprime mortgages, prime RMBS, CDOs ABS, equity securities, derivatives, and likely some unmentioned securities. The Company's failure to break out the assets comprising this aggregate trading asset figure hid meaningful information from investors so that they could assess the risk in the portfolio and constitutes a fraud upon them.

318.    Additionally, SOP No. 94-6, *Disclosure of Certain Risks and Uncertainties* ("SOP 94-6") also requires disclosures to be made in financial statements about the risks and uncertainties existing as of the date of those statements regarding the following:

> *a.* Nature of operations
>
> *b.* Use of estimates in the preparation of financial statements
>
> *c.* Certain significant estimates
>
> *d. **Current vulnerability due to certain concentrations***

(SOP 94-6 ¶8) (Emphasis added.)

319.    With respect to disclosures of an entity's vulnerability due to certain concentrations, SOP 94-6 indicates:

> ***Vulnerability from concentrations arises because an entity is exposed to risk of loss greater than it would have had it mitigated its risk through diversification.*** Such risks of loss manifest themselves differently, depending on the nature of the concentration, and vary in significance.
>
> Financial statements should disclose the concentrations described in [subsequent paragraph] if, based on information known to management prior to issuance of the financial statements, *all* of the following criteria are met:
>
> > *a.*    The concentration ***exists at the date of the financial statements***.
> >
> > *b.*    The concentration makes the enterprise vulnerable to the risk of a ***near-term severe impact***.

> *c.* It is at least ***reasonably possible*** that the events that could cause the severe impact will occur in the near term.

Concentrations, including known group concentrations, described below require disclosure if they meet the criteria of [preceding paragraph]. (Group concentrations exist if a number of counterparties or ***items that have similar economic characteristics collectively expose the reporting entity to a particular kind of risk***.) Some concentrations may fall into more than one category.

> *a. Concentrations in the volume of business transacted with a particular customer, supplier, lender, grantor, or contributor.* The potential for the severe impact can result, for example, from total or partial loss of the business relationship. For purposes of this SOP, it is always considered at least reasonably possible that any customer, grantor, or contributor will be lost in the near term.

> *b. **Concentrations in revenue from particular products**, services, or fund-raising events.* The potential for the severe impact can result, for example, from volume or price changes or the loss of patent protection for the particular source of revenue.

> *c. Concentrations in the available sources of supply of materials, labor, or services, or of licenses or other rights used in the entity's operations.* The potential for the severe impact can result, for example, from changes in the availability to the entity of a resource or a right.

> *d. **Concentrations in the market** or geographic area* [footnote omitted] *in which an entity conducts its operations.* The potential for the severe impact can result, for example, from negative effects of the economic and political forces within the market or geographic area. For purposes of this SOP, it is always considered at least reasonably possible that operations located outside an entity's home country will be disrupted in the near term.

(SOP 94-6 ¶¶20-22) (Certain emphasis in the original, certain emphasis added).

320. Further, the Company's significant concentration in subprime-related securities represented a material contingency *which was required to be disclosed* in the Company's condensed interim, or quarterly financial statements. APB No. 28, *Interim Financial Reporting* ("APB 28"), states:

> Contingencies and other uncertainties that could be expected to affect the fairness of presentation of financial data at an interim date should be disclosed in interim reports in the same manner required for annual reports. Such disclosures should

be repeated in interim and annual reports until the contingencies have been removed, resolved, or have become immaterial. (APB 28 ¶22) (Footnote omitted.)

321. The Company's 2006 annual financial statements and 2007 quarterly financial statements, in violation of GAAP, lacked the required disclosure regarding its significant concentration in subprime-related securities.

322. In addition to the lack of disclosures required by GAAP, certain disclosures were materially false and/or misleading. For instance, in the 2006 annual financial statements, the Defendants reported in Fn. 29 . . . . . .  The Company disclosed its "exposure" to these types of loans on an aggregate basis, in modest amounts that belied the extraordinary exposures to the sub-prime crisis that the Company faced.  The lack of disclosure throughout the 2006 annual financial statements, that the Company in fact had significant exposures to subprime-related securities, served to further mislead investors.

323. Thus, the statements made in the disclosures to, or about, the relevant financial statements regarding, generally, the Company's financial position and results of operations, and more specifically, but not exclusively, its risk profile and exposures, as described herein, were materially false and misleading as those financial statement disclosures were not in conformity with GAAP (FAS 5, FAS 107, FAS 133, FAS 157, FAS 159 and SOP 94-6).

324. In addition to the requirements of GAAP, Regulation S-K requires the Company to include certain disclosures in the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of the Company's filing with the SEC. Regulation S-K states as follows, in relevant part:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. (17 C.F.R. § 229.303(a)(3)(ii)).

185

The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. (17 C.F.R. § 229.303(a)).

325.    The Company's MD&A, filed with the SEC as part of the Company's Form 20-F for the year ended December 31, 2006, in violation of Regulation S-K, did not adequately disclose the material decline in the fair value and related losses of the Company's subprime-related securities indicating the reported financial information was not indicative of the Company's future financial position or results of operations.

Ineffective Disclosure Controls and Procedures and Internal Control over Financial Reporting

326.    The SEC defines "disclosure controls and procedures" as:

…controls and other procedures of an issuer that are designed to ensure that *information required to be disclosed by the issuer in the reports filed or submitted by it under the Exchange Act is recorded, processed, summarized and reported, with the time periods specified in the Commissions rules and forms*…

(SEC Final Rule Release Nos. 33-8124, 34-46427, IC-25722; File No. S7-21-02)

(Emphasis added). (Footnotes omitted).

327.    Internal control over financial reporting is defined in Public Company Accounting Oversight Board ("PCAOB") Auditing Standard No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction with An Audit of Financial Statements* ("AS 2"), as follows, in relevant part:

A process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and **the preparation of financial statements for external purposes in accordance with generally accepted accounting principles** and includes those policies and procedures that:

(1) Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;

186

(2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and

(3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Note: This definition is the same one used by the SEC in its rules requiring management to report on internal control over financial reporting, except the word "registrant" has been changed to "company" to conform to the wording in this standard.

(See Securities Exchange Act Rules 13a-15(f) and 15d-15(f).2/) (AS 2 ¶7)

(Emphasis added).

328. Exchange Act Rules 13a-14 and 15d-14 require the Company's principal executive officer and principal financial officer to quarterly and annually certify the effectiveness (or deficiencies in the effectiveness, as applicable) of the Company's disclosure controls and procedures as of an assessment date within 90 days prior to the filing date of the report. Further, the Company is required to annually report on the effectiveness of its internal control over financial reporting. AS 2 states, in relevant part:

A company subject to the reporting requirements of the Securities Exchange Act of 1934 (an "issuer") is required to include in its annual report a report of management on the company's internal control over financial reporting… The report of management is required to contain management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year, including a statement as to whether the company's internal control over financial reporting is effective... (AS 2 ¶2).

329. During the Class Period, the Defendants caused the Company to mislead investors regarding the effectiveness of the Company's disclosure controls and procedures, and internal control over financial reporting. Certain Defendants falsely represented that the Company's disclosure controls and procedures were effective as of the date of the 2006 annual report filed

187

during the Class Period.  In fact, as the SEC and the DOJ found, that for at least a year and one half leading up to the filing of the 2006 Annual Report at least two traders were able to fabricate transactions in client money market accounts.  These transactions were reported to clients and entered in the financial records of Credit Suisse.  Further, these transactions and the overstatement of the value of these securities led to errors in the computation of commissions charged and compensation of these traders and senior management.

330.    In the Company's 2006 Annual Report, Defendants Grübel and Fassbind falsely state that:

> The Chief Executive and the Chief Financial Officer concluded that, as of the end of the period covered by this report, the design and operation of the Group's controls and procedures were effective, in all material respects, to ensure that information required to be disclosed in the reports the Group files and submits under the Exchange Act is recorded, processed, summarized and reported as and when required.  (2006 Annual Report, page 229)

Additionally in the Company's 20-F filing Grübel and Fassbind filed SOX certifications asserting:

> 1.  I have reviewed this annual report on Form 20-F of Credit Suisse Group;
>
> 2.  Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this report;
>
> 3.  Based on my knowledge, *the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant* as of, and for, the periods presented in this report;
>
> 4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and *we have*:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) *designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting practices*;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the periods covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrants internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is likely to materially affect, the registrants internal control over financial reporting.

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

331.    The 2006 certifications were false and misleading as Credit Suisse's financial reporting was misstated and its internal controls were circumvented by at least two employees that defrauded clients and caused the financial statements for the year ended December 31, 2006 to fail to accrue a material liability and expense in accordance with FAS 5 for the amounts that Credit Suisse would ultimately have to return to clients, including additional possible damages

189

that could ensue, as clients became aware of the fraud and sought arbitration and/or judicial relief. Alternatively, even if Credit Suisse was not able to reasonably determine a portion or all of the potential liability, it failed to disclose the exposure and the possible extent of liability, or that it was unable to estimate the liability, in its notes to the financial statements.

332.    Incredibly, Defendants Dougan and Fassbind made the same bold assertions regarding the design and effectiveness of Credit Suisse's internal controls in their 2007 Annual Report certifications even in light of their knowledge, obtained during the summer of 2007, that clients were then pursuing legal action to recover monies lost as a result of the aforementioned fraudulent scheme. Additionally, Credit Suisse's lauded internal controls had also failed to detect mis-marking errors for many of its securities that were carried at fair value at December 31, 2007. These mis-marking errors were the result of a massive breakdown of internal controls, including an incentive compensation system that rewarded excessive asset valuations, and thus circumventing internal controls. The inadequacy of these internal controls was so severe that the UK Regulatory Agency fined Credit Suisse £5.6 million.

333.    Additionally, the Company's disclosure controls and procedures, and internal control over financial reporting were not effective throughout the Class Period, as the Defendants caused the Company to issue the relevant financial statements that were materially misstated with respect to the valuation and disclosure of the Company's exposure concentrated in subprime-related securities. As a result of the Company's failure to maintain effective disclosure controls and procedures and internal control over financial reporting, the Defendants were not only able to delay recognizing material losses on its subprime-related securities, but permitted them to falsely report that their sub-prime exposures were "remote" and "de minimis," and thus fail to make transparent disclosures, all in violation of GAAP. The Company's true financial

190

condition and results of operations were only further masked with false reassurances that the Company had an effective risk management process and adequate disclosures. But for the disclosures forced by KPMG on February 19, 2008, these GAAP violations would have resulted in the payment of millions of dollars of excessive compensation to the Individual Defendants.

334. In addition, statements made regarding, generally, the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting, and more specifically, but not exclusively, the identification, measurement, monitoring, management, and disclosure of risk, as described herein, were materially false and misleading for the reasons set forth above.

## VIII.  PLAINTIFFS' CLASS ACTION ALLEGATIONS

335. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Credit Suisse securities, including ADRs, between February 15, 2007 and April 14, 2008, inclusive, and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

336. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Credit Suisse securities were actively traded on the SWX and the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Credit Suisse or its transfer agent and may be notified of

191

the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

337. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.

338. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

339. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial performance, operations and management of Credit Suisse; and

c. to what extent the members of the Class have sustained damages and the proper measure of damages.

340. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX. LOSS CAUSATION/ECONOMIC DAMAGES

341.    Defendants' false and misleading statements and omissions had the intended effect and caused Credit Suisse securities to trade at artificially inflated levels throughout the Class Period.

342.    As described in ¶¶ 263 to 290, the decline in the price of Credit Suisse securities beginning on November 1, 2007 was the direct result of the leakage of the truth and the public unraveling of Defendants' fraud as the truth was disclosed and was absorbed by the market. Each of these described stock price declines were statistically significant, and were compared to the relevant market of Credit Suisse's peers, appropriately adjusted, to assure that the declines were attributable to discovery of the truth about Credit Suisse's false and misleading statements and omissions rather than other market events or disclosures about Credit Suisse that were unrelated to the fraud alleged in this complaint. As such, these Credit Suisse price declines negate any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE FRAUD-ON-THE-MARKET DOCTRINE

343.    At all relevant times, the market for Credit Suisse securities was an efficient market, for the following reasons, among others:

d.    Credit Suisse met the requirements for listing, and was listed and actively traded on the SWX and NYSE, a highly efficient and automated market;

e.    As a regulated issuer, Credit Suisse filed periodic public reports with the SEC and its other regulators; and

f.    Defendants regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on

193

the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services. Copies of Credit Suisse's quarterly financial and annual reports, and related financial performance slides were posted on the Company's website.

344. As a result of the foregoing, the market for Credit Suisse securities promptly assimilated current information regarding Credit Suisse from all publicly available sources and the assimilation of this information is reflected in the price of Credit Suisse shares and ADRs. Under these circumstances, all persons who purchased or acquired the securities of Credit Suisse during the Class Period suffered similar injury through their purchase of the aforementioned securities at artificially inflated prices and a presumption of reliance applies.

## XI.   NO SAFE HARBOR

345. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by executive officer(s) of Credit Suisse who knew that those statements were false when made.

## XII.   SCIENTER

194

346.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Each of the individual Defendants personally made material false and misleading statements or omitted material information when speaking about Credit Suisse's financial performance, prospects, internal controls and/or risk management and either made the statements with knowledge of their falsity, or were reckless in not assuring their truthfulness.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Credit Suisse, their control over, and/or receipt and/or modification of Credit Suisse's materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Credit Suisse, participated in the fraudulent scheme alleged herein.

347.    Throughout the Class Period, the Individual Defendants were motivated to conceal material facts from investors because the majority of their compensation depended on the reported performance of Credit Suisse and the reported fair values of its securities, as provided in ¶¶ 177-93.

## FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

348.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

349.    During the Class Period, Defendants carried out a plan, scheme and course of

195

conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Credit Suisse's securities at artificially inflated prices and to suffer losses when the truth was revealed and the price of the Company's ADRs dropped. In furtherance of this unlawful scheme, plan and course of conduct, defendants took the actions set forth herein.

350.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Credit Suisse's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

351.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to make false statements and/or conceal adverse material information about Credit Suisse's earnings and performance, as specified herein.

352.    The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Credit Suisse's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Credit Suisse and its performance and future prospects

196

in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Credit Suisse's securities during the Class Period.

353.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

354.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Credit Suisse's financial performance and risk profile from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and misstatements of the Company's financial

197

performance, financial condition, risks and internal controls throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading. This is particularly true with respect to the false and misleading assurances which each Defendant made to the market in their conference calls with analysts.

355.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Credit Suisse's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Credit Suisse's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Credit Suisse's securities during the Class Period at artificially high prices and were damaged thereby.

356.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Credit Suisse's actual financial performance and risk profile, which was not disclosed by defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Credit Suisse securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

357.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange

Act and Rule 10b-5 promulgated thereunder.

358. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

359. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

360. The Individual Defendants acted as controlling persons of Credit Suisse within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.

361. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

362. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

199

363. As set forth above, Credit Suisse and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Fed.R.Civ.P. 23;

B. Awarding Plaintiffs and other members of the Class compensatory damages;

C. Awarding Plaintiffs and other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements;

D. Awarding Plaintiffs and other members of the Class any other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: October 20, 2008

Respectfully submitted,
SCOTT + SCOTT LLP

By
BETH A. KASWAN
29 West 57th Street, 14th Floor
New York, NY 10019
Tel: (212) 223-6444
Fax: (212) 223-6334
bkaswan@scott-scott.com

David R. Scott
108 Norwich Avenue
PO Box 192
Colchester, CT 06415

200

Tel: (860) 537-5537
Fax: (860) 537-4432
drscott@scott-scott.com

Arthur L. Shingler III
Hal D. Cunningham
600 B Street, Suite 1500
San Diego, California 92101
Tel.: (619) 233-4565
Fax: (619) 233-0508
ashingler@scott-scott.com
hcunningham@scott-scott.com

Samuel H. Rudman
David A. Rosenfeld
Coughlin Stoia Geller Rudman & Robbins LLP
52 Duane Street, 7th Floor
New York, NY 10007
Tel.: (212) 693-1058
Fax: (212) 693-7423
SRudman@csgrr.com
DRosenfeld@csgrr.com

David C. Walton
Darren J. Robbins
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel.: (619) 231-1058
Fax: (619) 231-7423
davew@csgrr.com
drobbins@csgrr.com

Deborah R. Gross
Law Offices of Bernard M. Gross, P.C.
Wanamaker Building, Suite 450
100 Penn Square East
Philadelphia, PA 19107
Tel: (215) 561-3600
Fax: (215) 561-3000
Debbie@bernardmgross.com

William H. Narwold (WN-1713)
Motley Rice LLC
One Corporate Center
20 Church Street, 17th Floor

201

Hartford, CT  06102
Tel: (860) 882-1676
Fax: (860) 882-1682
bnarwold@motleyrice.com

Joseph F. Rice
Motley Rice LLC
28 Bridgeside Boulevard
Mount Pleasant, SC  29464
Tel: (843) 216-9000
Fax: (843) 216-9450
jrice@motleyrice.com

Christopher J. Keller
Labaton Sucharow LLP
140 Broadway
New York, NY  10005
Tel: (212) 907-0853
Fax: (212) 883-7053
ckeller@labaton.com

*Attorneys for Plaintiffs*

202

## CERTIFICATE OF SERVICE

I hereby certify that a true and complete copy of the foregoing Amended Complaint for

Violation of the Federal Securities Laws was served this 20th day of October, 2008, upon the

following parties via Regular U.S. Mail and e-mail:

Richard W. Clary
Julie A. North
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019

*Attorneys for Defendants Credit Suisse Group and Brady W. Dougan*

Beth A. Kaswan
SCOTT + SCOTT LLP
29 West 57th Street, 14th Floor
New York, NY  10019
Tel:  (212) 223-6444
Fax: (212) 223-6334

*Attorney for Plaintiffs*

203

## PLAINTIFF'S CERTIFICATION
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned, Dr. Franz Gschiegl and Mag. Winfried Buchbauer, on behalf of ERSTE-SPARINVEST Kapitalanlagegesellschaft m.b.H. ("ERSTE-SPARINVEST"), for account of the funds listed in Schedule A (the "Funds"), declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1. We have reviewed a complaint against Credit Suisse Group ("CS") and designate Motley Rice LLC as proposed lead counsel for ERSTE-SPARINVEST in this action for all purposes.

2. We are duly authorized to institute legal action on ERSTE-SPARINVEST's and the Funds' behalf, including litigation against CS and the other defendants. ERSTE-SPARINVEST controls and manages and is attorney-in-fact for the Funds.

3. ERSTE-SPARINVEST did not acquire CS securities at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

4. ERSTE-SPARINVEST is willing to serve as a lead plaintiff and understands that a lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial. ERSTE-SPARINVEST also understands that, if appointed Lead Plaintiff in this action, it will be subject to the jurisdiction of the Court and will be bound by all rulings by the Court, including rulings regarding any judgments.

5. ERSTE-SPARINVEST will not accept any payment for serving as a representative party beyond its pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law.

6. Within the past three years, ERSTE-SPARINVEST has sought to serve as a representative party for a class in an action under the federal securities laws in the following cases:

*In Re: General Motors Securities Litigation,* No. 05-cv-8088 (S.D.N.Y. 2005);
*Rosen v. General Motors Corporation et al.,* No. 05-cv-60290 (E.D. Mich. 2005);
(The motions in the GM actions relate to parallel proceedings stemming from the same litigation filed in two districts. The consolidated class action is now proceeding as *In Re: General Motors Corporation Securities & Derivative Litigation,* 2:06-md-01749-GER (E.D. Mich. 2006);
*In Re: UnitedHealth Group Inc. PSLRA Litigation,* No. 06-cv-01691 (D. Minn. 2006);
*In Re: Juniper Securities Litigation,* 06-cv-04327 (N.D. Cal. 2006);
*Weissmann v. Par Pharmaceutical Companies, Inc.,* 06-cv-03226 (D.N.J. 2006);
*In Re: Telik Inc. Securities Litigation,* Case No: 1:07-cv-04819-CM (S.D.N.Y. 2007);
*In Re: UBS AG Securities Litigation,* Case No: 1:07-cv-11225 (S.D.N.Y. 2007).

7. Within the past three years, ERSTE-SPARINVEST has not served as a representative party for a class in an action under the federal securities laws.

8. ERSTE-SPARINVEST understands that this is not a claim form, and that its ability to share in any recovery as a member of the class is unaffected by its decision to serve as a representative party.

9. Attached hereto as Schedule A is a complete listing of all transactions ERSTE-SPARINVEST made on behalf of the Funds during the Class Period in the security that is the subject of the complaint. ERSTE-SPARINVEST will provide records of those transactions upon request.

10. ERSTE-SPARINVEST is also represented and counseled in this matter by its attorney, Deborah M. Sturman of Sturman LLC.

**We declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct**

Executed this 13th day of October 2008

ERSTE-SPARINVEST Kapitalanlagegesellschaft m.b.H.


_____                    _____
**Dr. Franz Gschiegl**                        **Mag. Winfried Buchbauer**
**Managing Director**                         **Legal Counsel**

**Credit Suisse (SWX: CSGN VX)**
Class Period: 04/30/07 - 02/29/08

**SCHEDULE A**

| ERSTE-SPARINVEST | DATE | SHARES | PRICE (CHF) |
|---|---|---|---|
| **ADVISORY EMERGING OPPORTUNITIES (EB032)** | | | |
| Purchases: | 01/10/08 | 10,000 | 63.05 |
| Sales: | 01/24/08 | 10,000 | 59.58 |
| **ESPA STOCK EUROPE (EB832)** | | | |
| Purchases: | 04/26/07 | 182,279 | 95.05 |
| Sales: | 06/21/07 | 5,788 | 90.75 |
| | 08/16/08 | 7,059 | 77.15 |
| | 09/19/07 | 3,285 | 79.65 |
| | 11/20/07 | 5,997 | 64.40 |
| | 12/12/07 | 3,374 | 71.80 |
| | 12/14/07 | 14,577 | 69.49 |
| | 01/23/08 | 5,156 | 54.55 |
| **ESPA STOCK EUROPE-ACTIVE (EB962)** | | | |
| Purchases: | 01/03/08 | 38,000 | 66.40 |
| **ESPA STOCK FINANCE (EB965)** | | | |
| Purchases: | 12/21/07 | 1,000 | 68.50 |
| | 01/03/08 | 2,000 | 66.40 |
| **XT EUROPA (EB706)** | | | |
| Purchases: | 05/21/07 | 5,728 | 93.09 |
| | 06/20/07 | 3,237 | 92.55 |
| | 07/20/07 | 5,860 | 85.55 |
| | 08/31/07 | 4,363 | 79.61 |
| | 11/06/07 | 7,170 | 71.05 |
| Sales: | 09/04/07 | 3,813 | 81.07 |
| | 10/08/07 | 1,734 | 81.57 |
| | 01/09/08 | 2,681 | 62.51 |
| | 02/05/08 | 6,743 | 59.60 |
| | 02/19/08 | 4,858 | 53.15 |

## CERTIFICATION

I, Colm o'Brien, as Fund Manager of the Irish Life

Investment Managers Limited ("Irish Life"), hereby certify as follows:

1. I am fully authorized to enter into and execute this Certification on behalf of Irish Life. I have reviewed the complaint filed against Credit Suisse Group ("Credit Suisse") alleging violations of the federal securities laws;

2. Irish Life did not purchase the securities at the direction of counsel or in order to participate in any private action under the federal securities laws;

3. Irish Life is willing to serve as a class representative in this matter, including providing testimony at deposition and trial, if necessary;

4. Irish Life's transactions in Credit Suisse during the class period are reflected in Exhibit A, attached hereto;

5. Irish Life has not sought to serve as a lead plaintiff or class representative in any class action under the federal securities laws during the last three years preceding the date of this certification;

6. Beyond the pro rata share of any recovery, Irish Life will not accept payment for serving as a class representative on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 3 day of October, 2008.

_____
[NAME] Colm O' Brien
[TITLE] Fund Manager
Irish Life Investment Managers Limited

## EXHIBIT A

## TRANSACTIONS IN
## CREDIT SUISSE GROUP

| ACCOUNT NUMBER | TRANSACTION TYPE | DATE | NO. OF SHARES | PRICE | COST/ PROCEEDS | Currency |
|---|---|---|---|---|---|---|
| IPAIEN | Purchase | 3/2/2007 | 3,674.00 | 85.08 | -312583.92 | CHF |
| IPAIEN | Purchase | 3/13/2007 | 384 | 87.53 | -33611.52 | CHF |
| IPAIEN | Purchase | 3/13/2007 | 1,541.00 | 87.53 | -134883.73 | CHF |
| IPAIEN | Purchase | 3/15/2007 | 40,460.00 | 82.12 | -3322575.2 | CHF |
| IPAIEN | Purchase | 3/16/2007 | 2,412.00 | 84.58 | -204006.96 | CHF |
| IPAIEN | Purchase | 3/26/2007 | 20,103.00 | 91.24 | -1834197.72 | CHF |
| IPAIEN | Purchase | 3/27/2007 | 1,955.00 | 89.38 | -174737.9 | CHF |
| IPAIEN | Sale | 3/30/2007 | -300 | 87.33 | 26199 | CHF |
| IPAIEN | Purchase | 4/12/2007 | 2,213.00 | 88.68 | -196248.84 | CHF |
| IPAIEN | Sale | 4/24/2007 | -350 | 92.49 | 32371.5 | CHF |
| IPAIEN | Sale | 5/22/2007 | -9,000.00 | 92.54 | 832860 | CHF |
| IPAIEN | Purchase | 6/11/2007 | 14,195.00 | 89.4 | -1269033 | CHF |
| IPAIEN | Purchase | 6/28/2007 | 7,085.00 | 86.63 | -613773.55 | CHF |
| IPAIEN | Purchase | 7/20/2007 | 817 | 86.83 | -70940.11 | CHF |
| IPAIEN | Purchase | 9/28/2007 | 300 | 77.42 | -23226 | CHF |
| IPAIEN | Sale | 11/23/2007 | -20,000.00 | 62.95 | 1259000 | CHF |
| IPAIEN | Purchase | 11/29/2007 | 800 | 67.4 | -53920 | CHF |
| IPAIEN | Purchase | 11/29/2007 | 300 | 67.4 | -20220 | CHF |
| IPAIEN | Purchase | 12/7/2007 | 17,500.00 | 69.8 | -1221500 | CHF |
| IPAIEN | Purchase | 12/17/2007 | 1,463.00 | 70.05 | -102483.15 | CHF |
| IPAIEN | Purchase | 12/17/2007 | 2,318.00 | 70.05 | -162375.9 | CHF |
| IPAIEN | Purchase | 12/17/2007 | 2,061.00 | 70.05 | -144373.05 | CHF |
| IPAIEN | Purchase | 12/17/2007 | 1,539.00 | 70.05 | -107806.95 | CHF |
| IPAIEN | Sale | 1/24/2008 | -4,088.00 | 59.69 | 244012.72 | CHF |
| IPAIEN | Sale | 1/24/2008 | -9,885.00 | 59.69 | 590035.65 | CHF |
| IPAIEN | Purchase | 1/25/2008 | 10,980.00 | 59.69 | -655396.2 | CHF |
| IPAIEN | Purchase | 1/25/2008 | 3,058.00 | 59.69 | -182532.02 | CHF |
| IPAIEN | Purchase | 2/25/2008 | 18,500.00 | 53 | -980500 | CHF |
| IPAIEN | Purchase | 2/26/2008 | 1,172.00 | 53.08 | -62209.76 | CHF |
| IPAIEN | Purchase | 3/11/2008 | 1,057.00 | 47.91 | -50640.87 | CHF |
| IPAIEN | Purchase | 3/12/2008 | 1,678.00 | 49.83 | -83614.74 | CHF |
| IPAIEN | Purchase | 3/20/2008 | 2,618.00 | 51.88 | -135821.84 | CHF |
| IPAIEN | Sale | 4/2/2008 | -318 | 57.79 | 18377.22 | CHF |

| ACCOUNT NUMBER | TRANSACTION TYPE | DATE | NO. OF SHARES | PRICE | COST/ PROCEEDS | Currency |
|---|---|---|---|---|---|---|
| IPSRE | Purchase | 3/6/2007 | 400 | 84.35 | -33740 | CHF |
| IPSRE | Purchase | 3/15/2007 | 300 | 84.45 | -25335 | CHF |